UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

WAVE 3 LEARNING, INC., a Nevada
corporation

OCT 1 2 2016

|

Plaintiff |

| 16-cv-5643 THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

v. |

|

AVKO EDUCATIONAL RESEARCH | Judge James B. Zagel
FOUNDATION, INC., a Michigan |
501(C)3 nonprofit corporation and |
Donald J. McCabe |

|

Defendant |

---

**DEFENDANT'S REPLY TO PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant Donald J. McCabe, President of the AVKO Educational Research

Foundation, Inc. (AVKO), respectfully submits this reply to Plaintiff's complaint.

**NATURE OF THE ACTION**

1.     There **is no** breach of contract, nor breach of an implied covenant of good faith and

fair dealing, nor unjust enrichment, nor tortious interference with a business

expectancy. All those claims by Wave 3 Learning, Inc. (Wave 3), even if they were

at one time to have been true, were satisfied by AVKO's total compliance with the

PRELIMINARY INJUNCTION ORDER granted by the Court on August 15, 2016.

Consequently, this is a malicious and frivolous legal action by Wave 3 Learning, Inc.

(Wave 3) orchestrated by Thomas A. Morrow (Morrow) that is designed to bankrupt

both the non-profit 501(C)3 AVKO and myself personally. The malicious motive is

apparent once the history of the relationship between Thomas Morrow and AVKO is

understood. The frivolous nature of the motion is equally apparent, as Morrow has

achieved his main goal of bankrupting both AVKO and myself. **See Exhibit A**.

From the beginning of the AVKO/Morrow relationship in 2009, Morrow has attempted to get the copyrights to the materials I personally developed without having to pay anything for them beyond the $50,000 he paid AVKO on June 4, 2010. This $50,000 that he paid was on behalf of Home School Holdings, Inc. (HSH) in Morrow's capacity of President and CEO of HSH and its major stockholder. On July 9, 2011, Morrow told my grandson Brian McCabe that unless I signed the Copyright and Trademark Assignment he was willing to not only destroy AVKO but my personal estate as well. **See Exhibit A**. It appears that he has already accomplished both goals as AVKO is bankrupt and so am I. **See Exhibit L**. Thus, he knows he can claim with impunity the copyrights of the instructional materials I have written without having any legal opposition from either AVKO or myself and so he has.

## JURISDICTION AND VENUE

2. I agree with Plaintiff on jurisdiction.
3. I have no problem with the reasoning given.

## PARTIES

4. Agreed. The address is correct.

5. Defendant AVKO Educational Research Foundation, Inc. is a **501(c)3 nonprofit membership** organization with its principal place of operations (only part of which is publishing)[1] is located at 3084 Willard Road, Birch Run, Michigan 48415.

6. Agreed. Address is correct.

---

[1] Of more importance than the publishing aspect, AVKO's mission consists of giving free daily tutoring, free tutor training, maintenance of the Bernice Webb Memorial Library open to the public, and research into the causes of the reading and spelling problems associated with dyslexia, as well as discovering new methods for teaching and developing effective materials to implement them and effective methods of disseminating the methods and materials, hence the licensing of Wave 3 Learning, Inc and JJH Publishing..

## BACKGROUND

7. After five years of litigation in four different courts in which Wave 3 and its attorneys unsuccessfully tried to appropriate AVKO's copyrights, Thomas Morrow for Wave 3 and I for AVKO signed a settlement agreement on February 24, 2016. See **Exhibit B**. The agreement was **not** mutually beneficial. In that agreement AVKO did grant an exclusive license but not to AVKO's *Sequential Spelling 1-7* but to the *Wave 3 Revised Edition Sequential Spelling Teacher Editions 1-7*. See **Exhibit M** in which Plaintiff clearly identifies the revised versions of Sequential Spelling as the ones that AVKO granted an exclusive license to sell. This was the basis for making title and cover art changes to distinguish Wave 3's derivative version to which AVKO granted a license from AVKO's classic version.

As AVKO could not afford new attorneys and AVKO's former attorneys Brian Noack and Adam Wolek (WONO) refused to continue representing **AVKO and me** unless all the money they claim are owed them (over $100,000.00) were paid in full, the Court had no option but to accept the word of Wave 3's attorneys as to what was agreed upon in the February 23, 2016 Settlement Agreement. Although I recognize the legal position the Court was put in, I also note that the deliberate withholding from me (and AVKO) of the knowledge of the sealed initial complaint by both Wave 3's attorneys and AVKO's attorneys was most probably of malicious intent on the part of both sets of attorneys.

8. At the age of 83, on February 24, 2016 after having had only three hours of sleep the night before and having been up since 2:00 am without any rest and without proper meals, I attended a lengthy settlement conference mediated by Magistrate Judge Sheila Finnegan. Around 8:00 I told Judge Finnegan, I was exhausted and asked if it were possible to adjourn to a later date. At that point, my eyes were watering. But she (or my attorneys) assured me that a delay was not possible. At around 10:00 p.m. as the

snowstorm was already in progress, I reluctantly signed the settlement agreement without having had ample time to examine it nor being in the proper mental state due to lack of sleep and nutrition. I signed mainly because Judge Finnegan and AVKO's attorneys Brian Noack and Adam Wolek repeatedly told me that **Wave 3 did not have any more money to continue the litigation** and the settlement as written was the best AVKO could possibly expect to get for the damages caused by Wave 3 that had been estimated by Epsilon Economics as being well over one million dollars. That Wave 3's contention that it could not have afforded more is obviously untrue inasmuch as Wave 3 has continued the litigation.

## DENIAL OF ANY BAD FAITH ATTEMPT TO UNDO THE SETTLEMENT AGREEMENT

9. Since February 24, 2016, on behalf of AVKO I have attempted **not to undo** but rather **to correct obvious deficiencies and ambiguities** through negotiation (**See Exhibit C**). Wave 3, however, would not negotiate. However, Plaintiff and AVKO's attorneys **WITHOUT AUTHORIZATION FROM AVKO** did"undo" part of the agreement by making an amendment to the agreement. It also should be noted that according to an Email and a letter from AVKO's attorney Brian Noack this action took place on February 25, 2016 (Less than twenty-four hours after the Settlement was signed) but notification to AVKO of the **unauthorized** change to the settlement agreement did not place until **July 8,** 2016! (See **AVKO Exhibit D**). This is definitely a bad faith undoing of part of the settlement agreement **initiated by Wave 3** as well as self-serving malpractice by AVKO's counsel Noack and Wolek. I and the majority of the AVKO's board of directors wanted me to negotiate with Wave 3 and to correct the obvious deficiencies in the Settlement Agreement. See **AVKO Exhibit C**.

10. In paragraph 10 of Wave 3's complaint, Wave 3 asserts without any evidence whatsoever, that I "unreasonably denied approval of Wave 3's revised versions of Sequential Spelling Level 1 and 2. What happened is that Dahlia Saper without approval from either AVKO or its attorneys unilaterally gave the protocol terms to Jerry Bailey[2] upon which he was to make his decision. She instructed Baily that **if** he determined that Wave 3's changes were reasonable AVKO **must** accept them. It should have been "IF AVKO'S OBJECTIONS ARE REASONABLE Wave 3 must comply." This is the meaning of "not unreasonably withheld" as it is written in the settlement agreement. Attorney Saper knew that this was AVKO's position. Yet, she unilaterally, as if she were the judge interpreted the terms of the Settlement Agreement to favor Wave 3. Here Plaintiff's attorney **clearly managed to undo part of the agreement**. AVKO's objections to the changes were reasonable objections--not unreasonable. Just because a change may be reasonable does not mean an objection to the change is unreasonable. There is room for judgment. If both sides have a reason for their position, then as the settlement was written AVKO's objections should stand. But, that is not the directions given by Wave 3 to Jerry Bailey whose decision AVKO was bound by. On page 8 paragraph 27 in **Wave 3's First Amended Complaint** under **Undermining the Approval Process**, Wave 3 disparages me and AVKO by deliberately referring to my objection to the "deletion of the outdated and offensive word 'negro' (sic)." As the word *Negro* is always to be capitalized. I strongly believe it is important for a teacher (as well as Thomas Morrow and his attorneys) to know the correct spelling of *Negro*. My instructions clearly stated that if that word (or any other word) were to appear to be offensive to the teacher, the teacher should omit the word. The remainder of Wave 3's

---

[2] The person whose name was drawn following the terms of The Settlement Agreement to be the arbitrator of a dispute between Wave 3 and AVKO regarding changes in Sequential Spelling. **Mr. Bailey** also happens to be the owner of Dynamic Literacy, which is **prominently featured on Wave 3's Website**. I do not believe in coincidences. As I was not there to observe the drawing nor was any representative of AVKO, I have only the word of Wave 3 that it occurred.

accusations of my attempts to "undermine" the approval process is without merit. The fact is, Thomas Morrow has never submitted all the materials for AVKO's approval. That, of course, is a **material breach by Wave 3 of the Settlement Agreement**. See **Exhibit H** for latest email exchange regarding approval of Wave 3's online version which is now available on its website in clear violation of the terms of the Settlement Agreement.

11. In **Wave 3's First Amended Complaint** on page 10 under **AVKO Sold Sequential Spelling Level 1-7 Material to Distributors in Direct Violation of the Settlement Agreement** paragraphs 38, 39, and 40 are clearly irrelevant as AVKO **is not** selling to distributors nor to any individuals as we are in compliance with the Court's order. In fact, we couldn't even if we wanted to. AVKO's entire inventory of Sequential Spelling was shipped, at AVKO's expense, to Wave 3 as per the order of the Court.

12. Attorney Saper claims that I "attempted to force Wave 3 to agree to a nonexclusive license to the Sequential Spelling material…" There is a world of different between attempting to "force" and attempting to convince with reasonable arguments that there was more than one way of eliminating the problems inherent in the very faulty agreement.

13. It is true that I tried to explain to Mr. Morrow that as being only the co-owner of the copyrights to the DVD versions of Sequential Spelling, AVKO "could not cede, sell, or transfer that which is not wholly its to give." That was NOT an attempt to undermine the agreement, but rather an effort to convince Mr. Morrow that the Settlement Agreement needed to have its problems rectified through negotiation. I am certain that any attorney can find numerous cases to cite that one co-owner of "X" cannot sell or give away all of "X" away to a third party. **See Exhibit C**. For citations of co-owned copyright rights see **Exhibit J**.

Yet, Wave 3 claims that the Settlement Agreement gave all of "X" (the copyrights to the DVD versions of Sequential Spelling) to them and leaves the co-owner of X (Instructional Media Innovations) with nothing.

14. Agreed. Please do read Wave 3's Exhibit B pages 5-6.

15. In paragraph 15, Plaintiff claims "Relying on his own legal theory (a theory he did not run by AVKO's lawyers..." Even if it were to be true (it isn't) just how would Plaintiff know I did not run it by my lawyers (and AVKO's) without a serious breach of lawyer/client confidentiality? No, those emails of mine were attempts to solve through negotiation the problems created by four attorneys working under the pressure of time as a snow storm was beginning to hit Chicago on February 24, 2016.

16. In Plaintiff's paragraph 16, the claim is made that I knew and understood that that the Settlement Agreement granted "Wave 3 an exclusive license to Sequential Spelling Levels 1-7 and their derivatives. This grant includes AVKO's "classic" editions of the Teacher's Guides and Student Workbooks, as well as Wave 3's approved revised versions and all future approved derivative works." Plaintiff makes this claim despite the fact that the words **"classic" editions** do not appear anywhere in the Agreement. Plaintiff makes this claim despite the wording created by their attorneys, that is: "**Materials at Issue** AVKO shall grant and hereby grants an exclusive license in the United States and Canada, and a worldwide nonexclusive license to the **below titles** and their derivatives (collectively "Sequential Spelling") (emphasis added) No mention of DVD's is in the agreement. Plaintiff's attorney mentions this in an email to Thomas Morrow which was in turn sent to Joe Hipps co-owner of IMI the co-owner of the Sequential Spelling DVDs. Matt Grothouse apparently did not bother to check on the copyright rights of a co-owner of copyrights but rather asked Thomas Morrow as to what his understanding was and if he considered the DVD's (co-copyrighted in 2008 three years prior to Wave 3's

existence) were derivatives of Wave 3's Revised Editions of Sequential Spelling. See **Exhibit G**.

Sequential Spelling Level 1 Teacher Guide

Sequential Spelling Level 2 Teacher Guide

Sequential Spelling Level 3 Teacher Guide

Sequential Spelling Level 4 Teacher Guide

Sequential Spelling Level 5 Teacher Guide

Sequential Spelling Level 6 Teacher guide

Sequential Spelling Level 7 Teacher Guide

Sequential Spelling Level 1 Student Response Book

Sequential Spelling Level 2 Student Response Book

Sequential Spelling Level 3 Student Response Book

Sequential Spelling Level 4 Student Response Book

Sequential Spelling Level 5 Student Response Book

Sequential Spelling Level 6 Student Response Book

Sequential Spelling Level 7 Student Response Book

These titles are the titles of the Wave 3 Revised Editions. The original series which I wrote did not have in any of its titles the words "Teacher Edition." It was either Wave 3's attorneys or Mr. Morrow himself who insisted on listing the separate Student Response Books and Teacher Editions as the **Materials at Issue**. I make that assertion because my attorneys (and AVKO's) were in possession of AVKO's *Sequential Spelling 1, 2, 3, 4, 5, 6* and *7*. And, I might add, our former attorneys still are in possession of these and other books and possessions of AVKO's that they have yet to return to AVKO despite my repeated requests.

17. In the Plaintiff's paragraph 17, I am accused of "unreasonably" denying approval of Wave 3's Student Workbooks. As the student workbooks "borrowed heavily" (technically infringing) from two separate AVKO copyrighted publications, I would have been derelict in my duties as AVKO President to just give approval without Wave 3 first asking for permission (standard in the publishing business) to use materials out of the Engaging Language Kits. And it should be noted that **Wave 3 violated the Agreement** by not sending copies of each of these books for approval or any for that matter. And **Plaintiff** is still in **violation** of the **first paragraph 10 "Right of Review"** on page 4 (as opposed to the second paragraph 10 on p. 6) of the **Settlement Agreement**. It says, "Wave 3 shall submit all of its existing Sequential Spelling materials to AVKO for approval prior to printing or publishing any new materials." Wave 3 has not submitted even one of its books, let alone **all**.

18. **In Wave 3's Complaint** on page 11 under **Refusing to Pay Wave 3 its Royalties** paragraph 43 the Plaintiff contends that "AVKO's payment to Wave 3 of 50% of gross profits from the aforementioned sales, however, was not conditioned upon Wave 3's fulfillment of the four $25,000 payments over four years." What the Plaintiff does not mention is that in the Settlement Agreement there is **no conditioning** upon **when** the aforementioned royalties must be paid. One of many faults in the Settlement Agreement that needed to be corrected. However, the whole point is moot. Despite my objection to the Court that AVKO shouldn't have to pay the amount immediately, the Court ruled that AVKO had to pay. And AVKO gave an accurate accounting and paid the Plaintiff. The Plaintiff also incorrectly claims that "The purpose of the Settlement Agreement was to provide clarity in the marketplace and to establish Wave 3 as the exclusive source of Sequential Spelling. No! That was not the case. The Plaintiff should read the Settlement Agreement. The **real purpose** of the settlement was to **end the ongoing litigation**

which Wave 3 claimed they could no longer afford doing. AVKO's attorneys presented an evaluation by an independent firm Epsilon Economics[3] that showed the litigation had cost AVKO well over $1,000,000 in damages. After extensive questioning regarding Wave 3's financial situation, both AVKO's attorneys Brian Noack and Adam Wolek along with Judge Sheila Finnegan convinced me that all Wave 3 could afford was $100,000 to be paid over four years but with no down payment until June 1, 2016. It should be noted that shortly afterwards, Thomas Morrow in an email to his distributors claimed Wave 3 was soon going to spend $75,000 in promoting Sequential Spelling.

**19. In Wave 3's First Amended Complaint** on page 15 under **Count I Breach of Contract** in paragraph 58 the Plaintiff contends it has kept "…confidential the terms of the Settlement Agreement not necessary to exercise its rights granted under the Settlement Agreement and (5) refraining from disparaging AVKO." **Not true in either case. See Exhibit N Wave 3's website!**

20.  Under **Count 1 Breach of Contract** in paragraph 59 the Plaintiff claims AVKO committed the material breach of contract by selling Sequential Spelling 1-7 to distributors after February 24, 2016. There is within the agreement a clause allowing this to occur until Wave 3 has their versions ready for sale and approved for sale. And to the best of our knowledge, it still hasn't. But again, the argument is moot. The Plaintiff has been paid its 50% of the gross profits on these remarkably few sales as per the Court's order. There is also a small sticking point that AVKO wanted corrected. For a contract to be a contract there must be some consideration not just a promise of a consideration. Part of the consideration was not paid until just days before June 1, 2016. Also in that same paragraph the Plaintiff accuses AVKO of violating the non-disparaging clause through its communications with Inquisicorp. That accusation in itself is disparaging. AVKO

---

[3] This evaluation cost AVKO $9,600.00. AVKO's attorneys Noack and Wolek have refused to release the evaluation document to AVKO as well as a complete set of the AVKO materials and copies of Wave 3's revised versions of Sequential Spelling the attorneys purchased and billed AVKO for.

would like to know what the Plaintiff believes occurred in the aforementioned communications and what proof it has for such a disparaging accusation.

21. Under **Count I Breach of Contract** on page 16, paragraph 60 (a) Plaintiff asks for an "injunction ordering AVKO to stop selling Sequential Spelling Levels 1-7 material to distributors…." Such an injunction is unnecessary as AVKO is not selling Sequential Spelling to anyone. Under my personal direction AVKO has complied with the Court's order that all AVKO's inventory of Sequential Spelling be shipped to the Plaintiff. It has no inventory to sell nor does it have the money or credit with which to restock. AVKO under my direction followed the Court's order to the letter which commanded AVKO to "terminate **all** licenses" to publish Sequential Spelling 1-7." AVKO followed The Court's order. On behalf of AVKO I sent emails officially terminating the only two licenses that had been issued by AVKO, one to the previously mentioned JJH Publishing and the other to *Wave 3 Learning*. JJH Publishing accepted the termination. Wave 3 did not. Wave 3 has claimed that **the Settlement Agreement does not allow a federal judge to have the authority to order the termination of its license.** Not being an expert in the law, but being somewhat proficient in understanding the English language, I merely followed the Court's ruling to the letter. I did not then and do not believe today that the Court cannot override a provision in a settlement agreement. The Court already has done so in this very case. The Settlement Agreement gave AVKO the right to sell Sequential Spelling to individuals. The Court has ruled otherwise and we have abided by the Court's decision. AVKO no longer sells Sequential Spelling period or the DVD's to which AVKO and IMI co-own the copyrights. I do not believe Ms. Saper has the authority to tell the Court what provisions in the Settlement the Court can and cannot revoke.

22. On page 14 in paragraph 50, Plaintiff admits to usurping the power of the Court by telling me exactly what I must write, word for word, to be in compliance with the Court's order and stating "AVKO cannot terminate its exclusive license to Wave 3 and Judge Zagel did not order AVKO to do so." The Court has the authority to rule on this--not Ms. Saper. If the Court had meant to order AVKO to terminate **all** licenses except Wave 3's, I'm sure the Court would have responded to a simple request by Ms. Saper for clarification rather than making the decision for the Court that it "constitutes non-compliance with the TRO and Judge Zagel's Contempt Order." In previous litigation Ms. Saper has argued on the absolute importance of the meaning of a word, specifically the phrase, "at least." Now, she seems to believe the word *all* does not mean all and that the word *licenses* is not a plural. In paragraph 51 she claims that my words "Perhaps on August 5th I will be able to tell you where you may send this purchase order" infers AVKO "**would** have the rights to license the works…"

At the time I wrote the email, I did not know what the future held in store. Hence, I used the word "*perhaps*." As it turns out, I might have been able to tell Exodus Books they could get the books from Wave 3 on August 5, 2016.

On page 14 in paragraph 10. Plaintiff states "AVKO, acting through its President, unreasonably denied approval to the Wave 3's revised material in an attempt to force Wave 3 to renegotiate the Settlement Agreement." Incorrect on two counts. (1) Mr. Bailey determined that Wave 3's changes were reasonable, not that AVKO's objections were unreasonable. He was following the protocol given to him by Dahlia Saper and **not objected to** by our attorneys, Noack and Wolek, **despite my demands** that they should. (2) The Plaintiff attributes a rather disparaging motive for AVKO's action of objecting to various changes in Wave 3's version of Sequential Spelling, i.e., "attempt to force Wave 3 to renegotiate..." That is pure unfounded speculation.

23. Under **Count III Unjust Enrichment** on page 18 in paragraphs 69 and 70 Plaintiff accuses AVKO (and me) of "wrongful acts" without stating specifically what the wrongful acts were. Nor does Plaintiff show any causality between the supposed wrongful acts and any lost revenue or lost customers.

24. Under **Count IV Tortious Interference with a Business Expectancy** in paragraph on page 16 Plaintiff claims that I and AVKO "…represented to Wave 3's current and potential distributors and consumers that Wave 3 did not possess to sell or distribute the aforementioned material and that AVKO retained the right to sell such material." I deny that I (representing either myself or AVKO) told any Wave 3 current and/or potential distributor or consumers that Wave 3 did not possess an exclusive license. Wave 3 has no proof of that. Wave 3 is deliberately equating exclusive licenses to publish in restricted areas (the U.S. and Canada) and copyrights as being identical. I did answer inquiries concerning who held the copyrights by saying AVKO owned the copyrights. I never denied Wave 3's exclusive license to its Wave 3 Revised Editions of Sequential Spelling. But again that is moot. I have positioned at every AVKO telephone the precise message that the Court has ordered AVKO and any of its volunteers to be given to any inquiries. I have also sent out the Court ordered e-mail to all former distributors and AVKO members and individual customers.

25. Under **Count IV Tortious Interference with a Business Expectancy** in paragraph 75 on page 19 Plaintiff claims "AVKO has intentionally interfered with Wave 3's business expectancy by convincing distributors and customers to purchase AVKO's goods instead of Wave 3's goods."

   **As AVKO isn't selling to distributors, how can there be interference?** If distributors are not purchasing from Wave 3, the Plaintiff just might have itself to blame

for demanding that their distributors sign contracts and by threatening them with lawsuits. See **Exhibit I** in which one distributor accuses Wave 3 of tortious interference.

26. Under **Certificate of Service** in the Plaintiff's **first complaint** in Wave 3's Exhibit B paragraph 63 on page 19, Plaintiff declares that on May 26, 2016 this complaint was served on AVKO's counsel. There is a slight problem with this. AVKO's counsel Noack and Wolek have claimed that their representation of AVKO ended March 9, 2016 when the case was dismissed by Judge John Darrah. **AVKO's counsel Noack and Wolek never forwarded the complaint to AVKO**. AVKO only received the complaint on July 19, 2016 in an email from Wave 3's counsel Dahlia Saper who obviously knew that Noack and Wolek no longer represented me or AVKO. I do not believe the timing to be coincidental.

In the **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INUNCTIONS** Under **STATEMENT OF FACTS** on pages 1-3 Plaintiff re-states what is on pages 2-3 of the complaint with some additions. At any rate, in response to Plaintiff's Statement of Facts, I would like to present what I wrote for a presentation to AVKO's Board of Directors:

## A Thumbnail **STATEMENT OF FACTS**:
## All of which are in the public records available to all, so there is no breach of confidentiality.

- **Thomas Morrow** drafted all the proposed contracts during the negotiations including the one[4] in which **he, Thomas Morrow** stated **AVKO owned the copyrights** and claimed that Home School Holdings (HSH) owned the publishing rights. In all other contracts proposed during initial negotiations and in the emails between Morrow and McCabe **during negotiations neither the word copyright nor the word copyrights were ever used.**

- In January, 2010 Thomas Morrow as CEO claimed under penalty of perjury in an SEC filing that HSH had purchased the publishing rights (not copyrights) and submitted a document signed only by me for AVKO but not by Morrow for HSH in

---

[4] A proposed three-way contract with a signing date of September 9, 2009 with AVKO, HSH, and Instructional Media Innovations, Inc.

December, 2009 as evidence! For a more extensive analysis of Thomas Morrow's propensity to manipulate the truth, see **Exhibit F**, my analysis of just one of Thomas Morrow's affidavits.

- Thomas Morrow for HSH and I for the AVKO Educational Research signed a "Plain English Publishing Agreement" on June 4, 2010. The agreement was for $600,000 and called for two payments of $300,000 consisting of $50,000 cash and $250,000 worth of stock.

- AVKO received only $50,000. Wave 3 in various legal documents claimed the check was from (1) HSH, (2) Thomas Morrow, and (3) Wave 3 Learning which did not come into existence until June 18, 2010.

- Morrow twice attempted to convince AVKO to agree to purchase stock from HSH at $0.05 a share when its true value was less than $0.001 claiming at the last minute that a signed subscription (purchase) agreement was necessary for AVKO to be given the stock.

- When Morrow left HSH and created Wave 3, AVKO attempted to work with Wave 3 using the June 4, 2010 contract as its basic template until such time as (according to the established protocol), Morrow could come up with an acceptable replacement contract.

- AVKO gave W3L approximately 9 months to get started and to fulfill its part of the bargain. When W3L did not, AVKO gave notice and then filed suit.The lawsuit 1:11-cv-13381-TLL-CEB was assigned to the Honorable Thomas L. Ludington.

- Because I failed to produce a $75,000 bond in time, the TRO motion was denied. Because AVKO's attorney (my personal friend) Susan Woodrow, **without the consent of AVKO,** dropped HSH from the lawsuit and because **Wave 3 could not be party to the contract** as it **wasn't in existence at the time the contract was signed**, all the charges related to copyright infringement and fraud in the inducement were dismissed.

- At the settlement hearing Thomas Morrow signed an agreement for Wave 3 handwritten in front of Judge **Ludington**. I also signed it. I also signed the subsequent formally drafted agreement as well to settle. Morrow refused. Thus, I had no reason to believe that Wave 3 would keep the agreement that was arrived at on February 23, 2016. This current frivolous and downright malicious lawsuit

justifies my belief.

- In case 1:11-cv-13381-TLL-CEB Judge Ludington ruled that AVKO had given Wave 3 an implied license to reproduce and distribute the AVKO materials.

- Judge Ludington also ruled that Wave 3 had to complete the $250,000 first installment on the license and that W3L must complete the $600,000 licensing fee the implied license called for.

- Wave 3 ignored that Court's ruling as well and has not paid AVKO anything.[5] AVKO informed Wave 3 that they were in breach of the implied licensing contract by not paying the agreed upon amount while continuing to publish.

- I sent Wave 3 emails regarding the implied contract and the payment that was due AVKO. Wave 3 ignored my warning that Wave 3 was in breach of contract and gave notice that AVKO would sue for breach of contract..

- Judge Ludington also ruled that the copyrights did NOT transfer to the licensee for publishing. Wave 3 has ignored that and to this day continues to claim copyright ownership.[6]

- Before AVKO could file suit for breach of contract in Michigan (because AVKO was following the implied contract's stipulations and gave notice) **Wave 3 in direct violation of the implied contract's stipulations filed suit** in Illinois rather than Michigan (1:14-cv-02948) for a declaratory judgment that it owned the copyrights.

- Judge Virginia Kendall three times dismissed Wave 3's case for failing to produce any signed document beside the laughable licensing of copyrights supposedly owned by Thomas Morrow himself and then "in an abundance of caution" transferred to Wave 3.

- Wave 3 filed again a 99% identical suit **before the first one** was settled. Both filings contained the "**manufactured**" document claiming Thomas Morrow had assigned his copyrights to Wave 3.

- Judge Kendall then dismissed the case on the grounds the court lacked jurisdiction and gently reprimanded both counsels for not knowing that. That AVKO was billed over $70,000 for defending a suit that did not belong in a federal court did not play

---

[5] On May 25, 2016 Wave 3 made a $25,000 payment directly to AVKO's attorneys, none of which was given to AVKO.
[6] Despite signing the settlement agreement of February 23, 2016 in which Wave 3 clearly states AVKO owns the copyrights, Wave 3 still claims it owns the copyrights.

well with AVKO's board of directors. However, as I had tried to get Brian Noack to counter-sue for breach of contract, I was not reprimanded. The board had agreed not with me but with the attorneys, that is, that AVKO should follow the advice of Brian Noack and his boss Michael Aschenbrener to wait until they won the case before going forward with the breach of contract suit.

- We have solid evidence to back all these allegations that show Wave 3 comes with unclean hands.

27. In Wave 3's **MEMORANDUM OF LAW** under CONCLUSION on page 8, the Plaintiff claims "Wave 3 will be irreparably harmed if Defendant is allowed to continue selling Sequential Spelling Levels 1-7 material to distributors and other non-individuals." The truth is, even **if** AVKO were to be selling to Distributors (which it is not), the total amount of all sales of **all** AVKO books not just Sequential Spelling for AVKO's fiscal year, from July 1, 2015 through June 30, 2016 was only $32,045. This is considerably less than the $75,000 criteria for a federal court. And when you consider most of AVKO's sales come from individuals buying off our website, and Wave 3 does not sell books to individuals, there can be no real harm to Wave 3. The legal expenses for AVKO for this period was $182,950.55 resulting in a net loss for the last fiscal year of **$44,485**. But that isn't really true. As AVKO is on an accrual basis, the $100,000 Settlement had to be reported as income even though AVKO will not see one penny of it. If our reporting were to be on a cash basis, AVKO really lost $144,485. AVKO's current sales of books, which of course could not have included any Sequential Spelling books, from July 1 through September 22, 2016 was a total of $2,731.

28. In Wave 3's **MEMORANDUM OF LAW** under **CONCLUSION** on page 8, the Plaintiff "requests this Court enter an Order granting (1) a temporary order requiring Defendant to (a) immediately cease mispresenting (sic) the terms of the Settlement Agreement to third parties,…" This request was already granted and I have seen to it that AVKO has complied. Plaintiff continues with "2) a subsequent preliminary injunction (a)

enjoining Defendant from any attempt to sell Sequential Spelling Levels 1-7 to distributors and other non-individuals and (b) enjoining Defendant from representing to third parties that Wave 3 does not have an exclusive license to the copyrights in the Sequential Spelling Levels 1-7 works, until final adjudication of the merits of this action." This is just another not-so subtle attempt on Plaintiff's part to get a Court to override Judge Ludington's ruling that AVKO owns the copyrights and to override the decisions of Judge Virginia Kendall that Wave 3 can't possibly own the copyrights. Besides, AVKO has already complied to all the Court's demands.

28. The exclusive licensing to the **restricted areas of the U.S. and Canada** of Wave 3's revised versions of Sequential Spelling does not in and of itself allow them to claim the copyrights. There is no question that Random House has the exclusive rights to publishing Dr. Seuss's books. Yet, the copyright is clearly marked © Dr. Seuss. See **Exhibit O** for a copy of the publishing information page of this and four other books that show that it is common practice in the publishing industry for holders of exclusive rights to publish in the U.S. to indicate the proper ownership of the copyrights to the authors. Plaintiff comes to its complaint with unclean hands. Plaintiff has on numerous occasions violated the confidentiality and non-disparagement clauses.

On Wave 3's website (minus the numbering): **See Exhibit N**.

(1) In a nutshell, the original author sold us the rights to the Sequential Spelling product line.
(2) He then sued us for copyright infringement and lost by summary judgement. (sic)
(3) He then brought suit again in a different court.
(4) Even though we felt confident we would win completely again, the expense had become so onerous that we agreed to a settlement.
(5) One term of the settlement was that we change the color scheme of the covers.
(6) Hence, the "New Revised" editions.

I have numbered the sentences for ease of understanding.

Each of the above sentences is a **misrepresentation** to the public of the current situation.

(1) The original author, which I am, did not sell anything to Wave 3. Thomas Morrow as President and CEO of Home School Holdings signed an agreement to purchase for $600,000 publishing rights to the AVKO materials. All that was ever paid was $50,000 by Thomas Morrow who later created Wave 3 Learning and in public documents claimed Wave 3 (which wasn't even in existence at the time the check was made out) paid the $50,000 and that he (Thomas Morrow) assigned the copyrights to the AVKO materials to Wave 3.

(2) I didn't sue. AVKO sued for fraud in the inducement as well as for infringement. What is true is that the charges of fraud in the inducement and infringement were dismissed on the technicality that AVKO's attorney, without AVKO's permission, dropped Home School Holdings from the lawsuit. Thus, Wave 3 Learning not being in existence at the time, could not be held responsible for fraud in the inducement. However, Judge Ludington did rule that AVKO retained the copyrights and that Wave 3 was obliged to pay the remaining $550,000 to retain the implied non-exclusive license to publish. Wave ignored those decisions.

No, I did not then bring suit next nor did AVKO. Wave 3 did. After AVKO notified Wave 3 that they were in breach of the implied license for non-payment, Wave 3 filed suit, not in Michigan, which was **a requirement of the implied license** granted by Judge Ludington, but in Illinois. After Wave 3's petitions for a declaratory judgment were dismissed by Judge Virginia Kendall three times for lack of evidence that Wave 3 ever had the copyrights, then AVKO did file suit.

Wave 3 may have been confident, but certainly not based upon a record of winning completely in all the former litigation.

(3) The settlement agreement calls for **confidentiality** of the terms of the agreement and Morrow blatantly breaches unnecessarily and incorrectly one of the terms of the contract and in doing so, **misrepresents** the reason for the change in the covers. It was NOT to distinguish between the two versions that Wave 3 had developed, but rather between the AVKO classic version and Wave 3's modified versions.

Morrow's "hence" implies a causal relationship between his first five sentences (all untrue) and the change in Wave 3's covers for Sequential Spelling.
The Revised Editions themselves are different from the original in the following regards:
- The instructions have been condensed and clarified.

- Racially and religiously offensive words have been removed.

This implies that the instructions needed to condensed and that they were not clear. That is not true. In fact, it is **disparaging**. This is clearly a **violation of the Settlement Agreement.** What is true is that because the Plaintiff wants all buyers of Sequential Spelling to purchase its student workbooks levels 1-7, Wave 3 eliminated the instructions on how to use plain paper instead of the Response book. Eliminating is not condensing nor is it clarifying.

This also implies that the original had racially and religiously offensive words. This is unnecessary. This is not a sales pitch but rather a disparaging comment. The usage of the word *words* implies more than just the word *Negro* which plaintiff misspells by using a lower case n, which definitely makes it a racial slur.

29. In conclusion I respectfully request the court to issue a summary judgment against Wave 3 and its counsel for knowingly and deliberately filing a nuisance suit whose sole purpose is to force AVKO and me deeper into bankruptcy so there would be no one left to challenge Wave 3's claims to all the copyrights of all the materials I have written. I am not asking for much. The reason is simple: It is not in AVKO's best interest to destroy Wave 3. They owe AVKO $75,000 plus royalties on sales. I would prefer a mild **sanction** to be placed upon Wave 3's **attorneys** for being complicit in a malicious and frivolous lawsuit. I would hope that whatever amount of money for damages to my reputation and that of AVKO's that the Court believes will serve as a sufficient deterrent against future frivolous filings will not destroy Wave 3 in the process. I do believe our former counsel Brian Noack would like to receive at least $60,000 for past expenses. Unfortunately, we also believe that Thomas Morrow, rather than paying any large court ordered costs, fines, etc., will choose the bankruptcy route. This he has done in the past, and just as he lied under penalty of perjury to the SEC, he also lied on his bankruptcy application. This we also have solid evidence to prove. It is in the public records. However, I wish that you will, at the very least, dismiss this case with prejudice and advise the Plaintiffs that the Settlement Agreement does NOT state that Wave 3 has the

right to publish an online version of Sequential Spelling without first obtaining a license

to do so. I have suggested that to Thomas Morrow as recently as July 14, 2016 and on

behalf of AVKO even offered Wave 3 the licensing fee to be a modest $25.00 along with

the marketplace standard of 50% royalty. **See Exhibit E**. The only reason AVKO can

find for Thomas Morrow to totally reject this offer, is that he knows the online version

has no real cost for materials and if he can slip his interpretation of the badly written

Settlement Agreement past the Court, he would only have to pay 6% royalty on sales as

opposed to the industry standard of 50%. **See AVKO Exhibit E.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th day of September, a true and

correct copy of the Answer to Plaintiff's Complaint was electronically served on Plaintiff

Wave 3 Learning, Inc. and its Attorney Daliah Saper.


     s/Donald J. McCabe
     President and Research Director Emeritus
     AVKO Educational Research Foundation, Inc.
     3084 Willard Road
     Birch Run, Michigan 48415
     DonMcCabe1@gmail.com

EXHIBITS

A   Email to my grandson threatening destruction of AVKO and my estate.

B   Settlement Agreement of February 24, 2016.

C   Illegality of exclusive rights because Instructional Media Innovations co-owns the
copyrights to the Sequential Spelling DVDs, plus 22 other problems with the Settlement
Agreement that need to be fixed.

D   July 27 email notifying AVKO that AVKO's Attorneys amended the Settlement
Agreement on February 25th, the day after the signing.

E   Offer of Settlement to replace Settlement Agreement of February 24, 2016.

F   Analysis of just one of Thomas Morrow's affidavits that shows his propensity to
manipulate the truth.

G   Letter from Thomas Morrow to Joe Hipps which establishes collusion between AVKO's
attorneys and Wave 3's.

H   Recent Email exchange between Morrow & myself relating to approval of online version
in which I try to help him improve his product and he has nothing but insults for me.

I   Letters sent to Distributors making demands and threatening lawsuits.

J   Citations from law on: The copyright rights of joint ownership of copyrights by IMI was
violated by the Settlement Agreement.

K   Identification of AVKO copyrighted materials.

L   My Financial Status and AVKO's.

M   Plaintiff's letter acknowledging the subject of the exclusive license being the Revised
Editions.

N   Plaintiff's website containing numerous violations of the Settlement Agreement
including misrepresentations to the public and to its distributors and customers.

O   Five Samples of Copyright Pages where the Exclusive Publishers give credit to the
authors as holders of the Copyrights.

## EXHIBIT A

From: Thomas Morrow <thomas@wave3learning.com>
Date: Tue, Jul 19, 2011 at 1:07 PM
Subject: A Favor Request
To: Brian McCabe <yirzmbrian@gmail.com>

**Hey, Brian.\*\*\*\***

**\*\* \*\***

**I hope things are going well.  I expect you are pretty busy with research
over the Summer, so I will keep this short.\*\*\*\***

**\*\* \*\***

**Your G-pa and I are likely to soon find ourselves in litigation.
I can't honestly claim to like him much, but I do respect him and
I would never wish the joys of litigation on anyone.  Having been
around that particular block several times, both winning and losing,
I know it is no fun either way.  A man Don's age should be enjoying
his garden and travelling and seeing
family, not getting himself embroiled in discovery and depositions
and all the stress it implies.\*\*\*\***

**\*\* \*\***

**If you agree that he would be better off without this stress and
strain, I would appreciate it if you could spend a moment or two
chatting with him about it.  I am willing to settle this as amicably
as possible. I am also willing to bring suit and destroy AVKO and
your G-pa's estate if I have to.  The decision is Don's, so I hope
you can help all of us out.  I know of all
the people in the world, your voice is the one he hears most with
both respect and affection.\*\*\*\***

**\*\* \*\***

**Thanks whatever you decide and best regards,\*\*\*\***

**Thomas Morrow\*\*\*\***
President\*\*\*\*
Wave 3 Learning, Inc.\*\*\*\*
126 E. Wing St. Ste 240\*\*\*\*
Arlington Heights, IL 60004\*\*\*\*
888-WAV-3LRN (928-3576) x 505\*\*\*\*
\*\* \*\*

# Exhibit B

As Exhibit B is "confidential" being the settlement agreement which already is in the hands of the Court and both Plaintiff and Defendant, this is being omitted in the electronic transfer but will be in the folder delivered to the Court.

# Exhibit C

Mr. Morrow,

It is quite apparent that you do not want to make any of the changes that would be necessary in the Sequential Spelling books that would allow us to give approval to your versions.

If you were, you would have, at the very least, removed all notices that Wave 3 owns the copyrights and obtained new ISBN numbers.

What is also apparent is that you still want to have what AVKO **cannot legally grant** Wave 3 and that is, exclusive rights.

## AVKO cannot cede, sell, or transfer that which **is not wholly its to give.**

Instructional Media Innovations, Inc. shares with AVKO the copyrights to the DVD versions.

Both of us missed that simple fact back in 2009 as did AVKO's attorney Charles Y. Cooper who was paid by AVKO to review and if necessary suggest changes to the June 4, 2010 contract I signed for AVKO and you signed for Home School Holdings, Inc.

AVKO's attorneys Woodrow, Darrow, Noak and Wolek missed it. Wave 3's attorneys DiGiacomo, Clark, and Saper missed that point of law as well.

Judge Ludington missed it as he should have used the phrase "at most" instead of "at least" and Judge Finnegan in her haste to get a settlement signed by us also missed that point of law.

That means the agreement **as written** is null and void on the face of it. I'm sure our attorneys can easily find case law that states one cannot sell that which is not wholly theirs.

That leaves us with a simple choice. Change the term to non-exclusive and re-negotiate the terms for derivatives or resume the court battle with motions from both sides running up our legal bills.

As I have stated to you previously, AVKO's Board of Directors could be persuaded to allow Wave 3 to produce and distribute derivatives (your teacher editions and student workbooks) as long as it is made clear that AVKO has only given permission and not its blessing and that AVKO has the copyrights to the teacher edition. AVKO would permit Wave 3 to copyright the student workbook derivatives you have developed.

That would enable AVKO to continue its selling of Sequential Spelling and its other books to those who wish to buy them. That would enable Wave to sell its versions as Wave 3 Sequential Spelling or whatever name it chooses that meets with our approval.

AVKO would then have no serious objection to your removal of the words *Negro* and *Negroes*, the teacher footnote explaining its inclusion and the occasional reference to people or literary characters whose fame was in a period prior to 1980's such as Bob Hope or Red Ryder.

AVKO would still have the right to disapprove of misspelled words, vulgar words, 6 pt type face, improper pagination, punctuation, grammar, untrue statements, etc.

The question remains, "Are you willing to compromise?"

I personally believe that you do not believe in compromising.

Unless AVKO hears otherwise from you or your attorney by the close of business on March 16, 2016, AVKO will ask its attorneys to proceed with its case against Wave 3.

### More Than a Few Problems with the Current Settlement Agreement.

1.  Upon information and belief Thomas Morrow was not completely honest and forthcoming regarding his and Wave 3's financial situation.

2.  The signed settlement is invalid because **it is illegal** for AVKO to grant exclusive publishing rights for the simple reason AVKO shares the copyrights to Sequential Spelling DVD's with Instructional Media Innovations, Inc. **Solution: non-exclusive rights.** A co-owner (partner) may not sell or give away that which belongs to the other co-owner exclusive rights(partner).

3.  Wave 3 is now claiming on its website (http://sequentialspelling.com) owns the copyrights and trademarks despite the fact that the word *copyrights* only occurs in paragraph 7 where it says Wave 3 "understands and believes that AVKO is the sole and exclusive owner of the copyrights at issue ... with the exception of this license as hereby granted." **If** AVKO's attorneys believed on February 24, 2016 the settlement agreement was merely "Wave 3 is to be given the copyrights for $100,000" in exchange for dropping of the lawsuit" then I believe **my attorneys are guilty of malpractice**. They have known that since 2011 I and AVKO have steadfastly maintained that AVKO has never and will never concede copyrights to Wave 3. Certainly I should have been informed of this interpretation of "an exclusive license in the United States...and a world-wide nonexclusive license..." (See article 3)

Also see **Exhibit K** for examples of Publishers who have exclusive rights to the publishing but who do not claim the copyrights for themselves but for the rightful owners of the copyrights. Certainly Random House, perhaps the best known publisher, acquired exclusive rights to the works of Dr. Seuss, but Random House recognizes Dr. Seuss on the publishing information page as the owner of the copyrights.

4.  Wave 3 (http://sequentialspelling.com/SS_for_Adults_and_Teens.html) is also claiming the copyrights to Sequential Spelling for Adults. This AVKO work was not the subject of the agreement--only Morrow's revised version of Sequential Spelling 1-7 and his Student Workbooks 1-7. It also contains a disparaging comment on its web page. **There is nothing in the settlement agreement regarding the licensing of the other AVKO materials to Wave 3 let alone the granting of copyrights!**

5.  Wave 3 also announced a new *Sequential Keyboarding* to be introduced. **There is nothing in the settlement agreement regarding the licensing of the other AVKO materials to Wave 3 let alone the granting of copyrights![1]**

6.  Wave 3 agreed that AVKO has the right to approve changes. Not a problem.

7.  More recently and shortly after filing their complaint and without informing AVKO of the filing, Wave 3 began submitting for approval their online version of Sequential Spelling. There is, of course, no licensing of that in the Settlement Agreement. While

---

[1] Eventually the announcement was removed.

commending Wave 3 on their new venture and wishing them success, I pointed out that the Settlement Agreement made no provision for the licensing of an online version and suggested a few salient points for a licensing agreement, as well as a few points that needed to be corrected. Thomas Morrow responded with what I consider to be a malicious attack.

8. Other than a protocol for selecting a third party to arbitrate a disputed change there is no protocol in the agreement for the arbitrator to follow. Now, that is a problem.

    a) Wave 3 has thus far submitted three books, Sequential Spelling 1, Student Work Book 1, and Sequential Spelling 4. All of which deviated so substantially from the original versions that they were deemed by AVKO as unacceptable. So too, the recent submission of the online version of Sequential Spelling 1.

    b) AVKO believes an arbitrator (like the head official at a NFL football game) must have overwhelming and indisputable evidence to overrule the calling by the field official (AVKO) that each change was justifiable. In other words, Wave 3 must convince the arbitrator that

        i. each deletion of each sentence in the instructions makes for a **b**etter, **m**ore **e**ducationally **s**ound **p**roduct (BMESP)

        ii. each additional sentence in the instructions makes for a BMESP

        iii. each deletion of a teacher note, footnote, special formatting, homophone, or word for spelling makes for a BMESP.

        iv. each addition of a teacher note or word for spelling makes for a BMESP.

        v. each additional activity (such as unscrambling words) is necessary for a BMESP.

        vi. As Wave 3 is in possession of the original Microsoft Word documents of Sequential Spelling, to speed the approval and/or arbitration process, Wave 3 should produce each book of Sequential Spelling as it is with each change clearly marked.

8. **AVKO's attorneys refused to argue these six points with Wave 3's attorneys and allowed Dahlia Saper for the Plaintiff to set the ground rules for Mr. Bailey to follow**. And this is AFTER March 9, 2016 the date that AVKO's attorneys claimed they stopped representing AVKO without notifying AVKO.

9. It was not established as to who was to contact Paul Holtz whom I understand refused to be that arbitrator. It was not established in the agreement as to who was to contact the person whose name overlapped or the one whose name might be picked out of a hat. AVKO would have been willing to accept Judge Finnegan if only to speed the process. Again, it was Thomas Morrow who ended up contacting Mr. Bailey and setting the ground rules. AVKO did not authorize Mr. Morrow to do the contacting and the setting up of the ground rules. AVKO does not want to believe its former attorneys would have given the Mr. Morrow that authorization without consulting AVKO. But, they may well have just done that just as on February 25, 2016 they amended the Settlement Agreement **without AVKO's knowledge or permission**.

10. There should have been two documents: **(1) one a settlement agreement** and **(2) a licensing agreement** to reproduce and distribute (i.e., a publishing rights agreement), or at the very least a division of the document **into two distinct parts**.

11. A license by law involves "consideration such as payment of money."

12.There has not been full payment. There is only the assurance given by Wave 3 that it intends to pay the the remaining $75,000 over the course of three years as part of the overall settlement agreement. As it is a matter of record that Wave 3 did not make any payment after a settlement agreement was signed in front of Judge Ludington. AVKO was not surprised that Wave 3 again did the same, especially since **Case 1:15-cv-03393** was recently dismissed WITH PREJUDICE.

13. Under 2. Settlement Payment it states: "Beginning **on or before** the Effective Date, Wave 3 shall pay to AVKO the sum of one hundred thousand dollars ($100,000.00) (the "Settlement Amount") in annual installments of twenty-five thousand dollars ($25,000) until satisfaction of the Settlement amount." NOTE: Nothing is said concerning payment of the licensing fees.

14. It also states: "Failure to pay the full Settlement Amount within 14 business days of the effective date of this Agreement terminates this entire Agreement...."

15. I know it continues on with "...unless the Parties agree in writing to extend this deadline." AVKO **did not agree "in writing"** to "extend this deadline.

16. Question: When is the Effective Date? The $100,000 has NOT been paid. According to the above sentence, the settlement amount will not be completed until June, 2019.

Yet, it clearly states in the first paragraph that "This Agreement shall be **effective on the date of the last signature required for full execution by both AVKO and Wave 3 ("the Effective Date").**" This would make **February 24, 2016 the effective date.** Hmm. On or before the Effective Date????

17. According to the legal definition of a license, a license requires a payment. There was **no mention in this agreement of a payment for the license**, merely royalties. That two sets of IP attorneys failed to recognize the requirement of a payment for a license is a bit incomprehensible.

18. Under **2. Settlement Agreement** the word *it* is ambiguous in simple ordinary English and certainly it should be ambiguous in legalese. "Upon satisfaction of the Settlement Amount, AVKO acknowledges the receipt and sufficiency of this payment, and that it is in consideration of the releases and other provisions contained in this Agreement."

19. On page 1, re: confidentiality it states: "WHEREAS, the parties desire to keep the terms of their settlement confidential." The operative word is "desire." It does NOT state, "parties must keep the terms of their settlement confidential." And certainly Thomas Morrow has already leaked some of the terms of the settlement causing great concern to Sonlight, IMI, and Rainbow. Exhibits available upon demand.

Based upon Wave 3's actions since the February 23, 2016 signing, AVKO sees no point in having a non-disclosure clause in a revised agreement or the non-disparagement clause.

Other rather minor problems with the signed agreement:

20. On page 2 There is an ambiguity as to who actually receives the 6% royalty fees. It could be construed that Wave 3 is to pay AVKO directly. It could also be construed that the royalties are to be paid directly to Wolek and Noack to be held in trust for AVKO. I am sure our former attorneys would prefer the latter and regret its omission. They did, without AVKO's permission or knowledge, amend the agreement in regards to the royalty payments making them quarterly and not yearly.

21. On page 4 There is an ambiguity as to the length of time in:

"Such an individual will be granted no fewer than fourteen (14) from receipt of the item to provide an authorization or rejection." Fourteen years, fourteen months, fourteen days, fourteen minutes, fourteen seconds? There is little excuse for four attorneys to miss this except perhaps the fact that it was late at night and their minds were a wee bit foggy.

22. In fact, the entire Count 10 Right of Review needs to be rewritten.

23. The numbering used in the signed Settlement Agreement goes from (13.) No Admission of Liability to (8.) Confidentiality so that there are two number eights, nines, and tens. Again four attorneys missed this.

# Exhibit D

Brian Noack <sup>Jul 8</sup>

to me, RobertM195, Adam

Don, Robert,

 At your request, please find the modifications to the settlement agreement below. The payment from Wave 3 represented 6% of the first quarter of sales. Payments will continue on a quarterly basis throughout the life of the agreement. As you may recall, AVKO has the right to audit these figures at any time pursuant to the agreement.

 Best,

 **Brian T. Noack**

briann@wonoip.com

P: 239.671.1103

F: 708.843.0509

**Wolek & Noack**

233 S Wacker Dr.

Suite 2140

Chicago, IL 60606

_____

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

**From:** Brian Noack <BrianN@wonoip.com>
**Date:** Thursday, February 25, 2016 at 3:01 PM
**To:** 'Daliah Saper' <ds@saperlaw.com>, 'Matt Grothouse' <matt@saperlaw.com>
**Cc:** Adam Wolek <adamw@wonoip.com>
**Subject:** Re: AVKO & Wave 3 Settlement

Hi Daliah,

We agree to Mr. Morrow's deal of making the audit privilege two-sided in exchange for quarterly royalty payments and the change in verbiage from "that year" to "the duration of this agreement." Out of an abundance of caution, we are responding to you rather than him to avoid any potentially impermissible communications with a represented party. We trust you'll pass along our acceptance.

Please let me know if you have any questions.

Best,

Brian

**Brian T. Noack**

briann@wonoip.com

# **EXHIBIT E**

For the preceding 23 reasons listed in Exhibit C, AVKO directed its attorneys Noack and Wolek to request a follow-up settlement conference with Judge Finnegan using all 23 reasons and any other reasons they may come up with to justify it. They refused even to contact Judge Finnegan. AVKO further directed its attorneys Noack and Wolek to use as a starting point for the negotiation of a proper settlement a draft entitled *"Settlement Agreement, Publishing License, and Release"* which AVKO had submitted to them. They refused to do so. The semi-polished version of the following was submitted to Wave 3 on July 25, 2016.

### Suggested SETTLEMENT AGREEMENT, PUBLISHING LICENSE, AND RELEASE

THIS SETTLEMENT AGREEMENT is entered into by the AVKO Educational Research Foundation, Inc. (AVKO) and Wave 3 Learning, Inc. (Wave 3). This Agreement shall replace the SETTLEMENT AGREEMENT AND RELEASE signed by both parties on February 24, 2016 and shall be effective on the date of the last signature required for full execution of this agreement (The Effective Date).

1. **The Representations and Warranties of the aforementioned agreement of February 24, 2016 will remain in full effect.**

2. **Settlement Payment**

Beginning on or before the Effective Date, Wave 3 shall begin to pay AVKO the sum of one hundred thousand dollars ($100,000.00) which is the Settlement Amount. The first payment must be a minimum of 25% ($50,000.00) and must be paid on or before the effective date. The remaining may be paid in amounts of $5,000 (or more) on or before the 1st day of each month until the $100,000 (plus 6% interest) has been paid.

Wave 3 shall pay the Settlement Amount by wire transfer, and any associated transmittal fees, or by providing a certified or cashier's check payable to Wolek & Noack," former attorneys for AVKO to be deposited in

_____ initial for Wave 3                    _____initial for AVKO

trust for AVKO. Failure to make any payments within 14 days of their due dates terminates this entire agreement.

3. **Materials at Issue**

(1) AVKO Sequential Spelling 1-7 and its Student Response Books

(ORIGINALS) and (2) Sequential Spelling Teacher Guides Levels 1-7 and their respective Student Work Books (DERIVATIVES).

AVKO hereby grants to Wave 3 an exclusive license to reproduce and distribute the aforementioned DERIVATIVES and/or a non-exclusive license to reproduce the ORIGINALS. This does not imply that Wave 3 has any right to claim the copyrights or trademarks to either the ORIGINALS or the DERIVATIVES.

AVKO hereby grants Wave 3 the opportunity to negotiate non-exclusive publishing rights to other AVKO materials. Wave 3 hereby acknowledges that until other licenses are negotiated with and obtained from AVKO, Wave 3 may not duplicate and distribute any AVKO copyrighted materials other than the *Wave 3 Learning, Inc. Sequential Spelling Teacher Editions 1-7* and their corresponding *Wave 3 Learning, Inc. Sequential Spelling Student Workbooks 1-7.*

4. **Licensing Provisions**

DERIVATIVES: Wave 3 agrees to change the covers and titles of their DERIVATIVES so that there is no confusion between Wave 3's DERIVATIVES and AVKO'S ORIGINALS.

ORIGINALS: Wave 3 agrees to duplicate and distribute the materials exactly as is with the exceptions of the mandatory changes in ISBN numbers and the

_____ initial for Wave 3                          _____initial for AVKO

notification that Wave 3 is publishing them.

Wave 3 further agrees not to make and distribute electronic derivatives of the DERIVATIVES or ORIGINALS. The existing electronic derivatives produced by Instructional Media Innovations, Inc. (IMI) as DVDs and whose copyrights are co-owned by IMI and AVKO may be purchased from AVKO or IMI at a discount of 55% of the retail price for resale by Wave 3.

5. **PAYMENT FOR AND DURATION OF LICENSING OF THE PRINTED VERSIONS OF SEQUENTIAL SPELLING**

The licensing fee for the printed versions of Sequential Spelling 1-7 and their respective Student Workbooks shall be five thousand dollars ($5,000.00) per year for five years renewable at the end of each five year period. The licensing fee must be paid on or before the first day of each licensing year, the anniversary of the effective date which is the date of the last signature to this Agreement.

Royalties of 10 % of gross sales or $15,000.00 (whichever is greater) must be paid within 14 days of the end of each quarter of the regular fiscal year (based upon the effective date).

6. **PAYMENT FOR AND DURATION OF LICENSING FOR ONLINE VERSIONS OF SEQUENTIAL SPELLING**

The licensing fee for the **ONLINE** versions of Sequential Spelling 1-7 and their respective Student Workbooks shall be ONE thousand dollars ($1,000.00) per year for five years renewable at the end of each five year period. The licensing fee must be paid on or before the first day of each licensing year, the anniversary of the effective date which is the date of the last signature to this Agreement.

_____ initial for Wave 3                    _____initial for AVKO

Royalties of 50 % of gross sales or $10,000.00 (whichever is greater) must be paid within 14 days of the end of each quarter of the regular fiscal year (based upon the effective date).

Wave 3 shall pay the LICENSING FEES AND ROYALTIES to Wolek & Noack," attorneys for AVKO to be deposited in trust for AVKO. Failure to make any payments within 14 days of their due dates terminates this entire agreement.

7.  **PAYMENT FOR AND DURATION OF LICENSING FOR ONLINE VERSIONS OF OTHER AVKO COPYRIGHTED MATERIALS**

The licensing fee for the **ONLINE** versions of ANY ONE AVKO COPYRIGHTED BOOK OTHER THAN THE Sequential Spelling 1-7 and their respective Student Workbooks shall be ONE thousand dollars ($1,000.00) per year for five years renewable at the end of each five year period. The licensing fee must be paid on or before the first day of each licensing year, the anniversary of the effective date which is the date of the last signature to this Agreement.

Royalties of 50 % of gross sales or $10,000.00 (whichever is greater) must be paid within 14 days of the end of each quarter of the regular fiscal year (based upon the effective date).

Wave 3 shall pay the LICENSING FEES AND ROYALTIES to Wolek & Noack," attorneys for AVKO to be deposited in trust for AVKO. Failure to make any payments within 14 days of their due dates terminates this entire agreement.

8.  **COPYRIGHT USE**

Wave 3 understands and believes that AVKO is the sole owner and exclusive owner of the copyrights at issue in this lawsuit as well co-owners with Instructional Media Innovations, Inc. of the copyrights to the DVD

_____ initial for Wave 3                          _____ initial for AVKO

(electro0nic) versions of the ORIGINALS. Wave 3 further understands and believes that as a result of the licensing to reproduce and distribute that there is no transfer of copyright rights or trademark rights.

9.  **TRADEMARK USE.**

Wave 3 understands and believes that AVKO is the sole and exclusive owner of the *Sequential Spelling* trademark.

10. **AUDIT.**

The attorneys for AVKO shall have the right to use an auditor of its choice to audit Wave 3's financial records upon reasonable notice of no fewer than fourteen (14) days. In the event the auditor discovers a discrepancy of greater than three percent (3%) between the revenue reported to AVKO and Wave 3's actual sales revenue, Wave 3 shall pay all past-due royalties with a five percent (5%) interest award and pay the costs of the auditor.

11. **RIGHT OF REVIEW**

Wave 3 shall submit one sample of all of the Sequential Spelling materials (DERIVATIVES or ORIGINALS) in the condition they fully intend to publish. Wave 3 shall be expressly permitted to sell the remainder of its existing stock of materials. Wave 3 shall not be permitted to print or sell any further Sequential Spelling materials (either the ORIGINALS or the DERIVATIVES) without the express written authorization of AVKO. Such written authorization shall not be unreasonably withheld. If in the unlikely event the parties cannot agree, Judge Finnegan will decide whether the approval was reasonably withheld. It will not be whether the changes are reasonable but whether refusal to accept any specific change is unreasonable.

_____ initial for Wave 3                                    _____ initial for AVKO

**12. RELEASE**

Conditioned upon the representations and warranties of the Parties, **Payment of the Settlement Amount,** and other obligations set forth herein, each party hereby releases and forever discharges the other from all claims, demands, damages and costs arising out of, or directly or indirectly connected in any way with, the claims and allegations asserted in the lawsuit and/or any matters, events acts or omissions which could have been asserted by or on behalf of itself in the lawsuit.

13. **Miscellaneous**

a) **Fees**. The parties to this Agreement shall bear their own attorneys' fees, costs and other expenses associated with the Lawsuit and Countersuit. If litigation is commenced in connection with this Agreement, the prevailing party shall be entitled to an award of its reasonable attorney's fees, and court and other direct costs relating not only to this case but all previous litigation between the two parties..

b) **Jurisdiction**. This agreement shall be exclusively governed by and construed in accordance with Illinois law. The United States District Court for the District of Illinois, Eastern Division, or the appropriate state court located in Illinois, shall have exclusive jurisdiction over any legal action or proceeding arising out of or relating to this Agreement.

c) **Severability, Waiver and Survival**. If any terms of this agreement is held invalid, illegal, or unenforceable by a court of competent jurisdiction, that term shall be severed from this Agreement and the remaining terms shall continue in full force.

d) **Counterparts**. This Agreement may be executed in one or more

_____ initial for Wave 3                              _____initial for AVKO

counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that signatures transmitted electronically, whether sent via facsimile or as attached files to emails (*e.g.,* _.PDF), shall be acceptable to bind the Parties and shall not in any way affect this Agreement's validity.

e) **Entire Agreement**. This Agreement sets forth the Parties' entire agreement and understanding relating to its subject matter and merges and supersedes all prior agreements.

f) **Binding Agreement**. The terms and provisions of this Agreement shall be binding upon the Parties and their respective successors, transferees, and permitted assigns.

g) **Independent Investigation**. Each Party has read and understood this Agreement and agrees to all of its terms and conditions and accordingly negotiated this Agreement with the knowledge of its respective counsel.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY]

_____ initial for Wave 3                    _____ initial for AVKO

IN WITNESS WHEREOF, each Party executes this Agreement either personally or by a duly authorized representative and agrees to be bound by this Agreement's terms and conditions.

By: AVKO Educational Research Foundation, Inc.
Donald J. McCabe
President
Date_____

_____
Signature

By: Wave 3 Learning, Inc.
Thomas A. Morrow
President
Date _____

_____
Signature

Witnessed by

_____

_____
Signature

Date_____

# EXHIBIT F

# Analysis of W3L'S EXHIBIT E

## Taken from: 1:11-cv-13381=TLL-CEB Doc #87-2
## Filed 02/08/12 Pg ID 2011-2015

| AFFIDAVIT OF THOMAS MORROW | MCCABE'S ANALYSIS |
|---|---|
| 1. I am Thomas A. Morrow, formerly Chairman and CEO of Home School Holdings and currently CEO of Wave 3 Learning, Inc. | Agreed |
| 2. I have reviewed Defendant's Motion for summary Judgment and Brief in Support and affirm that all statements contained therein are true to the best of my knowledge. | "… Are true to the best of my knowledge" is TM's license to twist the truth and to outright lie as evidenced below. |
| 3. In May 2009, when I was CEO of Home School Holdings, Don McCabe contact me to discuss Homes (sic) School Holdings' purchasing copyrights of AVKO's instructional materials. | Three lies:<br><br>1. The initial contact was to see if HSH would like to be a **distributor**, like Sonlight, Timberdoodle, etc.<br><br>2. The word copyrights was never mentioned during any of our conversations as being in any form for sale. The only contract proposal (all composed by Morrow) was in the three way contract with Instructional Media Innovations (IMI), in which the word copyrights occurred in the context of whereas AVKO owns the copyrights and HSH owns the publishing rights. As HSH and AVKO had yet to sign that agreement, this in itself was a lie by Morrow and an attempt to get me to sign a contract containing a lie.<br><br>3. TM was the one who first brought up the possibility of publishing the AVKO materials. |
| 4. On October 13, 2009, Home School Holdings filed its Form S-1 with the Securities and Exchange Commission. | Agreed, with the proviso that TM had led me to believe in May that the IPO would be ready BY September 30, 2009 the date he had selected for the signing of very first contract that he wrote: |
| 5. Shortly thereafter, Home School Holdings entered into negotiations to purchase the AVKO works. | Between our first meeting and October 13, 2009, Thomas Morrow had written two proposed Publishing Rights agreement and I had sent back to him two revisions. |
| 6. AVKO agreed to assign to Home School Holdings the worldwide exclusive rights to the AVKO works. | LIE. What is true is that Thomas Morrow attempted to get "worldwide exclusive publishing rights" but AVKO limited the rights to |

| | specifically the U.S. and Canada. |
|---|---|
| 7. On June 4, 2010, Home School Holdings and AVKO executed a Publishing Rights Agreement, which outlined the terms of the deal. | Agreed. |
| 8. After the agreement was executed, Home School Holdings provided AVKO with a subscription agreement whereby Home School Holdings was to transfer stock to AVKO under the terms of the Publishing Agreement. | Two Lies.<br><br>1. The subscription agreement was given to me the day before the signing. If the subscription agreement were to have been a necessary component of the contract, Mr. Morrow had a full year to disclose this.<br><br>2. The subscription agreement completely changed the conditions of the stock transfer as outlined by the terms of the publishing agreement. In fact, it was a **purchasing** agreement. Had I signed it AVKO would have been committed to purchasing $250,000 worth of stock at the rate of $0.05 per share when the value of the stock was less than $0.001. |
| 9. Don McCabe refused to sign the Subscription Agreement on behalf of AVKO because it referenced a "purchase of shares." | That was not the only reason I refused to sign it. I would have been testifying to at least four untruths. .<br><br>Question: Hypothetically speaking, if the signing of the Subscription Agreement was necessary for the assigning of $500,000 worth of stock in two blocks, why did Thomas Morrow sign the publishing agreement anyway? |
| 10. I subsequently removed the language and provided Mr. McCabe with a substitute Subscription Agreement, which he again refused to sign. | TRUE. The reason was because the key portions of the agreement called upon me to testify to untruths one of which was that I had been given the "Prospectus" to examine. |
| 11. It soon became clear that Home School Holdings would not achieve its IPO as intended. | |
| 12. I then resigned from Home School Holdings. | David Nicholson and HSH have a slightly different viewpoint. |
| 13. After resigning, I offered to continue the deal with AVKO through a newly created company called Wave 3 Learning and AVKO agreed to proceed despite the lack of a contract. | What is true is that AVKO and Morrow agreed to proceed under the terms of the June 4, 2010 contract **until such time** as an acceptable contract could be negotiated. |
| 14. We continued to operate as if the terms of the Publishing Rights Agreement were in place. | AVKO did. AVKO tried to get Wave 3 Learning to abide by the terms, but was unsuccessful. One example is the failure of W3L to provide two desk copies of each of "The Works" as requested and required by the contract. |

| | |
|---|---|
| 15. AVKO continued to encourage Wave 3 Learning to publish the AVKO works. | |
| 16. In October 2010, I notified AVKO that I needed it to provide me with the proper standing under trademark law to acquire the sequentialspelling.com domain name from a cybersquatter. (sic) | Agreed that he notified AVKO. AVKO did not agree with the necessity of "giving away" the copyrights nor with the necessity of Wave 3 Learning acquiring that website.<br><br>In October, 2010, he also notified AVKO (See W3L's Exhibit Q) that W3L was **"in advanced discussions with two experienced and capable online curricula developers to take the works online."** I don't believe in coincidences. It's the same time his great push began to acquire the copyrights. It appears to me that his talks were stalled because he didn't have the copyrights. |
| 17. To do so, I provided AVKO with an agreement that was drafted by my attorney. | Agreed. See W3L's Exhibit N: After stating "This document shouldn't cause you concern; there is nothing hidden here" he slipped in "AVKO also hereby conveys, transfers, assigns, delivers, and contributes to Wave 3: 1. all of AVKO's right, title, and interest of any kind in and to the Works; 2. any registrations and copyright applications; 3. any renewals or and extensions of any registrations or copyright applications."<br><br>  Obviously, I read the agreement and refused to sign away AVKO's copyrights.. |
| 18. When AVKO refused to sign the agreement, I attempted to explain the reason for the agreement under copyright law. | Reasons given were not convincing. See above. |
| 19. AVKO continued to pay invoices issued by Wave 3 Learning, Inc. and continued to operate as if the terms of the Publishing Rights Agreement were in place for an additional six months. | Did you expect AVKO not to pay debts? Did you expect AVKO not to keep its word? AVKO did expect W3L to keep its word. |
| 20. AVKO ultimately filed suit on July 29, 2011. | Agreed |
| 21. Wave 3 Learning has relied on AVKO's representations and insistence that Wave 3 Learning should continue printing and selling the AVKO works. | Partially true. Certainly Wave 3 Learning has not relied on AVKO's insistence that AVKO be given desk copies, that Wave 3 Learning remove its claims to copyrights of the AVKO materials. |
| 22. Wave 3 Learning was, prior to the filing of the lawsuit, ignorant of the true facts, namely, that AVKO believed that Wave 3 Learning had infringed on the copyrights. | This is a lie. |
| 23. Wave 3 Learning has expended significant sums in reliance on AVKO's representations. | What representations? Presumably the alleged "promise" that he would receive at least $300,000 in sales no matter how well or how |

| | |
|---|---|
| | poorly he managed the business is ludicrous. |
| 24. Specifically, I personally provided AVKO with an initial payment of $50,000.00 | In different documents, it has been HSH and Wave 3 Learning that presented the initial payment. The initial payment, by the way, was to be $300,000 (not $50,000 which is is only 1/6 of the initial payment and not payment in full. $600,000 would have been payment in full. |
| 25.  Wave 3 Learning has purchased over $149,054 of product and $41,183 in inventory, expended $32,007 on advertising, $41.695 on the development of a Sequential Spelling iPad application, and $7,514 to recover the sequentialspelling.com domain name. | If true, W3L should have sales of $760,948.<br><br>So? The amount and effectiveness or lack thereof is not AVKO's fault.<br><br>AVKO could have helped prevent this travesty which has had nothing but bad reviews, and rightly so. The cost is outrageous. AVKO is not responsible for W3L's lack of good business sense.<br><br>A total waste of money. W3L could have acquired sequentialspelling.net for less than $50.00. |
| 26. Wave 3 Learning has also received $110,000 in capital contributions to fund and operate the business. | So? Why hasn't some of this been used to pay off some of the $550,000.00 it owes AVKO. |
| 27. In total, Defendants have invested $317,132 in Wave 3 Learning, Inc. in reliance on Plaintiff's representations. | This doesn't add up. |

# EXHIBIT G

# [FWD: FW: Call with WONO]



Inbox x

**Joe Hipps** 11:21 AM (3 hours ago)

to me

This is the email I was thinking of when we spoke...

All the best,

John Joseph Hipps (Joe)
Owner | JJH Publishing
www.JJHPublishing.com
www.JJHippsPlanners.com
Office and Fax:
844-554-4777 or 844-JJHIPPS

> -------- Original Message --------
> Subject: FW: Call with WONO
> From: "Thomas Morrow" <thomas@wave3learning.com>
> Date: Tue, March 15, 2016 5:06 am
> To: "'Joe Hipps'" <joehipps@jjhipps.com>

Joe
Hipps

**From:** Matt Grothouse [mailto:matt@saperlaw.com]
**Sent:** Monday, March 14, 2016 1:44 PM
**To:** Thomas Morrow <thomas@wave3learning.com>
**Cc:** Daliah Saper <ds@saperlaw.com>
**Subject:** Call with WONO

Hi Thomas,

Brian from WONO just called me and said that he is major having issues with Don (so much so that they are likely going to try to go to the Board now). So Brian more or less said we should just send out the email on our own. I am waiting on Daliah's notes and then I will send you our final draft.

In the meantime, Brian just sent us AVKO's three names

(listed below)). So as soon as you hear back from the third name, we can send them yours. It might be a good idea to include a "Dr." if possible).  If none overlap, we can go to the judge tomorrow.

One last thing. Brian said Don is hung up on this "null and void" theory based on the fact that IMI allegedly has some copyights or other rights to the DVD's so AVKO has no actual authority to grant an exclusive license for the DVD's.  Although Don is complete wrong insofar as it nullifies the grant to exclusive rights (in fact, AVKO would likely be liable to Wave 3 for misrepresentation), I did want to clarify what exactly you agreed to when it comes to the DVD's.  I recall at one point you saying you don't really care about the DVD's but at another point I remember you saying that IMI can just go through you. The agreement does not explicitly mention the DVD's or IMI but it does give Wave 3 the exclusive rights to Levels 1-7 for both the Teacher's Guide and the Student Response Books and any derivatives thereof (presumably, DVD's would be considered a derivative).  What was your understanding?


Donald Neal Thurber (author of D'Nealian Handwriting)
Dr. Eldo Bergman (Texas Reading Institute)
Lee Caskey (author of The Smell of Stupid Growing up Dyslexic)

# EXHIBIT H

Thomas Morrow     Mr. McCabe: The Test Environment for Sequential    Jul 14
Spelling online is now availa...

**Don McCabe**            Jul 14
**‹donmccabe1@gmail.com›**

to Thomas

Mr. Morrow,

The link you gave has no place for a name and password. Let me know when I can see your online version.

And please remember you will need a license from AVKO which will be forthcoming for a modest sum of perhaps $25.00 and the standard market royalty for online works of 50%.

We will even advertise your online version on our website as we still hope that you will eventually become successful at marketing.


May God smile on you today.

Don McCabe, Research Director Emeritus,
AVKO Educational Research Foundation
3084 Willard Road Birch Run, MI 48415-9404
Phone: (810) 686-9283    Fax: (810) 686-1101
[Website] http://www.avko.org


**Thomas Morrow**          Jul
**‹thomas@wave3learning.com›**    14

Click sequential spelling online in upper left corner. It is currently configured thus so people won't try to use it.

I do appreciate the humor....all derivatives are already licensed.

I am certain to become successful at marketing, once you decide to adhere to your agreement by ending your constant interference.   May I expect that to occur soon?

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

888-928-3576 Ph and Fax

**From:** Don McCabe [mailto:donmccabe1@gmail.com]
**Sent:** Thursday, July 14, 2016 6:29 PM
**To:** Thomas Morrow <thomas@wave3learning.com>
**Subject:** Re: SS Online Test Environment

Don McCabe <donmccabe1@gmail.com> Jul 16

to Thomas

Dear Mr. Morrow,

You said: "I am certain to become successful at marketing, once you decide to adhere to your agreement by ending your constant interference.   May I expect that to occur soon?"

AVKO has adhered to the terms of the Settlement Agreement.   I have not interfered.

As to your online version of Sequential Spelling which I hope

will succeed, I got no further in the reviewing process than Lesson One.   Your sentence for the word sin must be replaced with one which a child can understand and/or will make some theological sense. "Do not expect me to absolve you of your sin" is unacceptable.

There is no point in my reviewing the rest of the online version if you do not change that sentence.

Thomas Morrow                           Jul
<thomas@wave3learning.com>               16

to Matt, me, Daliah

Mr. McCabe:

We are actually trying to achieve several goals with the sentences.   First is the primary pedagogical goal of providing context to enable a student to avoid a homonym mistake.   Second is to enable a student to encounter words that expand their vocabulary.   Third is the goal of inspiring teacher and student to engage a series of words to connect the learning of words with the learning of other things, such as civics, religion, science and history.   This is why SS is special.   Unlike *All About Spelling*, it places spelling in a more valuable pedagogical context.   Unlike *Spelling U See* the additional context does not take over the primary function of acquiring literacy.   If you had any contact with the market, you would be aware of these issues.

"Don't expect me to absolve you of your sins." achieves these goals quite effectively.   It offers the opportunity to expand vocabulary and calls upon teacher and student to reflect on the issues of forgiveness, redemption and sin in a manner the teacher can project at an age appropriate level.   It seems to escape you that about ¼ of the students doing level one are 12 years old or older.   Once again, you have no contact with the market. I meet 20,000 homeschooling families a year.   Well, every year except this year because you objected to Wave 3 "holding itself out as the Sequential Spelling company".   I am certain no one would interpret such a mindless and baseless complaint as interference.

I will take this as your refusal to approve SS online and move

it on to Mr. Bailey.   I will ask the developers to shut down your access.

The rest of your note is so intensely ludicrous, I won't deal with it further.

Thanks and Best regards,

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

888-928-3576 Ph and Fax

**From:** Don McCabe [mailto:donmccabe1@gmail.com]
**Sent:** Saturday, July 16, 2016 10:35 AM


Don McCabe <donmccabe1@gmail.com> Jul 17


to Thomas, Daliah, Matt

Mr. Morrow,

In the spirit of cooperation, I returned to the task of reviewing your online version of Wave 3's Revised Edition of Sequential Spelling 1.

When I struck the letter *p* as I was starting to spell the word *pinned* on lesson three

the words *pen*, *pin*, and pins popped up.

When I then deliberately misspelled *pinned* as *pind* (rhyming with *wind*) I was told
to try again. I did so, only I deliberately misspelled again with *pined*
. Up pops the
message that I again misspelled it and to try again with the correct

spelling in front

of me to directly copy.

Copying a correct spelling is not what Sequential Spelling is all about. The showing of the
correct spelling, must, of course be done.   However, it should NOT remain on the
screen when the student types in the correct spelling.

When on the next word I typed in the first letter *s* (of the word *sinned*) the words *sin,*
*sins, skin, spin* and *spins* immediately popped up on the screen. I don't think you really
intended these pop ups to occur. It is more likely to confuse rather than to aid in making the correct spelling.

When I typed in the second letter *i, sin* and *sins*, popped up.

When I typed in the third letter *n*, the words *sin* and *sins* popped.

On the next word *I*, I typed in lowercase *i*, and immediately popped up the words *I* and *in*.

When I copied the correct spelling (supposedly used as a guide) up popped I, *i,* and *in*.)

On the next word *shin*, I typed in the first letter *s* and up popped *sin sinned sins skin spin* and *spins*.

When I typed in the second letter *k*, only the word *skin* popped up.

When I deliberately changed the second letter to *c*, nothing popped up. When I was directed to spell *skins* correctly with the correct spelling in front of me, up popped the same bunch of words and with the *sk* came *skin* and with the *s* it merely said "You attempted to spell skins you spelled "skins." No mention of it being correct. This should,   in my humble opinion, say something like, "Good, you got it right this time."

On the next word *wins*, when I typed in the *w*, immediately the word *win* popped up.

When I typed in the *i*, both *win* and *twin* popped up. This might tend to be confusing.

On the next word *twins*, when I typed in the *t*, the words *thin* and *t win* popped up.

After following the first "clue" the word *thin*, I typed in *thins*. When I was told to try again and I typed *t* I got the words *thin, thins* and *twin* to pop up. If your programmer designed these pop ups as clues to the correct spelling, it doesn't make a great deal of sense to include an immediate previous misspelling as a clue. After

correctly copying *twins* The word *twins* occurred as well as the
sentence but this time the sentence was not read nor was there a
button to have the sentence read. Having the sentence
automatically be read should, according to those experts who
ascribe to the values of neurological impress, give additional help
to the students who have some form of reading problems
as well as spelling problems.

**AVKO does want your online version of your Wave 3 Revised
Edition of Sequential Spelling to succeed and we do believe that
we can help by showing you how it can be improved.**

Lecturing me about the purpose of Sequential Spelling is not the
way to receive help, nor is your unwillingness to change the
sentence, "Do not expect me to absolve you of your sin." Perhaps
a priest might be able to say that sentence to a congregant in the
confessional, but not for the common lay person. If you believe it is
that important to use the word *absolve* in the very first lesson, a
simple change to something like, "Only God can absolve you of
your sin" would accomplish this purpose.

```
Thomas Morrow                    Jul
<thomas@wave3learning.com>        17
```

```
to me, Daliah, Matt
```

Mr. McCabe:

I am flummoxed.   There is a great word for the vocabulary.

Where was this spirit of cooperation hiding for the last six
years?   Had it chosen to emerge when you signed the
Settlement Agreement, $25,000 of additional legal expenses
*directly* related to your interference and misconduct could
have been avoided. With that money, the development
could have been faster and marketing could have begun in
earnest.   There could be literally thousands of users of SS O
already.   Instead, the paper products are dying and the
market is hopelessly confused by your actions and those of
your self-identified co-conspirator John Joseph Hipps.   This
June, for the first time in history, the product line HAD ZERO
$ in sales for the month.   This has never happened, EVER,
even in prior Novembers, the weakest month of the year
normally.

In the last six years, ***exclusively*** as a result of your lies and
misconduct, we have been locked in litigation that cost both

organizations close to a ½ million dollars.   Product development has had to be haphazard and more often delayed than not.   Distributors are divided in loyalties and hopelessly distrustful of both organizations because of your lies.   Several people have lost their jobs, I have had two heart attack scares (that cost me about $10k each), a new and powerful competitor (Spelling U See) came onto the scene and gained traction because we could not fight it.   Where would we be now if the product line had gotten that $500,000 rather than the lawyers?   All this pain and agony and expense because of your overweening pride, egotism, paranoia and greed is disgusting.   All so you could force us to pay tribute to the Eighth Wonder of the Modern World, Don McCabe.   I would say you should be ashamed, but you are incapable of shame and shame does not even begin to describe the atrocity that is your conduct.   Your very existence.

You have my personal encouragement to invest in a pair of asbestos underwear, Mr. McCabe.

You are correct; only God can absolve you of your sins.   This, logically, would lead me to counsel you that you shouldn't expect me to absolve you of your sins.   I will, however, absolve myself of the duty to listen to your manure of the male kine any longer.   This and all IDs associated with you are henceforth blocked.   If you wish to communicate with me, you may write to Daliah and Matt.

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

888-928-3576 Ph and Fax

# Exhibit I

Joe Hipps <joehipps@jjhipps.com> Mar 24

to Family, Family, Brian, Robert, Adam, me

Mr Noack,

As you can see by the highlighted comments below, Mr. Morrow (Wave3) is engaging us (IMI) once again with his threats and intentional interference with contractual relations (Tortious Interference). His interference has caused verifiable damage to our sales and branding over the past few years. We have no intentions of complying with Mr. Morrow's demands or engaging in a business relationship with Thomas Morrow(Wave3). We are growing tired of his disregard for our contract with AVKO from to 2008. We have no evidence that would suggest that Wave3 has any of the rights he his asserting, such as exclusive distribution or copyright. We understand that we are within our rights to sue for Tortious Interference.

We have plans to update our Sequential Spelling DVDs and offer other computer based products based on AVKO products. We will not invest in any future projects until the legal entanglement of AVKO with Wave3 has been completely resolved.

Respectfully,

**John Joseph Hipps**
Partner | Instructional Media Innovations IMI
Site: www.InstructMI.com
Office: 336.793.5178 Fax: 336.770.5524

------------Attached--------------

## Today 03/24/2016

Good morning, Joe.

Just following up on my earlier email to see if you want to have a discussion tomorrow.

Let me know as you get the chance.

Thanks!

Thomas Morrow
President
Wave 3 Learning, Inc.
126 E. Wing St. Ste 240
Arlington Heights, IL 60004

Ph: 1-888-WAV-3LRN (928-3576)

## 03/22/2016

Hey, Joe.

I am following up on my note last week. Do you want to set up a time to chat by phone on Friday? It's good Friday, so if you have commitments, no problem.

Let me know as you have time. If there is a better date/time, please feel free to propose it. I am not available this week except Friday.

Best regards,
Thomas Morrow
President
Wave 3 Learning, Inc.
126 E. Wing St. Ste 240
Arlington Heights, IL 60004
Ph: 1-888-WAV-3LRN (928-3576)

## 03/16/2016

Good morning, Joe.

I note the wee hour of this sending and I am sorry if I ruined your sleep. That is not the intention. I appreciate this demonstration of good faith. I think we can work together.

Please know I was not referring to instructmi.com....that should definitely stay up. My reference was to Allspelling.com and the amazon.com store front. I don't want you to delete them, just suspend them (as I have my apps) while we discuss what we will do going forward. I don't imagine it will be a lengthy discussion. You and I are business men capable of acting in good faith, so I am not concerned.

My week is quite busy....like you, I have a day job in technology (I do SAP B-1 and other finance and accounting system implementations) and right now it is killing me. I have a client who is trying to complete a B-1 implementation for the US sub of a multinational in just three months. We are almost done but now the real crunch is hitting with UAT and live migration (yes, they have to keep working while I implement a system...ugh!). Maybe we should plan on having a discussion next week, phone or email, your pick. I cannot do it Wed or Thu (that is final physical count day...another ugh!) but any other day should do. Friday would be best. That will give us all time to get a little more distance, too.

Thanks again, Joe, and have a nice weekend!

Best regards,
Thomas Morrow
President
Wave 3 Learning, Inc.
126 E. Wing St. Ste 240
Arlington Heights, IL 60004
Ph: 1-888-WAV-3LRN (928-3576)

## 03/15/2016

Hey, Joe.

Sorry, I had to shoot that note off quick because I am a little pressed for time today.

Just a quick one: actually, the copyrights were registered AFTER I had **already bought and paid for an exclusive license, so there is some question about the legality of the registration (see forwarded email)**. In any case, with an exclusive license to the AVKO half, it is of no concern now.

AVKO will not be a party to any arrangement between IMI and W3L as they have already made their deal. This is what you said to me back in 2012 when I asked about your payments to AVKO from my purchases of DVDs, and it what was ratified again February 24. There is no change.

For your information so that you may feel more comfortable, we have been asking for Don's input on the distributor letter for three weeks now without answer (once again, see forwarded email). His desire to change the agreement from exclusive to non-exclusive will not happen, so you will need to decide how you want to play this, given that reality. After 4.5 years and $150k (and counting) in the Federal Courts, my patience is not what it used to be.

I am hopeful I will see allspelling.com and your online stores **suspended** soon pending an arrangement between us.

Best regards,
Thomas Morrow
President
Wave 3 Learning, Inc.
126 E. Wing St. Ste 240
Arlington Heights, IL 60004
Ph: 1-888-WAV-3LRN (928-3576)

**03/14/2016**

Good afternoon, Joe

With great satisfaction, I am writing to inform you that on February, 24, 2016, AVKO Educational Research Foundation, Inc. and Wave 3 Learning, Inc. amicably and conclusively resolved their ongoing legal dispute.

Going forward, Wave 3 Learning, Inc. will be your **exclusive** source for all Sequential Spelling products.  This includes all future derivatives developed by Wave3 and approved by AVKO.  Wave 3 can deliver all of the current revised editions out of its existing inventory until AVKO's review process is complete. This approval process has commenced and will be completed shortly.  In the meantime, if you wish, you may order the AVKO Sequential Spelling Level 1 Classic Teacher Guide (and Level 1 **only**) from AVKO until Wave 3's version is approved.  Wave 3 will notify you once AVKO approves its Level 1 version.

Accordingly, please direct all future orders for Sequential Spelling products to Wave 3.  If you inadvertently submit orders to AVKO, they will be forwarded to Wave 3 Learning, Inc. for fulfillment.

To answer some questions you might have, please review the following:

**Q1:** What should I do with inventory I am holding which was sourced from AVKO?

**A1:** You may sell it off or you may return it, depending on what you want to do and what your distribution agreement with AVKO says.  This agreement only precludes you from acquiring any more inventory from AVKO (except for Level 1 until Wave 3's version is approved).

**Q2:** What if I received an order from AVKO or IMI after March 14 for non-Level 1 material?

**A2: Please send us documentation of that order to us.  We will take the documentation and address the issue directly with AVKO / IMI.**

**Q3:** Does this agreement affect the DVDs, too?

**A3:** Yes, all Sequential Spelling products and their derivatives.  We will be exploring a relationship with IMI to ship the DVDs, but that will **not make them immediately available.**

If you have other questions, please feel free to contact me by phone or email.

Best regards,

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

Ph: 1-888-WAV-3LRN (928-3576)

Brad Bjorkman, Heppner's Legacy Homeschool Resources
<bradbj@legacyhomeschool.com>

Mar 17

to donmccabe, me

Dear Don:

I received the e-mail below with attachment this morning.   As there has been some confusion and disagreement between Wave3 Learning and AVKO previously, I thought it prudent to verify with you the accuracy of this information.   Please review the e-mail below and its attachment carefully, and then reply with confirmation of its accuracy, or with corrections.

In addition, this e-mail only addresses Sequential Spelling products.   Please confirm that we should still purchase other products directly from AVKO, e.g. "Individualized Keyboarding".

Thank you in advance for your help with this.

Blessings,

Brad

*Brad Bjorkman*

**Heppner's Legacy Homeschool Resources**
Mail: PO Box 753 | Store: 369 Jackson Avenue NW
Elk River, MN 55330-1803
Phone: 763-241-HOME (4663) | FAX: 763-274-0142
www.legacyhomeschool.com

*It is our Ministry and Mission to help you Succeed in the Comprehensive Education of Your Children. TM*

**From:** Thomas Morrow [mailto:thomas@wave3learning.com]
**Sent:** Thursday, March 17, 2016 8:14 AM
**To:** 'Brad Bjorkman - Heppner's Legacy'
**Subject:** Settlement of Litigation Between AVKO and Wave 3 Learning

Good morning, Brad.

With great satisfaction, I am writing to inform you that on February, 24, 2016, AVKO Educational Research Foundation, Inc. and Wave 3 Learning, Inc. amicably and conclusively resolved their ongoing legal dispute.

Going forward, Wave 3 Learning, Inc. will be your **exclusive** source for all Sequential Spelling products. This includes all future derivatives developed by Wave3 and approved by AVKO. Wave 3 can deliver all of the current revised editions out of its existing inventory until AVKO's review process is complete. This approval process has commenced and will be completed shortly. In the meantime, if you wish, you may order the AVKO Sequential Spelling Level 1 Classic Teacher Guide (and Level 1 **only**) from AVKO until Wave 3's version is approved. Wave 3 will notify you once AVKO approves its Level 1 version.

Accordingly, please direct all future orders for Sequential Spelling products to Wave 3. If you inadvertently submit orders to AVKO, they will be forwarded to Wave 3 Learning, Inc. for fulfillment.

To answer some questions you might have, please review the following:

**Q1:** What should I do with inventory I am holding which was sourced from AVKO?

**A1:** You may sell it off or you may return it, depending on what you want to do and what your distribution agreement with AVKO says. This agreement only precludes you from acquiring any more inventory from AVKO (except for Level 1 until Wave 3's version is approved).

**Q2:** What if I received an order from AVKO or IMI after March 14 for non-Level 1 material?

**A2:** Please send us documentation of that order to us. We will take the documentation and address the issue directly with AVKO / IMI.

**Q3:** Does this agreement affect the DVDs, too?

**A3:** Yes, all Sequential Spelling products and their derivatives. We will be exploring a relationship with IMI to ship the DVDs, but that will not make them immediately available.

If you have other questions, please feel free to contact me by phone or email.

Best regards,

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

Ph: 1-888-WAV-3LRN (928-3576)

Attachments area

**Don McCabe** <donmccabe1@gmail.com> Mar 17

Brad,

What is correct is that a settlement agreement was signed.

To the best of our knowledge, Wave 3 does not carry any AVKO products other than their versions of Sequential Spelling. In any case, you may purchase any of the AVKO materials from us.

If and when AVKO gives its approval to any of the Wave 3 Sequential Spelling Books, we will immediately advise you.

May God smile on you today.

Don McCabe, President and Research Director Emeritus,
AVKO Educational Research Foundation
3084 Willard Road Birch Run, MI 48415-9404
Phone: (810) 686-9283    Fax: (810) 686-1101
[Website] http://www.avko.org


**Brad Bjorkman, Heppner's Legacy Homeschool Resources**
<bradbj@legacyhomeschool.com>                          Mar 17


Hi Don:

Thanks for your prompt reply and clarification. We will continue to purchase all of the AVKO products we offer directly from AVKO.

Blessings,

Brad

*Brad Bjorkman*

**Heppner's Legacy Homeschool Resources**
Mail: PO Box 753 | Store: 369 Jackson Avenue NW
Elk River, MN 55330-1803
Phone: 763-241-HOME (4663) | FAX: 763-274-0142
www.legacyhomeschool.com

*It is our Ministry and Mission to help you Succeed in the Comprehensive Education of Your*

*Children. TM*

# Exhibit J

**Accountability Among Coowners**
Notwithstanding the similarities on the issues of creation, transfer and joint ownership for copyrights and patents, the rights and duties of coowners of a copyrighted work differ substantially from those for joint owners of a patent. Joint owners of a copyright have an obligation to account to the other coowner[s].

Under the copyright law, a coowner of a copyright must account to other coowners for any profits earned from licensing or use of the copyright. This obligation to account is not set forth in the Copyright Act. There is no express statutory provision in the Copyright Act analogous to that which is articulated by the Patent Act.[15] It is well settled that the duty to account does not derive from the copyright law's proscription of infringement in the Copyright Act. Rather, it comes from equitable doctrines relating to unjust enrichment and general principles of law governing the rights of coowners. [16]

http://alphatechcounsel.com/blog/the-confusing-world-of-joint-ownership-of-intellectual-property/

# The Confusing World of Joint Ownership of Intellectual Property

by Matt Storms

A confusing topic for many entrepreneurs is joint ownership of intellectual property.   It often comes up in connection with joint development arrangements, subcontracting portions of work, joint ventures, and other collaborative projects involving intellectual property development, whether it be in connection with software, cleantech, medical device, drug development, or other technology-based initiatives.
Joint ownership of intellectual property can result when two (or more) people co-invent a patentable invention or co-author a joint work of authorship.   Joint ownership can also come up as a matter of a compromise in a contract.
While it may seem fair and a reasonable compromise to declare that all intellectual property developed as part of a collaborative project should be jointly owned, many of the implications of jointly owned intellectual property are counterintuitive.   For instance, joint ownership related to patents is very different than joint ownership of copyright.
So, let us go through the basic implications of joint ownership by the default rules in the United States for patents, copyright, trade secrets, and trademarks.

Joint Ownership of a Patent
In the absence of an agreement to the contrary, each joint owner of a patent may make, use, offer to sell, sell and import the patented invention without the consent of the other joint owners, provided that the joint owner does not infringe the patent rights under a separate patent.   Notably with patents, there is no duty of accounting among the owners of the patent.   In other words, one owner can profit from the patent and does not have to share   the proceeds of the profits with the other owner(s).
To exclusively license a patent to another, however, generally requires the consent of all the owners of the patent.   Also, the consents of all owners of a patent are generally needed for patent enforcement. This means that in many cases, any single owner can limit enforcement of the rights under the patent.

Joint Ownership of Copyright
Analogous to patents, each owner of a copyright is free to copy, distribute, prepare derivative works based on the joint work, and exercise the other exclusive rights of copyright.   Unlike patents, however, joint owners of copyright do have to account to one another for profits they receive in connection with the jointly owned copyright.   In other words, each owner has to share the profits with the other owners. **To exclusively license copyright requires the consent of all the owners of the copyright**.   Also, unlike joint owners of a patent, one owner of a copyright cannot block another owner of that copyright from suing for infringement by simply refusing to join in the suit.   While **each individual owner has the right to enforce the copyright in preventing others from using the copyrighted material**, another owner can

circumvent that enforcement by simply licensing to the "infringer" the right to use the copyrighted material.

Joint Ownership of a Trade Secret
The law surrounding joint ownership of trade secrets is not as well established as it is for patents and copyright.   As with copyright, joint owners of a trade secret likely have to account to one another for profits related to the trade secret.   Although, that conclusion is not entirely clear by case law or statute. To exclusively license a trade secret likely requires the consent of all the owners of the trade secret. Sometimes joint ownership can make maintaining secrecy difficult, however, which if compromised could jeopardize the trade secret status.   Although in some contexts, joint owners may have an obligation to one another to keep a trade secret confidential.

Joint Ownership of a Trademark
While joint ownership of trademarks is possible, it is somewhat unusual in that joint ownership is counter to the fundamental purpose of a trademark, which is to serve as a designation of origin from a single entity or person.   A more common strategy is a jointly owned single entity owning the mark.   When there is joint ownership of a trademark, however, as with copyright and trade secrets, joint owners of a trademark likely have to account to one another for profits related to the mark.   **To exclusively license a trademark requires the consent of all the owners of the trademark**.

Other Issues of Joint Ownership of Intellectual Property
There are a few other general things to keep in mind with regard to joint ownership of intellectual property.   As with the status of joint ownership itself, the parties can modify many of the default rules by addressing the particular issues in a contract, subject to certain legal restrictions such as those related to antitrust.   For example, the parties can decide that only one party is in charge of registration, maintenance, and prosecution of the intellectual property and that the parties must share all royalties in a certain manner (e.g., 70/30).
In addition, the default rules outlined above are quite different in many foreign countries.   For example, in Canada and the U.K., in the absence of an agreement to the contrary, a joint owner of a patent, while having the right to exploit the patented invention, has no right to license it to a third party without the consent of the other owners.
While joint ownership makes sense in certain contexts, many times it does not.   Often joint ownership sounds good in concept at a very high level, but when emerging companies understand the implications of joint ownership of intellectual property they frequently try to avoid it or they contract out of many of the default rules.

by Matt Storms |

**To be effective, a transfer of copyright ownership must be in writing:**


# Joint Ownership And Assignments Of Intellectual Property Rights: Part II - Copyrights

M&E IP/IT Newsletter - Volume 6, Issue 1

In our last newsletter we reviewed joint ownership and assignments of patents.[1] Here, we turn to a review of some of the significant issues surrounding joint ownership and transfer of copyrights. Both copyrights and patents are based on the same constitutional foundation and grant the owners similar rights.[2] However, the rights granted to joint owners of patents and copyrights differ in several important aspects.

Joint owners of both patents and copyrights are free to exploit the property without the consent of their joint owner(s) absent agreement to the contrary. However, only joint copyright owners are obligated to account to each other for any profits earned from licensing or use of the copyright.

A brief review of the copyright ownership rules is worthwhile before reviewing a few cases in which the joint ownership of copyright rules have been applied.

**Initial Ownership**

Copyrights and patents allow the owners to exclude others from using the protected work or invention. Copyright ownership, as with patents, arises at creation and rests with the author or authors. The Copyright Act provides as follows:

(a) INITIAL OWNERSHIP. — Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.[3]

Thus, the statutory scheme at creation under the copyright law is similar to the patent law. Joint inventors or creators of an invention become the initial joint owners of a patent for the invention. The Patent Act provides that "[w]hen an invention is made by two or more persons jointly, they shall apply for patent jointly."[4]

However, an initial difference between copyrights and patents is that copyright ownership arises automatically at creation. In the case of patents, an affirmative act of filing a patent application is required to initiate creation of the right.

It is important to keep in mind that to be coowners of a copyrighted work based on co-authorship, each author must contribute copyrightable subject matter to the work. That is, one is not a joint author where the contributions are limited to "[i]deas, refinements, and suggestions."[5]

In *Erickson v. Trinity Theatre*, for example, the Seventh Circuit Court of Appeals sought to interpret the definition of a "joint work" in the Copyright Act as a work prepared by two or more authors with the intention that their contributions be merged into inseparable or independent parts of a unitary whole.[6]

The legislative history of the Copyright Act of 1976 discussed this as follows:

[A] work is "joint" if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unity whole." The touchstone here is

the *intention*, at *the time the writing is done*, that the parts be absorbed or combined into an integrated unit....[7]

This determination of co-authorship and the resulting coownership of a copyright are issues arising under the Copyright Act. Accordingly, federal jurisdiction is exclusive.[8] In contrast, as discussed below, the right to an accounting arising under the common law is generally held to be a state claim governed by state law.[9]

**Transfer of Ownership**

Once the work is created, the copyright is freely transferable as personal property. Section 201(d) of the Copyright Act provides:

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or passed as personal property by the applicable laws of intestate succession.[10]

***A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.***[11]

Similarly, the transfer rules relating to patents provide that "patents shall have the attributes of personal property. Applications for patent, patents, or any interest therein shall be assignable in law by an instrument in writing."[12]

**Right to Use**
Ownership of a copyright in an independently created work gives the owner of the work the right to use and publish the copyrighted work. In the case of joint authors (now joint owners) of an independently created work, each holds an individual interest in such work, regardless of the relative contribution to the work. Thus, each coowner has an independent right to use or license the use of the copyright in an independently created work without the need to obtain the consent of the other coowners.[13]

The rights granted to joint copyright and patent owners to exclude and license are similar except with respect to the right to use issue, for example. The copyright law grants the owner[s] of a copyright the exclusive right to use the copyrighted work, so long as there has been independent creation thereof.[14] This right is broader than rights given to patent owners, which do not include a right to use the patented invention — only to exclude others from use - and the patent owner cannot use "independent creation" as a defense if commercializing the invention also happens to infringe upon the patent rights in the invention of another.

**Accountability Among Coowners**
Notwithstanding the similarities on the issues of creation, transfer and joint ownership for copyrights and patents, the rights and duties of coowners of a copyrighted work differ substantially from those for joint owners of a patent. Joint owners of a copyright have an obligation to account to the other coowner[s].

Under the copyright law, a coowner of a copyright must account to other coowners for any profits earned from licensing or use of the copyright. This obligation to account is not set forth in the Copyright Act. There is no express statutory provision in the Copyright Act analogous to that which is articulated by the Patent Act.[15] It is well settled that the duty to account does not derive from the copyright law's proscription of infringement in the Copyright Act. Rather, it comes from equitable doctrines relating to unjust enrichment and general principles of law governing the rights of coowners. [16]

This obligation to account in copyrights is in marked contrast to the rights of joint owners of patents in the United States governed by the U.S. Patent Act as follows:

In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and *without accounting to the other owners.*[17]

The obligation for coowners of copyrights to account is discussed in the legislative history of the 1976 Copyright Law revisions. The House Report acknowledges the lack of a statutory provision as follows:

There is also no need for a specific statutory provision concerning the rights and duties of the coowners of a work; court-made law on this point is left undisturbed. Under the bill, as under the present law, coowners of a copyright would be treated generally as tenants in common, with each coowner having an independent right to use or license the use of a work, subject to a duty of accounting to the other coowners for any profits.[18]

### Agreements to Vary the Default Copyright Rule

As in the case of patents, these general or default rules of ownership and exploitation of copyright can be varied by an agreement between the coowners — but such an agreement must be in writing. Such agreements and transfers in writing may be recorded at the Copyright Office.[19]

### Application of the Default Copyright Rule

The general default rules apply to jointly owned copyrights regardless of whether ownership was created by co-authorship or by transfer. This is true regardless of the amount of the relative contribution and of the form of the copyrighted work. For example, *Erickson v. Trinity Theatre* involved three plays and videotapes;[20] *Oddo v. Ries* involved a book describing how to restore Ford F-100 pickup trucks, in part based on a manuscript that contained much but not all the material to be included, and was a reworking of previously published magazine articles written by one partner;[21] *Goodman v. Lee* involved ownership of the song "Let the Good Times Roll;"[22] *Gaiman v. McFarlane* involved rights to comic-book characters;[23] and *Janky v. Lake County Convention and Visitor Bureau* involved a promotional song by a doo-wop group "Stormy Weather."[24]

For example, in *Oddo v. Ries*, Oddo and Ries entered into a partnership in March 1978 to create and publish a book describing how to restore Ford F-100 pickup trucks. According to the partnership agreement, Ries was to provide capital and supervise the business end of the venture; Oddo was to write and edit the book. By January 1980, Oddo had delivered to Ries a manuscript that contained much but not all of the material the partners planned to include in the book. This manuscript consisted partly of a reworking of previously published magazine articles that Oddo had written and partly of new material, also written by Oddo, which had never before been published. At about this time, Ries became dissatisfied with the progress Oddo had made on the manuscript. Ries hired another writer to complete Oddo's manuscript and then published the finished product. The book that Ries eventually published contained substantial quantities of Oddo's manuscript and also contained material added by the new writer. Based on these facts, the court found that Ries could not infringe the partnership's copyrights in the manuscript or the book created pursuant to the partnership agreement. On the other hand, Ries could infringe the earlier copyrights to the articles and could be required to account to Oddo for any profits he made from use of the copyrights in the articles.[25]

Referring to another example, *Goodman v. Lee*, Shirley Goodman filed an action in 1985 against Audrey and Nikki Lee (the Lees), respectively the widow and daughter of Leonard Lee (Leonard). Goodman sought a declaration that, together with Leonard, she was a co-author of the 1956 rock-and-roll hit "Let the Good Times Roll" and for an accounting from the Lees for all royalties received from the use and exploitation of that song. After a jury trial and several post-trial hearings, the district court entered a final judgment declaring Goodman a joint owner of the copyright of "Let the Good Times Roll." The court ordered the Register of Copyrights to identify her as a co-author and joint owner of the copyright registration and awarded her one half of all royalties received by the Lees from 1976 to 1993, together with prejudgment interest computed for those dates at the rates set forth in the

Louisiana Civil Code. This case highlights the rule courts have exclusive original jurisdiction over claims for declaratory judgment to establish co-authorship under the Copyright Act which necessitate the application and interpretation of the copyright ownership provisions of the Act. Having found co-ownership, applicability of federal law ended and Goodman's claim for an accounting was governed in all respects by state law, which law provided that she was entitled to recover her share of the proceeds collected by the Lees for the use of "Let the Good Times Roll." Goodman was not entitled to recover any part of the royalties received by Leonard before his death, as Goodman failed to name either his estate or its succession representative as a defendant in the action. Under Louisiana law, once a succession has been opened judicially, it is a distinct legal entity that answers for the decedent's obligations until the succession proceedings have been closed. Similarly, the three-year statute of limitations under the copyright law was deemed not to apply to the action for an accounting. The court noted: "[n]owhere in the Act, however, do its provisions detail any action available to a coowner for an accounting. Instead, as discussed above, such an action is governed by state law."[26]

In *Janky v. Lake County Convention and Visitors Bureau*, the composer of a promotional song sought to enjoin performance of the song by Lake County, Indiana. Cheryl Janky alleged that she composed the song and obtained an initial copyright listing herself as the sole author and never gave the county visitors bureau permission to use it. Henry Farag was a band member with Janky who, Janky admitted, recommended changes that were adopted and accounted for 10 percent of the lyrical content. At this point, a new copyright registration was filed listing Farag as a co-author. Farag then licensed the bureau to use the song. Janky filed another copyright registration, again listing herself as the sole owner. She then sought to enjoin the use by the bureau and damages. The Seventh Circuit Court of Appeals held that even though the band member contributed only 10 percent of the song, he was a joint owner of the copyright with the composer in the song. Therefore, he could license the song without the other coowner composer's consent. The copyright filed by the composer after the song was revised was registered identifying the band member as an author and the work as joint. This acknowledgment was considered strong evidence of the requisite intent to create a joint work under Section 102 of the Copyright Act.[27]

### Conclusion

These default rules strongly suggest that a suitable ownership agreement between joint owners of copyright may be beneficial, and, depending on the facts of a particular case, it may be desirable to define in writing the rights of the respective coowners as to use, license and accounting prior to creation of the work.

The default rules allowing a joint owner of a copyright to use the work without consent — yet be under an obligation to account — allows for unintended consequences. This is true especially in the case where one co-author contributes a substantial portion of the work. Thus, it may be beneficial to address allocation of the respective use and ownership rights to an income stream by written agreement at an early time in the relationship, and such an agreement may best be in writing.

* This article was prepared by Michael I. Wolfson, who is a former partner of McCarter & English, LLP. Michael Wolfson can be reached at miwolfson@aol.com.
[1] See Joint Ownership and Assignments of Intellectual Property Rights, *Intellectual Property &Technology Update* Vol. 5, No. 3 (2010). Click here to read Part I.
[2] See U.S. Const., Art. I, § 8 ("The Congress shall have Power…To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries[.]").
[3] *See* 17 U.S.C. § 201(a).
[4] 35 U.S.C. § 116.
[5] *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994).
[6] *See id.*
[7] H.R. Rep. No. 94-1476 at 120 (1976).
[8] *See* 28 U.S.C. § 1338(a).

[9] *See Goodman v. Lee*, 78 F.3d 1007, 1012 (5th Cir. 1996); Oddo v. Ries, MME, 743 F.2d 630, 633 (9th Cir. 1954).

[10] 17 U.S.C. § 201(d).

[11] 17 U.S.C. § 204(a).

[12] See 35 U.S.C. § 261.

[13] See *Oddo*, 743 F.2d 630 and *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 268 (2d Cir. 1944). The law on this point differs in foreign jurisdictions, and, in many countries, all coowners must join in licensing to a third party. In the United Kingdom, for example, one joint owner may not even exploit the copyright without the consent of the other coowners. See Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT §6.10[D] (Mathew Bender, Rev. Ed.).

[14] *See* 17 U.S.C. § 106.

[15] 35 U.S.C. § 262.

[16] *Oddo v. Ries, MME*, 743 F.2d at 633 (internal citations omitted).

[17] 35 U.S.C. § 262 (emphasis added).

[18] H.R. Rep. No. 94-1476 at 121.

[19] *See* 17 U.S.C. § 204(b).

[20] *Erickson*, 13 F.3d 1061

[21] *See Oddo*, 743 F.2d 630.

[22] *Goodman*, 78 F.3d 1007.

[23] *Gaiman v. McFarlane*, 360 F.3d 644 (7th Cir. 2004).

[24] *Janky v. Lake County Convention and Visitors Bureau*, 576 F. 3d 356 (7th Cir. 2009).

[25] See *Oddo*, 743 F.2d 630.

[26] *Goodman*, 78 F.3d at 1013.

[27] *See Janky*, 576 F. 3d 356 (citing 17 U.S.C. § 201(a)).

Copyright © 2016 McCarter & English, LLP. All Rights Reserved

http://www.mccarter.com/Joint-Ownership-And-Assignments-Of-Intellectual-Property-Rights-Part-II---Copyrights-05-27-2011/

# Exhibit K

AVKO's federally registered copyrights include:

| Copyright Number | Name | Year |
|---|---|---|
| TX0007582184 | If it is to BE . . . It is up to me to do it | 2003 |
| TX0007573205 | Sequential Spelling 2 | 2006 |
| TX0007573207 | Sequential Spelling 3 | 2006 |
| TX0007573219 | Sequential Spelling 4 | 2006 |
| TX0007573235 | Sequential Spelling 5 | 2006 |
| TX0007573278 | Sequential Spelling 6 | 2006 |
| TX0007570538 | Sequential Spelling 7 | 2006 |
| TX0007582356 | Sequential Spelling for Adults | 1998 |
| PA0001857872 | Sequential Spelling 1 | 2009 |
| PA0001857873 | Sequential Spelling 2 | 2009 |
| PA0001857874 | Sequential Spelling 3 | 2010 |
| PA0001857875 | Sequential Spelling 4 | 2011 |
| PA0001915566 | Sequential Spelling DVD Volume 5, Version 2.0 | 2013 |
| TX0007572942 | Patterns of English Spelling with New Word Families in Sentence Context | 2008 |
| TX0007573818 | Basic Patterns of English Spelling with Unabridged Examples | 1991 |
| TX0007477279 | Sequential Spelling 1 | 2008 |
| TX0007477506 | To Teach A Dyslexic | 1995 |
| A928855 | AVKO "10-4-1" Cards | 1977 |
| A711306 | AVKO Student Record Book | 1975 |
| A716108 | Individually Guided Typing | 1975 |
| A815786 | Student Record Book for Reading Via Typing | 1976 |
| A716107 | Reading Via Typing | 1975 |
| A611728 | AVKO Sequential Spelling Tests - Series One | 1974 |
| A716103 | AVKO Sequential Spelling Tests - Series One | 1975 |
| A716104 | AVKO Sequential Spelling Tests - Series Two | 1975 |
| A716102 | AVKO Sequential Spelling Tests - Series Three | 1975 |
| A716101 | AVKO Sequential Spelling Tests - Series Four | 1975 |
| A716105 | AVKO Sequential Spelling Tests - Series Five | 1975 |
| A815787 | Spoken Dialect Translation Exercises Student Record Book | 1976 |
| A815785 | Student Record Book for Individually Guided Typing | 1976 |
| A848352 | AVKO Student Record Book | 1976 |
| A716106 | Word Families in Sentence | 1975 |

# Exhibit L

# Financial Status of AVKO and Me

From the 990 draft for the fiscal year from July 1, 2015 through June 30, 2016 prepared by Gerald Barthle of Ballard & Van Fleteren, CPA's from information I provided via Quick Books computer program:

As of June 30, 2016, AVKO owes  --------$201,472

AVKO's gross income from all sales
      not just Sequential Spelling  ---------- $44,485

AVKO's expenses  --------------------------- $179,489

Net loss for the year-------------------------- $135,004


From the Quick Books trial balance of September 23, 2015

My personal income is my monthly social security check of $793

As the house I live in is co-owned by my wife and quick deeded as part of a living trust in 2012, it is not mine to give or sell.

I own a 2009 Chevrolet AVEO, one golf bag, one set of golf clubs, a tennis racket, one suit, one top coat, one winter jacket, one spring jacket, two dress shirts, two sport coats, two pair of shoes, three sweaters, 10 sport shirts, eight berets, dozen pair of socks and underwear and many objects of little value, other than sentimental such as photographs and souvenirs.

# Exhibit M



**SAPER**
─────── L A W ───────

Intellectual Property | Entertainment | Social Media | Business

Saper Law Offices, LL\
505 N. LaSalle Suite 350
Chicago, Illinois 60654
Tel: 312.527.4100
Fax: 312.527.5020

dsaper@saperlaw.com
www.saperlaw.com

Wednesday, March 30, 2016

**\*\*Via Electronic Mail\*\***

Jerry Bailey
President & Chief Executive Officer
Dynamic Literacy
PO Box 388
Lake Junaluska, NC 28745
888-696-8597
jbailey@dynamicliteracy.com

Re: Approval Process

Dear Mr. Bailey,

Thank you for agreeing to review this material for AVKO Educations Research Foundation, Inc. ("AVKO") and Wave 3 Learning, Inc. ("Wave 3"). Mr. Morrow will be sending you the relevant material shortly. Before he does, however, it is important to set forth the appropriate standard of approval and the appropriate procedure by which you shall grant or deny such approval.

**Authorization Standard**

AVKO has granted Wave 3 an exclusive license to sell Sequential Spelling[TM] Teacher Guides and Student Response Books Levels 1-7 (and their derivatives). While Wave 3 may immediately start selling any *unrevised* Teacher Guide or Student Response Book, for all revised or derivative works, AVKO must first approve or "authorize" those works before Wave 3 can sell any copies not currently in its inventory. Such authorization cannot be "unreasonably withheld." This approval process is intended to be a quality control measure: AVKO wants to ensure that the revised and derivative works are not riddled with spelling, grammatical, formatting, continuity, or functionality errors and that the revised and derivative works do not materially depart from the theory, methodology, and common essence of Sequential Spelling products. For each of AVKO's specific objections, therefore, the predominant question should be: "Is withholding approval based on this objection reasonable?"

**Authorization Procedure**

For each work sent to you for approval, you will be sent three different documents. The first document will be the revised or derivative work. The second document will be AVKO's

_____

Engagement Letter Page 1 of 2

objections to the revised/derivative work (listed in a word doc or set forth as marked revisions in the work itself). The third document will be a list of Wave 3's responses to AVKO's objections.

Once you have reviewed the work, AVKO's objections, and Wave 3's responses, you will make an independent and binding decision as to approval or disapproval. Your decision must issue within two weeks of having received the work. Please note that your approval can be granted outright or it can be conditioned upon the execution of certain changes/revisions. Once you have approved a work, your decision will be binding on both AVKO and Wave 3. Wave 3 will then have the exclusive right to sell those works.

If you have any questions regarding approval, please send your questions to the four following email addressed:

ds@saperlaw.com (counsel for Wave 3)

matt@saperlaw.com (counsel for Wave 3)

briann@wonoip.com (counsel for AVKO)

adamw@wonoip.com (counsel for AVKO)

Sincerely,

/s/ Daliah Saper
Daliah Saper

# Exhibit N

**Violations of Settlement Agreement on Wave 3's Website**:

On Wave 3's website

"Why Are There 'New' Revised Editions?

This is really confusing!   Why did you do this?

For the full story, please see "What Happened to AVKO?"    "

This then goes to PAGE UNDER CONSTRUCTION

Under "About Us" it has "What Happened to AVKO?" and it goes to "Page Under Construction." This has nothing to do with promoting their products. It, does however, allow for much negative inferences about AVKO.

Going back to Wave's answer to its question, "Why are there 'New' Revised Editions?"

It says (minus the numbering):

(1) In a nutshell, the original author sold us the rights to the Sequential Spelling product line.
(2) He then sued us for copyright infringement and lost by summary judgement. (sic)
(3) He then brought suit again in a different court.
(4) Even though we felt confident we would win completely again, the expense had become so onerous that we agreed to a settlement.
(5) One term of the settlement was that we change the color scheme of the covers.
(6) Hence, the "New Revised" editions.

I have numbered the sentences for ease of understanding.

Each of the above sentences is a misrepresentation to the public of the current situation.

(1) The original author, which I am, did not sell anything to Wave 3. Thomas Morrow as President and CEO of Home School Holdings signed an agreement to purchase for $600,000 publishing rights to the AVKO materials. All that was ever paid was $50,000 by Thomas Morrow who later created Wave 3 Learning and in public documents claimed Wave 3 (which wasn't even in existence at the time the check was made out) paid the $50,000 and that he (Thomas Morrow) assigned the copyrights to the AVKO materials to Wave 3.

(2) I didn't sue. AVKO sued for fraud in the inducement as well as for infringement. What is true is that the charges of fraud in the inducement and infringement were dismissed on the technicality that AVKO's attorney, without AVKO's permission, dropped Home School Holdings from the lawsuit. Thus, Wave 3 Learning not being in existence at the time, could not be held responsible for fraud in the inducement. However, Judge Ludington did rule that AVKO retained the copyrights and that Wave

3 was obliged to pay the remaining $550,000 to retain the implied non-exclusive license to publish. Wave ignored those decisions.

(3) No, I did not then bring suit next nor did AVKO. Wave 3 did. After AVKO notified Wave 3 that they were in breach of the implied license for non-payment, Wave 3 filed suit, not in Michigan, which was **a requirement of the implied license** granted by Judge Ludington, but in Illinois. After Wave 3's petitions for a declaratory judgment were dismissed by Judge Virginia Kendall three times for lack of evidence that Wave 3 ever had the copyrights, then AVKO did file suit.

(4) Wave 3 may have been confident, but certainly not based upon a record of winning completely in all the former litigation.

(5) The settlement agreement calls for confidentiality of the terms of the agreement and Morrow blatantly lists unnecessarily and incorrectly one of the terms of the contract and in doing so, misrepresents the reason for the change in the covers. It was NOT to distinguish between the two versions that Wave 3 had developed, but rather between the AVKO classic version and Wave 3's modified versions.

(6) Morrow's "hence" implies a causal relationship between his first five sentences (all untrue) and the change in Wave 3's covers for Sequential Spelling.

The Revised Editions themselves are different from the original in the following regards:

- The instructions have been condensed and clarified.
- Racially and religiously offensive words have been removed.

This implies that the instructions needed to condensed and that they were not clear. That is not true. In fact, it is disparaging which is clearly a **violation of the Settlement Agreement.** What is true is that because the Plaintiff wants all buyers of Sequential Spelling to purchase his student workbooks levels 1-7, he eliminated (not condensed) the instructions on how to use plain paper instead of the Response book.

This also implies that the original had racially and religiously offensive words. This is unnecessary. This is not a sales pitch but rather a disparaging comment. The usage of the word *words* implies more than just the word *Negro* which plaintiff misspells by using a lower case n, which definitely makes it a racial slur.

Quid pro quo?

On the Plaintiff's website (www.sequentialspelling.com) more space is given to showing the virtues of Jerry Bailey's educational materials than to its own.

**WordBuild by Dynamic Literacy** is the finest late grammar school through middle school level vocabulary program available!

It begins by familiarizing students with common elements (e.g. Greek and Latin roots) and then encourages students to explore how the elements manifest themselves in a whole collection of English words.

The program is very affordable and is available as a paper, teacher-led **curriculum** or as an online, independent learning resource. WordBuild is an outstanding follow on to Sequential Spelling which will cement your student's knowledge of English vocabulary.

Emphasis added. You would think correct spelling would be found on sequentialspelling.com.

That has a disparaging effect on AVKO's trademarked Sequential Spelling. Just as Plaintiff's failure to correct

Level One consists of 180 daily lessons totaling just over 4,000 words.   It begins with the word family "in" and ends with the word families "as" and "ac".

As the author I know the last two word families in Sequential Spelling 1 are -ase as in chase and -ace as in face. This I explained politely to Thomas Morrow but he has refused to make that simple correction.

# Exhibit O

Case: 1:16-cv-05643 Document #: 38 Filed: 10/12/16 Page 91 of 95 PageID #:420

*For*

KELVIN C. VANDERLIP, JR.

Copyright 1949 by Dr. Seuss. Copyright renewed 1977 by Dr. Seuss. All rights
reserved under International and Pan-American Copyright Conventions.
Published in the United States by Random House, Inc., New York, and simulta-
neously in Canada by Random House of Canada Limited, Toronto.

*This title was originally cataloged by the Library of Congress as follows:*
[Geisel, Theodor Seuss] 1904–   Bartholomew and the oobleck; written and illustrated by
Dr. Seuss [pseud.] New York, Random House [1949]   [48] p. illus. (part col.) 31 cm.
I. Title.   PZ8.G326Bar   49-11423   ISBN: 0-394-80075-3   0-394-90075-8 (lib. bdg.)

Manufactured in the United States of America

# Dedication

This book is dedicated to Dr. Robert Kraft, who introduced me to the I-Search paper, and Dr. Ken Macrorie, who came up with the idea. It's also dedicated to all students who hate or fear writing but know they need to be comfortable with it if they want to succeed in this world, and to those of us who teach them and parent them. (Well, that about covers everybody.) Finally, it's dedicated to my dream of a wildly literate society.

# Thanks

Thanks to Robert Kraft, Russ Larson, Phil Arrington, and Carol Schlagheck from Eastern Michigan University's English department, Keith Stanger and Ron Colman, Eastern Michigan University reference librarians, Steve Climer, dean of Baker College of Allen Park Department of Developmental Education, and journalist extraordinaire Sheryl James for their expert editing and helpful comments; Lexanna Lyons, from Roberto Clemente High School, and Cheryl Grace, from Community High School, both in Ann Arbor, for their kind words of support; Adrienne Love and Joyce Moore, from the Detroit Public Schools, for opening up a new world to me; and especially to Emily for her editing and comments but also for just being there.

Cover art design by Kate Scheible, Hamtramck, Michigan.
Typesetting and page design by
Sally Day, Daze Design, Ypsilanti, Michigan.

Second edition © 2005, Ken Wachsberger
First printing 2003
Printed in the United States of America
All rights reserved

ISBN 0-945531-04-4

Azenphony Press
Writing for Sanity Division
PO Box 130884
Ann Arbor, MI 48113-0884
www.azenphonypress.com
info@azenphonypress.com
(734) 973-6536

*Also by John Bakeless*

The Adventures of Lewis and Clark

To Fyle Edb

COPYRIGHT © 1969 BY JOHN BAKELESS
COPYRIGHT © 1969 BY KATHERINE BAKELESS
ALL RIGHTS RESERVED. NO PART OF THIS WORK MAY
BE REPRODUCED OR TRANSMITTED IN ANY FORM BY ANY
MEANS, ELECTRONIC OR MECHANICAL, INCLUDING PHOTOCOPYING
AND RECORDING, OR BY ANY INFORMATION STORAGE OR RETRIEVAL
SYSTEM, WITHOUT PERMISSION IN WRITING FROM THE PUBLISHER.
LIBRARY OF CONGRESS CATALOG CARD NUMBER 69–14723
PRINTED IN THE U.S.A.
FIRST PRINTING

To J₁

A

THE GOD₁



Text copyright © 1999 by J. K. Rowling
Illustrations copyright © 1999 by Mary GrandPré
All rights reserved. Published by Scholastic Press, a division of Scholastic Inc.,
Publishers since 1920.

SCHOLASTIC, SCHOLASTIC PRESS, ARTHUR A. LEVINE BOOKS, and associated logos
are trademarks and/or registered trademarks of Scholastic Inc.

No part of this publication may be reproduced, or stored in a retrieval system, or transmitted
in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise,
without written permission of the publisher. For information regarding permission, write
to Scholastic Inc., Attention: Permissions Department, 555 Broadway, New York, NY 10012.

Library of Congress Cataloging-in-Publication Data

Rowling, J. K.
Harry Potter and the Prisoner of Azkaban / by J. K. Rowling.
p.  cm.
Sequel to: Harry Potter and the Chamber of Secrets
Summary: During his third year at Hogwarts School for Witchcraft and Wizardry,
Harry Potter must confront the devious and dangerous wizard responsible for his parents' deaths.
ISBN 0-439-13635-0
[1. Wizards—Fiction.  2. Magic—Fiction.  3. Schools—Fiction.
4. England—Fiction.]   I. Title.
PZ7.R79835Ham   1999
[Fic] — dc21   99-23982

10 9                    9/9 0/0 1 2 3 4
Printed in the U.S.A.   23
First American edition, October 1999

Fo[

THIS IS A BORZOI BOOK
PUBLISHED BY ALFRED A. KNOPF, INC.

Copyright © 1979, 1981, 1982 by Ivor Noël Hume
All rights reserved under International and Pan-American
Copyright Conventions. Published in the United States by
Alfred A. Knopf, Inc., New York, and simultaneously in
Canada by Random House of Canada Limited, Toronto.
Distributed by Random House, Inc., New York.

Permission to reproduce photographs
and other illustrations is found on page 343.

Library of Congress Cataloging in Publication Data

Noël Hume, Ivor.
Martin's Hundred.

Bibliography: p.
Includes index.
1. Martin's Hundred site (Va.)  2. Carter's Grove (Va.)
3. Wolstenholme Towne (Va.)  4. Carter, Robert,
1663–1732—Homes and haunts—Virginia.
5. Noël Hume, Ivor.  I. Title.
F234.M378N63 1982  975.5'425  81–48096
ISBN 0-394-50728-2     AACR2

Manufactured in the United States of America
Published June 17, 1982
Second Printing, October 1983

