EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3      WAVE 3 LEARNING, INC., a Nevada      )
        Corporation                          )
 4                                           )
                                             ) 16 CV 5643
 5           Plaintiff,                      )
                                             )
 6      vs.                                  )Chicago, Illinois
                                             )
 7      AVKO EDUCATIONAL RESEARCH FOUNDATION )
        INC., a Michigan corporation,        )  August 8, 2016
 8                                           )
             Defendant.                      )  12:35 p.m.
 9

10                   TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE JAMES B. ZAGEL
11

12      For the Plaintiff:

13                      SAPER LAW OFFICES, LLC
                        BY: Matt Grothouse
14                      505 North LaSalle
                        Suite 350
15                      Chicago, Illinois 60654
                        (312) 527-4100
16
        For Defendant AVKO:
17
                        PRESIDENT OF AVKO EDUCATIONAL
18                      RESEARCH FOUNDATION:
                        Donald McCabe
19


20
        Court reporter:
21
                        Blanca I. Lara, CSR, CP, RPR
22                      219 South Dearborn Street
                        Room 2504
23                      Chicago, Illinois 60604
                        (312) 435-5895
24


25
```

```
 1                (Proceedings taken in open court:)

 2

 3          THE CLERK:  Case number 16 CV 5643, Wave3

 4   Learning versus AVKO Educational Research Foundation.

 5          MS. SAPER:  Good morning, Your Honor.

 6          Daliah Saper and Matt Grothouse on behalf of

 7   Wave3.

 8          THE COURT:  You could tell me your name too.

 9          MR. McCABE:  I'm Donald McCabe, the president of

10   the AVKO Educational Research Foundation.

11          THE COURT:  Thank you.

12          MR. GROTHOUSE:  Your Honor, we're here before

13   the Court today as a result of a settlement agreement

14   entered into by Wave3 Learning, Inc., and AVKO

15   Educational Research Foundation on February 24th.

16          As part of that settlement agreement, AVKO

17   granted to Wave3 an exclusive license to Sequential

18   Spelling material levels 1 through 6, and all

19   derivatives thereof.

20          Since that date AVKO, unfortunately, has

21   violated that exclusive license by:

22          One, selling or licensing the material to a

23   nonindividual, particularly JJH Publishing, and to

24   selling materials, seemingly, to third-party

25   distributors such as Exodus Books and Rainbow Road.
```

```
 1          This has caused great damage to Wave3's
 2   business.  Wave3 has lost tens of thousands of dollars
 3   in revenue.  Distributors are unclear at who has rights
 4   to what.  Obviously, it's causing mistrust between
 5   distributors and Wave3.  It's damaging Wave3's
 6   reputation and goodwill.  And obviously, Wave3's ability
 7   to honor its portion of the settlement agreement.
 8          Wave3, our client, has been extremely --
 9   exercised extreme self-restraint in the face of these
10   breaches, antagonistic and petty e-mails.  It has paid
11   -- or it has honored its portion of settlement agreement
12   by paying a $25,000 check, by paying royalties, even
13   though AVKO has refused to pay royalties thus far, it
14   has honored the non-disparagement cause, confidentiality
15   agreement.  And obviously, it is difficult to do this in
16   the face of the other party not honoring its end of the
17   bargain, but Wave3 has continued to honor its end of the
18   bargain in the face of these violations.
19          Obviously, Wave3 has come to this Court in prior
20   weeks to address these violations in the form a
21   temporary restraining order, which the Court granted, in
22   which AVKO thereafter violated by:
23          One, continuing to sell to non-individuals,
24   particularly JJH Publishing.  AVKO learning admitted so
25   much in its filing -- or I should say, Mr. McCabe's
```

1    filing to the Court, that it was licensing to

2    JJH Publishing, which is a nonindividual, in direct

3    violation of the settlement agreement.

4          AVKO has also misrepresented Wave3's rights to

5    third-parties.  It has represented that Wave3 does not

6    own exclusive license, or at least not exclusive license

7    in as far as the material is concerned.

8          AVKO has represented or misrepresented to

9    third-parties that Wave3 only owes an exclusive license

10   in Wave3 versions of the material, which is false.

11         Additionally, after the temporary restraining

12   order was granted, and after Mr. McCabe was held in

13   contempt of court, Mr. McCabe continued to violate not

14   only the TRO and the settlement agreement, but also Your

15   Honor's contempt of court order by:

16         One, refusing to clarify Wave3's rights under

17   the settlement agreement.  Mr. McCabe even asked us to

18   draft an e-mail that he could send out to distributors,

19   which counsel for Wave3 did draft an e-mail and did

20   sends it to Mr. McCabe, which is a very toned down and

21   fair e-mail that he could send to distributors

22   explaining the rights that Wave3 had.

23         Mr. McCabe refused to send that, and instead,

24   Mr. McCabe responded to e-mails from distributors,

25   Exodus Books and Rainbow Road, which he submitted --

1    Mr. McCabe submitted to the Court in the form of a

2    filing, that:

3            One, the Court terminated Wave3's license.

4            And two, that it was possible that AVKO could

5    renegotiate licenses with these distributors after the

6    TRO period ended, which was last week, in direct

7    violation of the settlement agreement, in direct

8    violation of the TRO, and in direct violation of the

9    Court's order of contempt.

10           That's why we are here today.

11           THE COURT:  You want to respond to this?

12           MR. McCABE:  I'm here without an attorney, and

13    the reason for that is, we haven't had time to get one.

14    I thought perhaps I'd have an attorney here, but all of

15    those charges that he has listed now, the AVKO

16    Foundation completely denies.

17           Now, as far as the TRO, in that TRO, Judge, if

18    you recall, it said that AVKO must terminate all

19    licenses.  AVKO gave two licenses to two different

20    firms, one was Wave3, one was JJH Publishing.

21           So I sent them, and then they have that on

22    record, I sent them a notice.  And I certainly would

23    hope that I would be able to renew the license to Wave3.

24    I would like them to be successful.

25           The AVKO Foundation is not in the business of

1  making money. We are very non-profit. What we do is

2  develop materials to teach anybody how to teach anybody

3  to read. And hopefully, and this is how we would -- we

4  would have to go into a long, long backstory, but

5  there's been five different lawsuits in which Wave3 has

6  been trying to get control of the copyrights of the AVKO

7  Foundation.

8       Judge Ludington told them no, AVKO has the

9  copyrights, you only have a -- it's a form of oral

10 contract -- not an oral contract, an implied contract.

11 And Judge Ludington further told them that they would

12 have to pay the amount of the original contract, which

13 was for $600,000, by the way.

14      Wave3 never paid anything more than $50,000.

15 And that, in court records, they have claimed that the

16 $50,000 was first paid by Holmes School Holdings,

17 Incorporated, secondly by Thomas Morrow himself, and

18 then by Wave3 Learning. Three different ones.

19      The judge, in his rulings, said that they would

20 have to come up and pay. When the entire case was

21 dismissed, no money was forthcoming, AVKO did notify

22 them that they were in breach of contract and hadn't

23 paid and that we would, of necessity, have to file suit.

24      We gave them notice, but they decided to file

25 first. And they filed a case in front of Virginia --

1    Judge Virginia Kendall in which she told them that I

2    will dismiss the case but without prejudice -- without

3    prejudice, that they couldn't have copyrights unless

4    they had something signed, a document that it had been

5    transferred.

6         Again, they filed, and again they filed.  And

7    then before Judge Kendall could even make the final

8    decision, they filed again with a 99.9 percent identical

9    suit.

10        Our attorneys were very nice.  They have a white

11   hat and they told them, you're not supposed to do that,

12   you better withdraw it because we don't want you to be

13   sanctioned.  So they did withdraw it.

14        Judge Virginia Kendall ruled that the whole case

15   should not have even been brought before her, both

16   attorneys had made mistakes about jurisdiction.  And so

17   that case went by the boards, but it certainly cost the

18   AVKO Foundation a great sum of money.

19        And then AVKO did file suit, before Judge

20   Darrah.  It got to the point where we offered them to go

21   -- they have a -- I'm sorry.

22        THE COURT:  Take your time.

23        MR. Mc CABE:  We had the --  we had the --

24        MR. GROTHOUSE:  Settlement conference.

25        MR. McCABE:  -- the settlement conference.

1    And the whole purpose of the settlement

2    conference was -- basically, both sides told the judge

3    that -- that neither had enough money to continue on,

4    the litigation was destroying both.

5    And so there was a settlement agreement drawn

6    up.  And it was done in haste.  Four attorneys, each

7    like too many cooks spoiling the broth, came out with a

8    document that I am sure would not get even close to a

9    passing grade in Law School 1.

10    And I wanted to get some of the things that were

11    definitely wrong.  For example, the $100,000 was to be

12    paid on or before the effective date, and the effective

13    date was that day.  Well, there wasn't any $100,000 paid

14    that day.  The most that was paid was $25,000, and that

15    not until June.

16    There's a lot -- lot of things in there that

17    were wrong.  The numbering was wrong, and there was not

18    a clear distinction made between the classic version and

19    the revised version that Wave3 wanted to produce.

20    AVKO said, okay, basically this, if you want to

21    do your revised version, which had in it a lot of busy

22    work in the form of student workbooks and that AVKO's,

23    in its philosophy, has felt that we do not waste kids'

24    time just doing busy work.  And there is a matter of the

25    problem of a joint copyright held by Instructional Media

1    Innovations and AVKO, that was the copyrights were

2    created long before Wave3 ever even came into existence.

3           IMI, that's the -- I usually refer to

4    Instructional Media Innovations as IMI.  They developed

5    the first 5 levels of Sequential Spelling in a form of

6    DVD's that students could use all by themselves.  They

7    didn't get to the 6 and 7 because they had been afraid

8    of getting involved in a lawsuit with Mr. Morrow.  In

9    fact, they have stopped even selling any DVD's to

10   anybody because they are afraid of another -- they know

11   the expenses of lawsuits.  The AVKO Foundation was --

12   the income last year, hmmm, was what, a negative of

13   one-hundred and some thousand dollars because of the

14   legal expenses.

15          (Brief pause).

16          MR. Mc CABE:  We would like to be able to have

17   -- you accept an answer to the complaint, one that has

18   been -- that an attorney could present to you.  I have

19   one that I have that I have shown to the attorney -- a

20   rough draft form to some attorneys, trying to get them

21   to represent AVKO, but I know I can't because I'm --

22   we're a small corporation, a non-profit 501(c)(3), and

23   not allowed to file all those documents.

24          But I wish you would read their complaint

25   because there are errors in fact in their complaint.

1      But I think that -- the one thing that I would

2 like you to do is to allow some time for AVKO to file --

3 we are in Michigan it's not easy for me to travel.  I

4 can't drive.  I'm blind in one eye.  And that would be

5 -- no way I can drive here.  I have to take either a bus

6 or a train, which consumes a tremendous amount of time.

7      THE COURT:  You've talked to me about two,

8 possibly three things:

9      One of the things you talked about is your legal

10 views of something that should or should not have

11 happened.  Issues that you are talking about to me are,

12 in part, legal questions, but a lot of what you said,

13 probably the most of what you said had nothing to do

14 with the law.  It had to do with what people did, what

15 people said, and you have presented a point of view.

16 And unless you object to this, I'm going to treat your

17 statements as testimony.  I'm not deciding whether it's

18 good or bad, but it's testimony.  It's on the record.

19      The difficulty in finding a lawyer, under these

20 circumstances, doesn't count.  A certain amount of time

21 has passed and you don't get a lawyer, which you may not

22 want to get a lawyer because the expense can sometimes

23 be pretty high.  So I'm not so much concerned, in fact

24 probably cannot be concerned about what your legal

25 principles are or even what your opponent's legal

1    principles are.  That's for me to decide, but I would

2    like to permit opposing counsel not to raise the issue

3    of legal issues because I'm taking that off the table

4    for now.

5         But if you wish to ask certain specific

6    questions to clarify something, now would be a good time

7    to do so.  And if you find that the question is somehow

8    objectionable, just tell me.  Do you understand that?

9         MR. McCABE:  Yes.  May I go get a drink of

10   water?

11        THE COURT:  Sure.

12        Well, actually we'll get you a drink of water.

13        MR. McCABE:  I have my own bottle back there

14   (indicating).

15        THE COURT:  Okay.  Sure.

16        (Brief pause)

17        MR. GROTHOUSE:  Your Honor, you can interject at

18   any point.  I feel like it's going to be somewhat

19   difficult to tow the line between fact and legal

20   question, but I will try my best.

21        To begin, I can just ask Mr. McCabe, rather

22   directly, if he understands that AVKO granted to Wave3

23   an exclusive license to the copyright of the materials

24   stated therein.

25        MR. McCABE:  We granted them an exclusive

```
1    license to their new revised additions of Sequential
2    Spelling 1 to 7, and their new response books.  They --
3    they know and -- that the classic version is entirely
4    different -- not entirely different, excuse me, is
5    different.  And they agreed.  And when we had -- it
6    ended up with Jerry Bailey, who was a sort of referee on
7    the changes, whether they would be acceptable, one of
8    the things that was in the decision that they agreed to
9    and that he ruled on is that the new version had to have
10   a different title and a different appearance from the
11   classic version so that --
12        THE COURT:  Stop for a second.  Stop for a
13   second.
14        Who is it who is saying this?
15        MR. McCABE:  Jerry Bailey, the one who was
16   selected to be the referee as far as whether or not the
17   changes to the classic version, going into the new
18   version, were -- the wording was something like, would
19   not be unreasonably withheld.
20        THE COURT:  Incidentally, did he say this
21   stuff --
22        MR. McCABE:  Pardon?
23        THE COURT:  Did he say these things when there
24   was a court reporter?  Somebody taking this stuff down?
25        MR. GROTHOUSE:  No.  Basically what he's talking
```

1    about, Your Honor, is the fact that Wave Learning was

2    granted an exclusive license to all material, classical

3    version, everything contained therein.  It's very clear

4    in the settlement agreement.  But they also were granted

5    material --

6         MR. McCABE:  Objection to the words "very

7    clear."  I would like -- I would like you to read the

8    document and you'll see that there's a lot of things

9    that are not very clear that he claims to be very clear.

10        MR. GROTHOUSE:  I would ask that the witness

11   does not interrupt me, as I have not interrupted him.

12        But I believe that it is very clear from the

13   settlement agreement.

14        If you look at it, it's very clear that AVKO

15   grants the exclusive license in the United States, and a

16   worldwide non-exclusive license to below titles and

17   their derivatives.

18        Now, the Wave3 versions were derivatives of the

19   original classical versions.  Wave3 wanted to make

20   derivatives, make improvements on the classical

21   versions, and they could only do so through approval,

22   but when it came to the classical versions, Wave3 was

23   able to sell those right away, because they had an

24   exclusive license for them.

25        I think that AVKO very much knew this,

1    particularly because one of the requirements or

2    conditions for having an exclusive license was that

3    Wave3 had to meet certain revenue benchmarks, and it

4    wouldn't make any sense for Wave3 to -- or Wave wouldn't

5    be able to reach those revenue benchmarks if AVKO was at

6    the same time allowed to license out the classical

7    versions --

8            MS. SAPER:  He's talking about Mr. Bailey and --

9            MR. GROTHOUSE:  Yes.

10           Going on, anyway, so when it came to the Wave3

11   revised versions, there's a process within the

12   settlement agreement about how that approval would

13   happen.  We wanted to make -- we wanted AVKO to have

14   some quality control measures over Wave3's revised

15   versions.

16           So the hope was that if Wave3 simply submitted

17   its revised versions to AVKO, that AVKO would look at

18   it, and, in good faith, with fair dealing, review the

19   revised versions and give feedback and give reasonable

20   changes.

21           The changes were supposed to be focused on

22   formatting and spelling errors, and, in general, a

23   general conformity to Sequential Spelling method.

24   However, what happened was, Mr. McCabe used the approval

25   process to try to renegotiate the exclusive license,

1    change it from an exclusive to a nonconclusive.

2              MS. SAPER:  He said this --

3              MR. GROTHOUSE:  I'm getting into that.

4              What happened was that, due to Mr. McCabe's

5    inability to work with Wave3 within the approval

6    process, and the inability of Mr. McCabe and AVKO's

7    lawyers to force McCabe to work with Wave approval

8    process, we had to go through an approval process.

9              Basically, we had somebody written into the

10   settlement agreement that would review this material.

11   He refused to do so.  So we had another level in the

12   settlement agreement that basically said, well, if this

13   individual, Mr. Paul Holtz, does not agree to review the

14   material, then each side will submit three names, and if

15   any of those three names overlap or if any of the

16   parties agree to nay of those three names, then that

17   individual will review the revised material and they

18   would decide whether or not AVKO's objections are

19   reasonable or unreasonable.

20             So what happened was, we submitted three names

21   and AVKO submitted three names, and Mr. Jerry Bailey was

22   one of the names agreed to -- or the only name agreed

23   to.

24             So what happened was, we sent a letter to Mr.

25   Jerry Bailey simply setting forth the approval process.

```
1    We wanted to do it together with AVKO.  So we sent the
2    letter to AVKO's lawyers.  And AVKO's lawyers reviewed
3    the letter and more or less agreed with its content, but
4    had to ask Mr. McCabe, the president's approval of the
5    letter, and Mr. McCabe, of course, refused to give the
6    approval.
7         But anyway, going on.  Once the materials were
8    submitted to Mr. Jerry Bailey, Mr. Jerry Bailey reviewed
9    the changes and the improvements to the classical
10   versions and approved the changes.  And that's the
11   third-party approval process, that's who Mr. Jerry
12   Bailey is.
13        MS. SAPER:  If you look at Section 10 of the
14   settlement agreement which outlines that process.
15        MR. GROTHOUSE:  But I think it's very important
16   that when Mr. McCabe represents that he believes that
17   Wave3 was only granted an exclusive license to Wave3's
18   versions of the Sequential Spelling material, I think
19   it's important to point out that that's not only not
20   true, but Mr. McCabe knows that's untrue, because he, in
21   fact, was asking in an e-mail sent on -- I had this --
22   we include this in our initial TRO.  In an e-mail sent
23   March 8th, Mr. McCabe asks Wave3 to:
24        "... if any agreement we made, you accept a
25        small change from exclusive to
```

```
 1              nonconclusive license, then we will approve
 2              all your new works and it will allow us to
 3              license the material to others, such as
 4              Inquisicorp."
 5          So Mr. McCabe and AVKO knew that Wave3 had an
 6     exclusive license to material, and, in fact, it was
 7     trying to convince Wave3 to renegotiate the settlement
 8     agreement so it could -- so it could license the
 9     material to third-party distributors, including IMI.
10          So Mr. McCabe's representation or new-found
11     interpretation of the settlement agreement, after the
12     fact, is in bad faith and it has been for this entire
13     time.
14          THE COURT:  Who owns AVKO?  Or what owns AVKO?
15          MR. McCABE:  No one.  It is a membership
16     organization.
17          THE COURT:  Who are its officers?
18          MR. McCABE:  Pardon?
19          THE COURT:  Who are its officers?
20          MR. McCABE:  Oh, God.  Well, the officers, I'm
21     the president.  Michael Lane, who is now lives in Texas
22     is the treasurer.  Robert McCabe is the vice president
23     and secretary.
24          MR. GROTHOUSE:  It is our understanding that
25     Mr. McCabe, more or less, controls AVKO and decides its
```

1   actions and pretty much has a domineering title and

2   influence.  He basically decides what AVKO does and does

3   not do.

4          THE COURT:  But you're the president?

5          MR. McCABE:  I am the president.  The choice of

6   words of "domineering" and "dominating" --

7          THE COURT:  No, I'm just asking you, are you the

8   president.

9          MR. McCABE:  I am the president.  I am the

10  author of almost all of the works.  And I do --

11         THE COURT:  Stop.  Stop.

12         MR. McCABE:  And I do not receive any -- any --

13         THE COURT:  I don't want you to answer that

14  question.  I want you to answer another one first.

15         I'm gathering from what people said that pretty

16  much you were in charge.

17         MR. McCABE:  Yes, now at the present time.  That

18  has not always been the case.

19         THE COURT:  Was it the case in say the last

20  six months that you were the president, you were pretty

21  much in charge?

22         MR. McCABE:  Yes.

23         THE COURT:  Okay.

24         MR. McCABE:  I've been trying to step down.

25         THE COURT:  Okay.  Now if you wanted to add

```
 1    something, you can.

 2          If you wanted to add something, you can tell me

 3    now.

 4          MR. McCABE:  Ahhh --

 5          THE COURT:  But you don't have to.  If you're

 6    done, you're done.

 7          MR. McCABE:  There is so much that he said that

 8    I would like to challenge, but --

 9          THE COURT:  What's your educational status?

10          MR. McCABE:  I have a bachelor's and a master's

11    degree in all the thesis as far as a Ph.D.

12          THE COURT:  And in what field or fields?

13          MR. McCABE:  Pardon?

14          THE COURT:  In what field or fields?

15          MR. McCABE:  In English.

16          THE COURT:  English.

17          MR. McCABE:  And in reading and special

18    education.

19          (Brief pause)

20          MR. GROTHOUSE:  Your Honor, I would like to ask

21    Mr. McCabe a question about his interaction with his

22    attorneys insofar as I can.

23          After February 24th we entered into a settlement

24    agreement.  Wave3 worked very, very hard.  Ms. Saper and

25    I worked very hard with the opposing counsel to:
```

1    One, try to make the post settlement agreement

2    relationship work.  We planned to send a letter to the

3    distributors, sort of telling the distributors what

4    happened and how the future was going to look.  We

5    submitted a letter, drafted a letter to AVKO's counsel.

6    AVKO's counsel reviewed it and basically said that it

7    looked good but we were going to have to get our client

8    to approve of it.  And what happened was, Mr. McCabe

9    refused to approve the letter.  So we had to send the

10   letter ourselves.

11          And this is the same thing that occurred when it

12   came to the approval process.  And more or less what

13   happened was that, I think that AVKO's counsel was true

14   to the settlement agreement and ethically bound.  I

15   think they felt like to follow through with the

16   settlement agreement.  And Mr. McCabe, more times than a

17   few, completed disagreed with AVKO's lawyers.  And he

18   basically went out on a limb and he wrote e-mails that

19   his lawyers told him not to write and he did actions

20   that his lawyers specifically told him not to do.

21          We tried to play damage control for months.  We

22   negotiated many times.  We talked to the opposing

23   counsel many times about Mr. McCabe's e-mails, about

24   Mr. McCabe's interpretation of the settlement agreement.

25          And we more or less gave at least five or six

```
1    different chances to try to make this work:  Including,
2    we filed the lawsuit, we motioned up the TRO, and then
3    we removed the TRO for about a month to try to give AVKO
4    the opportunity to remove Mr. McCabe in order to
5    facilitate a more constructive relationship going on.
6         I believe that it was AVKO's attorney's idea
7    that if Mr. McCabe was removed from the situation, that
8    we would be able to honor the settlement agreement going
9    forward.  So we motioned up the TRO and then we removed
10   it to try to give this removal of Mr. McCabe a chance.
11   That did not occur and that's when we re-filed and
12   motioned up the TRO again.
13        THE COURT:  Let me ask you a question about
14   this.  There was a period of time when I was looking at
15   the papers and I had -- there was a reference to
16   Mr. McCabe, but it looked like -- and I may be wrong,
17   this is my question, I'm not telling you something that
18   I'm sure of:  I got the distinct impression that
19   Mr. McCabe had, to some extent, took himself away from
20   whatever daily things that they were having.
21        MR. GROTHOUSE:  Yes, that's actually correct,
22   Your Honor.  Well, that's what we believed to be the
23   case.  The last communication we had with --
24        THE COURT:  You want to stop for a second.
25        MR. GROTHOUSE:  Sure.
```

1          THE COURT:  The impression I sort of got when

2     they was raised was that you were leaving the hands of

3     AVKO, or whatever was happening with them, your hands

4     were no longer going to be on it, is that correct or did

5     I miss interpret that?  This is after, this is the stuff

6     that's been happening recently.

7          MR. McCABE:  Okay.  There was a time in which I

8     handed in my resignation, but it was not accepted.  And

9     I was asked until this legal stuff is over, to continue

10    on.

11         THE COURT:  Okay.  I got that part.

12         Who took that position that you have to stay, in

13    some respect?

14         MR. McCABE:  I -- I'm sorry, my hearing isn't

15    very good.

16         THE COURT:  Well, that's okay, because mine

17    isn't either.  My question to you is, I got the

18    impression that you wanted to walk away.

19         MR. McCABE:  Yes.

20         THE COURT:  And my question to you is, who

21    wanted you to stay.

22         MR. McCABE:  The board, because the board --

23         THE COURT:  Wait.  Wait.  Stop.

24         And the board is?

25         MR. McCABE:  Well, those are the officers I gave

1    you.

2            THE COURT:  Yeah, Robert McCabe.  What's

3    Michael's last name?  My handwriting is terrible, the

4    treasurer?

5            MR. McCABE:  Michael Lane is the treasurer.

6    Lane, L-a-n-e.

7            THE COURT:   Right.

8            And you have -- and Robert McCabe is your son?

9            MR. McCABE:  Yes.

10           THE COURT:  So I got your son McCabe, and a

11   treasurer, Michael Lane.  Is there anybody else?

12           MR. McCABE:  On the -- as officers, those are --

13   those are it.

14           THE COURT:  Okay.

15           MR. McCABE:  My son is vice president and

16   secretary.

17           THE COURT:  Okay.

18           MR. McCABE:  But the members of the board don't

19   want to have anything to do with the legal case.  They

20   felt and they signed on on the board as far as helping

21   with the mission and the destination of AVKO, what we

22   do, and we're going to have to go out of existence -- or

23   when we do go out of existence, we have to leave

24   everything, all our assets to another non-profit

25   organization, and that will probably be -- this is what

```
 1    they're interested in, they're not interested in the

 2    legal aspect.

 3          Now, when we get to the problem with the

 4    attorneys that they brought up, I don't like to

 5    bad-mouth my attorneys; however, I'm afraid I'm going to

 6    have to in order to respond.

 7          The attorneys --

 8          THE COURT:  The only thing I'm asking you to do

 9    is to use the short version for that, but I do want you

10    to tell me about that relationship with you and the

11    lawyers.

12          MR. McCABE:  The attorneys wanted the big bucks

13    that they had -- that they claimed that they had earned,

14    and they thought that they were going to get it.

15          They even badgered me into having Absalom

16    Economics do an analysis of how much it cost to AVKO.

17    That cost AVKO $9,800, which we are paying off.  We're

18    paying them $800 a month.  And they did that right away.

19    They thought that, with that, they would be able to get

20    a lot of money out of Wave3.

21          At the get-go, I told them that Wave3 probably

22    -- we would probably never be able to get money from

23    them, they didn't have that much.  I wanted them to be

24    able to do good business, but they never wanted -- well,

25    that goes into a real long story, but at any rate, our
```

1   attorneys, when it comes to the time for the settlement

2   agreement, now they find out that they can't get

3   $100,000 upfront and they want to get paid.

4          They know the $100,000 is going to come

5   eventually, they hope, from Wave3.  So now they begin to

6   take Wave3's side on everything, and that's where the

7   problem really lies.

8          Wave3 knew why -- or what our attorneys were

9   trying to do.  Our attorneys wanted to get information,

10  contact information with every one of our board members

11  so they could harangue them and make them come up with

12  some -- some way with coming up with the money that is

13  owed, because he was -- our attorneys were threatening,

14  our attorneys refused to continue on until the $7,000

15  that we owed them was paid.

16         They have taken the -- they told my son, we

17  don't care what you do, how you do it, you come up with

18  the money.  My son signed over his pension to those

19  attorneys, $44,000.  You think that would let them

20  represent AVKO in front of you?  That wasn't enough.

21         I just -- they just cancelled -- or I sent them

22  two checks totaling $2,000 that they cashed this past

23  week and they said, "don't expect that this is going to

24  be enough to let us represent you," even though I put on

25  those checks this case number.

```
 1              Wave3 attorneys --
 2              THE COURT:  Stop.  Stop. Stop for a second.
 3              How much money was it that you are talking about
 4      that you gave them or that they got checks?  How much
 5      money?
 6              MR. McCABE:  2,000.
 7              THE COURT:  Okay.  Now you can go on.
 8              MR. McCABE:  Oh, God.
 9              (Brief pause).
10              MR. McCABE:  Wave3's attorneys knew that our
11      attorneys were not going to represent us anymore before
12      we did.
13              And this is when -- and I don't think it's
14      coincidence that they decided to now, hey, they don't
15      have any attorneys, good!  And they filed suit, knowing
16      that we would only have days in which to try and find an
17      attorney.
18              And when I talked to one of the attorneys that
19      was recommended to me, he used the term, "this is a
20      desert area for attorneys, they just don't want to take
21      on a client in a case like this where the attorneys,
22      regular attorneys dropped out."
23              THE COURT:  And when you were talking to other
24      lawyers --
25              MR. McCABE:  Oh, one other thing.
```

```
1              THE COURT:  Yeah.  Go ahead.
2              MR. McCABE:  I would like to show you the series
3    of -- last series of e-mails in which they are claiming
4    that I was nasty.
5              I have not been.  The last series of e-mails
6    between Thomas Morrow and myself, it had to do with what
7    they were asking for approval of their online version,
8    and I have them here.  And it would be -- I would like
9    you to read them.
10             THE COURT:  The origin of that is?  Say it to me
11   again.
12             MR. McCABE:  Pardon?
13             THE COURT:  Just tell me the origin of these
14   papers.
15             MR. McCABE:  Thomas Morrow sent to me a request
16   for -- for -- for the approval process.
17             THE COURT:  Right.
18             MR. McCABE:  And he gave the location on his
19   website where I could find them.
20             When I eventually found them, the first thing I
21   found was, on lesson number 1, where he had changed my
22   sentence of "sin," "it's a sin to tell a lie," he
23   changed it to, "sin, do not expect me to absolve you of
24   your sin."
25             I objected to it, and as nicely as I could on
```

```
 1    the fact that -- I did not even accuse him of using a

 2    blasphemous misstatement, but that is technically

 3    blasphemous.

 4              THE COURT:  And this was your lawyer?

 5              MR. McCABE:  Pardon?

 6              THE COURT:  This was your lawyer or this was

 7    someone else?

 8              MR. GROTHOUSE:  No, Your Honor --

 9              MR. McCABE:  No, this is Tom -- Thomas Morrow,

10    the president of Wave3.

11              THE COURT:  Right.  And what will this show me?

12              MR. McCABE:  His change was:

13              "...  "do not expect me to absolve you of

14              your sin."

15              I objected to that sentence, and from there on

16    end, he basically lost it in his response to me, and I

17    have that in writing.

18              MR. GROTHOUSE:  Your Honor, there's a lot said

19    there, so bear with me.  Wave3 obviously wants to

20    respond to many of the representations made by Mr.

21    McCabe.

22              First, Mr. McCabe, with all due respect, he has

23    over the last five years, and over the last year with

24    us, managed to do things and say things that either were

25    against the settlement agreement or just against the
```

1   court, and then after he does such things he's very good

2   at playing the role of the victim, when, in fact, he is

3   the perpetrator.

4        It's difficult to express to you how many times

5   it has happened when it comes to esthetics, when it

6   comes to appearances, it's difficult, and, obviously, he

7   is an elderly gentleman and we don't want to appear as

8   bullying, or anything like that, but at the same time

9   Wave3 has had rights and Mr. McCabe and AVKO has

10  continually violated those rights.

11       And it gets to a point where we have very much

12  strong-armed our client to be reasonable and to say, the

13  law will remedy your situation.  It's very difficult for

14  Wave3 and Mr. Morrow to hand somebody a check for

15  $25,000 when they're spitting in your face, when they

16  keep violating the settlement agreement, when they steal

17  revenue from you, and when the interaction between the

18  parties is vindictive, at best.

19       But we have strong-armed our client into being

20  the reasonable party.  And we have represented to our

21  client that if you are reasonable and if you uphold your

22  end of the settlement agreement, that the law will

23  vindicate you.

24       Now, we're in this situation where what happens

25  when an unreasonable party and a reasonable party meet.

1    I don't want this Court to fall into the enticing sign

2    of false middle-ground where --

3            THE COURT:  You can actually stop.

4            MR. GROTHOUSE:  Okay.  Anyway ....

5            THE COURT:  Let me tell you what I think.

6            MR. GROTHOUSE:  Sure.

7            THE COURT:  The theory of whatever appropriate

8    law applies is not at the heart of this.  What's at the

9    heart of this is a battle between one side, your client,

10   and the other battle is the only person standing before

11   me, and the reason he's the only person standing before

12   me is that I don't see anybody other than him as an

13   actual participant in AVKO.

14           MR. GROTHOUSE:  Well, fortunately, Your Honor, I

15   believe that is his own doing.

16           THE COURT:  No, I'm not saying in his own doing.

17   What I'm going to do is -- actually, I'm giving you

18   another date, and when we do the next date there will be

19   people on the witness stand.  And we will not be relying

20   particularly on what any of the assailants in this

21   particular case have done or how they felt, or any of

22   the variety of other things.

23           And part of this happens because when people

24   come to court, they frequently think that the other guy

25   is a jerk, where they have simultaneous, they both think

```
 1    they're jerks, and then we have a fairly long period of
 2    time about their feelings about each other, but I don't
 3    care what their feelings are, I want to care what the
 4    legal rules are, what the documents are, what they said.
 5         Then there is also going to be probably some
 6    discussion in which one person says something they
 7    believe is very important, and the other side says it's
 8    not true.  When that happens in a court of law, I sit
 9    here and I try to decide who is telling the truth.
10         This is not always perfectly easy.  There are
11    cases that end up in a tie, but what I think I see here
12    fairly clearly is the positions of at least two of the
13    battlers, but give me a second because I'm going to give
14    you another date.
15         (Brief pause).
16         THE COURT:  The 15th.  We're going to do this
17    again on the 15th.
18         And the time?
19         THE CLERK:  Yes.
20         THE COURT:  It's a Monday.
21         MR. GROTHOUSE:  Yeah.
22         THE CLERK:  11:00 a.m.
23         THE COURT:  And I expect to hear formal
24    testimony from at least two people, and there may be
25    others.
```

```
 1          MS. SAPER:  If I may, Your Honor.  I'm at a loss
 2   just because we're here to enforce the settlement
 3   agreement.
 4          THE COURT:  Oh, enforcing the settlement
 5   agreement is, clearly, your issue.
 6          MS. SAPER:  Right.
 7          THE COURT:  Your opponent thinks that maybe you
 8   don't have the right to insist upon that.  What I'm
 9   interested in is not so much -- I'm interested in what
10   these people did, your client and the current
11   individual.  And my bet is is that I will have some
12   idea, maybe a very clear idea, of who's in the right and
13   who's in the wrong.
14          And even if we don't get to that final point,
15   which I think we can, we can spend a little more time on
16   this.  This is, I think, pretty clear, if you look at
17   what is on the ground, how it got there is another
18   question entirely.  That's my view of that.
19          I had some concerns, when Mr. McCabe started
20   talking, that this was going to be a complicated legal
21   battle.  It's not a legal battle.  Both of them are
22   playing in exactly the same yard with kinds of things
23   that people who are not lawyers are perfectly capable of
24   dealing with.  And to the extent you're concerned that
25   maybe somebody is weak in the fight, I am pretty clear
```

```
 1    that your client isn't and I'm pretty clear he isn't.
 2    So I want to hear.
 3              MS. SAPER:  In the interim, the remaining issue
 4    really is the verbiage of the TRO, which states that
 5    Mr. McCabe should terminate licenses to JJH Publishing
 6    and the others.
 7              THE COURT:  Well, and this is why I want to do
 8    it by Monday.
 9              MS. SAPER:  Okay.
10              THE COURT:  So as far as we're concerned with
11    that, which has to do with things that happened for
12    purposes of this transaction in the future that existed
13    for them.  And it's a little hazy, but not much, but I
14    don't want to put myself in the position where I don't
15    understand clearly.
16              MR. GROTHOUSE:  One question, Your Honor?
17              THE COURT:  Yeah.
18              MR. GROTHOUSE:  I'm not really sure how to go
19    about asking these witnesses to come and appear before
20    the Court, particularly when it comes to AVKO's former
21    lawyers.  I'm not sure if we would have to call them to
22    witness, but obviously --
23              THE COURT:  What you can do with respect to that
24    is, you can inquire of them, after you tell them what
25    was said here that is on the record.  Maybe they'll be
```

```
 1    willing to come, maybe they won't, and maybe it won't be

 2    necessary either way, but you can ask them.  And if they

 3    need to -- it would be rare for me to do this, but there

 4    are some occasions where I might have them on the phone,

 5    which makes life a little easier.

 6         MR. GROTHOUSE:  Yeah.

 7         THE COURT:  And we'll do it that way.

 8         MR. GROTHOUSE:  Okay.

 9         THE COURT:  So that's where I am.

10         MS. SAPER:  And sorry, Your Honor, I don't want

11    to belabor the point, but the TRO does state that Wave3,

12    in the interim, is trying to make sales.  It states that

13    Wave3 has an exclusive license under the settlement

14    agreement.  Mr. McCabe was represented that Wave3's

15    license has been terminated pursuant to the TRO, which

16    is not accurate.  So that my client can continue

17    selling, so he can respond --

18         MR. McCABE:  I certainly would like to

19    un-terminate.  All I did was to follow the order.

20         THE COURT:  I am not entering an order which

21    forbids him, your client.

22         MS. SAPER:  Right.  Well, I hope not.  I hope

23    you wouldn't, Your Honor.

24         THE COURT:  Exactly.

25         MS. SAPER:  But the issue is, though, that
```

```
 1    Mr. McCabe is representing that Wave3 does not have the

 2    right to make sales.

 3            THE COURT:  I understand that.  This is why it's

 4    next Monday.

 5            MR. McCABE:  I have not represented that at any

 6    time.

 7            THE COURT:  Don't.  It's best if you save that

 8    later.  Best for you if you save that later.

 9            MR. McCABE:  Yeah.

10            THE COURT:  It's because of what has happened

11    here and the arrangement.  And there are many cases in

12    which you get people who are absolutely unwilling to

13    give on anything.  And given what's before me, one of

14    these two may very well be entitled to say, "this is

15    absolutely crucial," but great speed in litigations of

16    this sort is not a standing mark of the American

17    judiciary, and if I am correct as to when this started

18    and when this ended, you might possibly be the lawyers

19    in the most speedy of these cases because we're going to

20    be done next Monday.

21            MS. SAPER:  Thank you, Your Honor.

22            THE COURT:  10:30?

23            MR. GROTHOUSE:  11:00?

24            THE COURT:  11:00 o'clock.

25            Oh, Mr. McCabe, if you have papers that you
```

1   think are important, make sure you bring them with you.

2          MR. McCABE:  Bring them when?

3          THE COURT:  Next Monday.  Next week.

4          MR. McCABE:  Oh, my God.  I'd like to have an

5   attorney.

6          THE COURT:  You're free to have an attorney.

7          MR. McCABE:  Thank you, Judge, except it's a

8   matter of being able to find one.

9          THE COURT:  Well, but that's not an absolute

10  rule.  If you have, for example, a very weak case, you

11  might go see a hundred lawyers and they'll say no.  But

12  whatever it is, you try your best, but this case will go

13  on Monday with or without your having a lawyer.  And if

14  you want my personal opinion is, you're not dealing with

15  legal issues here.

16         MR. McCABE:  Pardon?

17         THE COURT:  You're not dealing with legal issues

18  here.  You're dealing with who said what to whom, and

19  that will resolve the case, one way or the other.

20  Otherwise --

21         MR. McCABE:  I still didn't -- there was one key

22  phrase that --

23         THE COURT:  Be here on Monday.  We are

24  proceeding on Monday.  If you have a lawyer, that's

25  fine; if you don't have a lawyer, that's also fine.  We

```
1    are going to proceed Monday.  And do not fail to show up
2    on Monday.  Either you or your lawyer or both -- well,
3    that's not true.  You must come.  Whether your lawyer
4    comes, that's another issue entirely.
5           But there's no law which says that if you start
6    looking for lawyers, the law requires that one of them
7    has to agree.  Maybe you'll have a larger pool.  But you
8    just told me that you think that the lawyers you've
9    talked to are unwilling, and they have the right to be
10   unwilling.  They may not like your case.
11          So that's where we are.  11:00 o'clock one week
12   from today.
13          MS. SAPER:  Thank you so much, Your Honor.
14          THE COURT:  Thank you.
15          MR. McCABE:  Is that about the case filed or the
16   TRO?
17          THE COURT:  It is, of course, about the TRO, but
18   it is -- it deals with everything in the dispute between
19   you and the other side.
20          MR. McCABE:  Okay.
21          THE COURT:  Thank you.
22          MS. SAPER:  Thank you.
23          MR. GROTHOUSE:  Thank you, Your Honor.
24
25
```

1

2

3          THE COURT:  Thank you.

4

5

6

7

8          (Which concluded the proceedings had on

9          this date in the above entitled cause.)

10

11

12          *     *     *     *     *     *     *     *

13

14

15    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

16    FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

17                          MATTER

18

19          /s/Blanca I. Lara          January 31, 2017

20

21

22

23

24

25