# EXHIBIT E

1

1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3  WAVE 3 LEARNING, INC., a Nevada       )
    Corporation                     )
4                             )
                           )  No. 16-cv-564
5                           )
          Plaintiff,           )
6                           )
    vs.                       )  Chicago, Illinois
7                         )
    AVKO EDUCATIONAL RESEARCH FOUNDATION )
8  INC., a Michigan corporation,    )  July 19, 2016
                           )
9          Defendant.          )  10:39 o'clock a.m.

10

11                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES B. ZAGEL
12

13  For the Plaintiff:

14             SAPER LAW OFFICES, LLC
             BY: Daliah Saper
15               Matt Grothouse
             505 North LaSalle
16             Suite 350
             Chicago, Illinois 60654
17             (312) 527-4100

18  For the Defendant:

19             Not Present

20

21  Court reporter:

22             Blanca I. Lara, CSR, CP, RPR
             219 South Dearborn Street
23             Room 2504
             Chicago, Illinois 60604
24             (312) 435-5895

25

1                          INDEX OF EXAMINATION

2 WITNESS                                          PAGE

3 THOMAS MORROW

4 Direct Examination By Mr. Grothouse: ..............6

5

6

7 EXHIBITS

8 ...................................................

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings taken in open court:)

2          THE CLERK:  Case number 16 CV 564, Wave 3 Learning,

3  Inc., versus AVKO Educational Research Foundation.

4          MS. SAPER:  Good morning, Your Honor.

10:39:47    5          Daliah Saper and Matt Grothouse on behalf of

6  plaintiff, Wave 3 Learning, Inc.

7          We're here this morning on Wave 3's motion for a

8  temporary restraining order and preliminary injunction

9  enjoining AVKO Educational Research Foundation from selling

10:40:05   10  certain copyrighted works, titled "Sequential Spelling," to

11  distributors and third-parties in violation of a settlement

12  agreement entered into on February 24th, 2016, with the

13  assistance of Magistrate June Finnegan.

14          In addition, AVKO has been misrepresenting the terms

10:40:23   15  of the settlement agreement, such that the marketplace is

16  confused and it's impacting Wave 3's ability to honor its

17  settlement obligations moving forward; however to be clear,

18  Wave 3 has honored to date all of its obligations, but it's

19  concerned that because of AVKO's ongoing violations of the

10:40:43   20  settlement agreement, it will no longer be able to do so.

21          We have here today Thomas Morrow, who is the president

22  of Wave 3, who can testify to the irreparable harm and damage

23  that he and his company are sustaining as a result of AVKO's

24  violations and breaches of the settlement agreement.

10:41:01   25          THE COURT:  Is there anyone here from AVKO?

4

1           MS. SAPER:  There is not.

2           We have -- there's been some procedural confusion with

3   respect to bringing this matter before you this morning, Your

4   Honor.  However, they have been apprised of the TRO and the

10:41:16   5   underlying complaint.  In fact, Mr. McCabe, AVKO's president,

6   filed an informal e-mail, an informal answer to Judge Ellis on

7   Friday with his position.

8           THE COURT:  I have looked at this, defendant's reply.

9   And I'm assuming --

10:41:39   10          (Brief pause).

11          THE COURT:  And whose company is AVKO, to whom does it

12  belong?

13          MS. SAPER:  Which one?  Which company?

14          THE COURT:  What I have here is, I have the

10:42:45   15  defendant's reply --

16          MS. SAPER:  That is --

17          THE COURT:  My major problem with having a defendant's

18  reply, is the defendant is a corporation.

19          MS. SAPER:  Correct.

10:42:54   20          MR. GROTHOUSE:  (Nodding).

21          THE COURT:  It cannot represent itself.

22          MS. SAPER:  Correct.

23          THE COURT:  It needs to have its own lawyer.

24          MS. SAPER:  (Nodding).

10:43:03   25          MR. GROTHOUSE:  (Nodding).

1    MS. SAPER:  To be clear, Your Honor, the parties have

2    a long and contentious litigation history, wherein both parties

3    have been represented by counsel for five years, in four

4    different courts, in two different states.  AVKO's attorneys

10:43:18    5    have essentially removed themselves after the breaches took

6    place.  I can't opine or speculate as to what has happened, but

7    Don McCabe should know and is aware of the procedural

8    requirements of having corporate representation by counsel.

9    THE COURT:  The other thing is, a document that says:

10:43:44    10    ".... more than a few problems with the current

11    settlement agreement ..."

12    which, conceivably, an attempt could be made to

13    somehow represent AVKO under these circumstances, but the

14    document that appears to be addressed by an individual, fully

10:44:16    15    familiar with the circumstances, he didn't sign it.

16    Who did you want to put on the stand?

17    MS. SAPER:  Thomas Morrow, president of Wave 3

18    Learning, Inc.

19    THE COURT:  Just come forward.

10:44:42    20    MR. MORROW:  Yes, sir.

21    THE COURT:  It won't bite you.

22    If you would swear him in.

23    THE CLERK:  Please raise your right hand.

24    (Witness duly sworn.)

10:44:57    25    THE COURT:  You can start at any time.

| | | |
|---|---|---|
| | 1 | MR. GROTHOUSE:  Okay. |
| | 2 | THOMAS MORROW, PLAINTIFF'S WITNESS, SWORN |
| | 3 | DIRECT EXAMINATION |
| | 4 | BY MR. GROTHOUSE: |
| 10:45:03 | 5 | Q.  Thomas, if you just want to give us some quick |
| | 6 | background -- |
| | 7 | THE COURT REPORTER:  Counsel, if he could state his |
| | 8 | name for the record, please. |
| | 9 | BY MR. GROTHOUSE: |
| 10:45:07 | 10 | Q.  Yes, please. |
| | 11 | A.  It's Thomas Morrow, T-h-o-m-a-s M-o-r-r-o-w. |
| | 12 | Q.  You are president of Wave 3 Learning? |
| | 13 | A.  I am the president of Wave 3 Learning.  I am one of two |
| | 14 | shareholders of the company. |
| 10:45:24 | 15 | Q.  Okay.  And how long have you been the president of Wave 3 |
| | 16 | Learning? |
| | 17 | A.  Since June 14th, 2010. |
| | 18 | Q.  When was the first time you met Don McCabe, president of |
| | 19 | AVKO? |
| 10:45:33 | 20 | A.  May 25, 2009. |
| | 21 | Q.  And did you enter into a business agreement with Don McCabe |
| | 22 | at AVKO? |
| | 23 | A.  Yes, on June 2nd 2010, originally. |
| | 24 | Q.  And would you please tell me about the dispute between you |
| 10:45:47 | 25 | and AVKO, in a very quick way. |

1    A.  Yes; very short.

2         We originally contracted to have Wave 3 Learning

3    become the ongoing publisher of Sequential Spelling.

4    Sequential Spelling is a language arts program that's very

10:46:02    5    popular among home educators and private schools.

6         The goal was for Wave 3 to completely take that

7    process over in exchange for a payment to AVKO.

8         Payment was made.  We began to publish the product.

9    About a year later, we discovered that while we were publishing

10:46:23    10   the product, they continue to publish the product also.

11        In a very short order, this led to the first case in

12   July of 2011.  That case was eventually determined by summary

13   judgment in April of 2013.

14        As a result of that agreement -- excuse me, of that

10:46:48    15   court case, we were supposed to be going forward with the

16   understanding that we had an exclusive license to market the

17   product.

18        We, once again, had the same problem.  We were

19   marketing the product, they were marketing the product.  We

10:47:01    20   brought suit in the Northern District of Illinois asking for --

21        What's the name of that?

22   Q.  Declaratory judgment.

23   A.  There you go.  What you said.

24   Q.  Declaratory judgment?

10:47:15    25   A.  Declaratory judgment; thank you.

1    Seeking to, once and for all, determine that we, in

2  fact, held an exclusive license to this product and we should

3  be publishing it.

4    The Court dismissed that without prejudice.  We filed

10:47:27    5  again under different circumstances.  The court dismissed that

6  without prejudice.

7    At that point, AVKO sued us again, this time in terms

8  of copyright infringement.  That is what led to the settlement

9  that was finally arrived at in February of this year, Your

10:47:42   10  Honor.

11  Q.  So on February 24th you went to the court and you

12  negotiated a settlement agreement with who?

13  A.  With the AVKO Educational Research Foundation.

14  Q.  Who as there?

10:47:56   15  A.  Mr. McCabe was there, his son Robert was there, an adult

16  son, both of his attorneys, and the attorney's clerk.

17  Q.  And was the judge there?

18  A.  Yes.

19  Q.  Who was the judge?

10:48:08   20  A.  Judge Finnegan.

21  Q.  And how long did that settlement agreement last?

22  A.  Wow!  9 hours -- nine and a half hours.  From 1:00 p.m. to

23  10:30.

24  Q.  Okay.  I have marked for identification purposes only

10:48:21   25  Plaintiff's Exhibit Number 1, which is the settlement

1    agreement.

2         MR. GROTHOUSE:  If I could give a copy to Your Honor.

3         (Document tendered to the Court.)

4         MR. GROTHOUSE:  I'm going to give a copy to

10:48:36  5    Mr. Morrow.

6         (Document tendered to the witness.)

7    BY MR. GROTHOUSE:

8    Q.  Now, Mr. Morrow, I just want to go quickly through some of

9    the provisions.

10:48:43  10         First, I want to go to, on page 2, where it says

11    number 3, it says, "materials at issue."  And based on your

12    understanding -- well, actually, let me establish the

13    foundation for the settlement agreement.

14         At the very end, I should ask you first, does this

10:49:01  15    look familiar?

16    A.  Yes; this is my signature showing the date of February 24th

17    and Mr. McCabe's signature on the same day.

18    Q.  And is this the settlement agreement that you entered into

19    on February 24th?

10:49:11  20    A.  This is it.

21    Q.  Thank you very much.

22         Now, may I direct your attention to provision number

23    3, and it says -- if you can read that provision off for me,

24    please.

10:49:21  25    A.  (Reading:)

1    "... Materials At Issue:  AVKO shall grant and

2    hereby grants an exclusive licensing in United

3    States and Canada, and a worldwide nonexclusive

4    license to the below titles and their derivatives

5    collectively known as "Sequential Spelling."

6    Q.  So, in a nutshell, what does this grant to Wave 3?

7    A.  This says that Wave 3 is the one and only source for these

8    7 works.  They're student response books, and any derivative

9    that comes from them in the territory of the United States and

10   Canada, and it allows us, on a nonexclusive basis, to

11   distribute anywhere in the world.

12   Q.  Okay.  Why did you enter into the settlement agreement?

13   A.  Well, after five years of litigation, we spent more than

14   enough money on attorneys.

15        I'd say, bluntly, I felt that I was in the right, Your

16   Honor, but I can't spend money forever on attorneys.  This is a

17   good agreement that serves both sides interests.  It allows us

18   to move forward and continue to deliver the product to the

19   students who need it, provides some income for the AVKO

20   Educational Research Foundation.  I think it's fundamentally

21   fair.

22        Like I said, I signed it, Your Honor.  It can't be

23   that bad, right?

24   Q.  Okay.  And then provision number 2.

25   A.  Yes, sir.

1    Q.  It says that you shall make four payments of $25,000,

2    totaling $100,000, correct?

3    A.  Correct.

4    Q.  It also says that you are going to grant or going to give 6

10:50:51    5    percent royalties to AVKO, correct?

6    A.  Yes, it does.

7    Q.  Why did you agree to pay $100,000 to AVKO?

8    A.  Well, I guess, fundamentally, to resolve the problem.

9          This product line is valuable in the context of an

10:51:08   10    exclusive license.  I was willing to pay that because I think

11    that I could make a good business out of it if I'm left alone.

12          If $100,000 is what I had to pay to achieve that, I

13    was willing to do that, because I think I can make a good

14    business out of it, but that $100,000 is predicated on an

10:51:26   15    exclusive license.

16    Q.  Directing your attention to provision number 5, can you

17    explain what that is?

18    A.  These are a series of annual revenue requirements that AVKO

19    requested.  Basically, it establishes them a baseline

10:51:40   20    understanding, they will receive an amount of income, at least

21    equal to 6 percent times those numbers, and it's -- the

22    intention is that the numbers will increase.

23          I think it was well understood at the time that the

24    point of these goals was to make sure that I was properly

10:51:58   25    incentivized to grow a business, and that's entirely

Morrow - direct by Grothouse

12

1    reasonable, in my opinion.

2    Q.  How much sales did you make in 2015 off these?

3    A.  Approximately $106,000.

4    Q.  And if you recall, how much sales during the settlement

10:52:10    5    agreement did AVKO make?

6    A.  About 145.

7    Q.  Okay.  So combined, it was possible -- now obviously, AVKO

8    made sales individually through its website, but it also made

9    sales by selling through distributors.

10:52:26    10    A.  Yes.

11    Q.  So combined, it was possible for you to reach this

12    benchmark, correct?

13    A.  Correct.  That was the understanding, was that the first

14    benchmark is easy to make, after that you have to start

10:52:37    15    working.

16    Q.  So if you're not the exclusive seller to this, can you

17    reach this benchmark?

18    A.  It's impossible.

19    Q.  Okay.  Now let me direct your attention to provision number

10:52:47    20    6.  Can you explain what this is?

21    A.  AVKO has a website on which they sell to individuals.  They

22    also sell to my distributors, which they are not supposed to be

23    doing.

24           We have agreed to continue to make sales to

10:53:00    25    individuals through their website, because they're relatively a

1    small component of the sales and it allows them to maintain

2    their relationship.  It's a membership organization, their

3    membership.  It was understood, however, that it was supposed

4    to be only through the website, only to individuals.

10:53:18    5    Q.  Okay.  Now, there's one exception, and I highlighted the

6    exception.  It's written and it's signed and dated, initialed

7    by all parties involved.  And what is that exception?

8    A.  They had requested the right to continue to sell -- the

9    spelling program exists in 7 levels.  They're levels of

10:53:36   10    achievement; in other words, you go 1, 2, 3, 4, 5, 6, 7,

11    they're ordinal.

12            They had asked for the right to continue to sell the

13    Level 1 books, which are the most commonly sold, for a while

14    because they had a large inventory, they wanted to work it

10:53:48   15    down.  We agreed to allow it to happen until such time as we've

16    gone through the approval process for our own Level 1 revised

17    version, which at that point would take over.

18    Q.  Okay.  And were you entitled to any royalties from those

19    sales?

10:54:02   20    A.  Yes; I was entitled to one half of the gross margin.  For

21    those of you unfamiliar with accounting terms, "gross margin"

22    is basically gross sales, less the direct cost of the product;

23    in other words, the cost of the book when printed.

24    Q.  To be clear, on the date of execution of the settlement

10:54:21   25    agreement, which is February 24th, 2016, was AVKO thereafter

1    allowed to sell any Sequential Spelling Works besides

2    Sequential Spelling Level 1?

3    A.  Only to individuals.

4    Q.  Okay.  And then once you got Sequential Spelling Level 1,

10:54:35    5    the Wave 3 version approved, were they allowed to sell

6    Sequential Spelling 1's after that?

7    A.  Only to individuals.

8    Q.  Okay.  Now, let me go to provision number 10.

9         Can you explain to me what this provision is?

10:54:50    10    A.  The provision is entitled "Right to Review."  This enables

11    AVKO to assure itself that the quality of the product is

12    sustained as we move it out into the marketplace.

13         Specifically, it enabled AVKO to look at each product,

14    if we added new product, and each of the existing ones when we

10:55:13    15    started as of February 25th.  They were allowed to review them

16    to make sure that they met certain quality standards that AVKO

17    wanted to see maintained.  We did, indeed, comply with that

18    requirement.  We began sending them the works on February 29th,

19    and by March 16th we provided them copies of all of the

10:55:34    20    existing revised works.

21    Q.  So to be clear, you were permitted to sell the original

22    unedited versions of the works, correct?

23    A.  That's correct.  We were allowed to sell any remaining

24    existing inventory that we had.

10:55:47    25         This provision is very important because we had a lot

1   of inventory; we still do.  We sold about half.  We still have

2   more than $20,000 in inventory.  So anything we held in

3   inventory, we were allowed to sell until it was gone, but once

4   we sold it and it was gone, then we had to replace it only with

10:56:04   5   goods that had been approved by AVKO.

6   Q.  But you were also allowed to sell, quote/unquote, classic

7   versions.  So if you wanted to sell AVKO's original versions

8   which you didn't like, you were allowed to make and produce and

9   sell those right away, correct?

10:56:16   10   A.  Yes.  I wouldn't say I didn't them.  I said I like ours

11   better.

12   Q.  Okay.  So you were allowed to sell the original versions,

13   and then but if you wanted to edit those versions --

14   A.  Yes.

10:56:25   15   Q.  -- or produce derivative works, like online versions, you

16   had to get those approved first, correct?

17   A.  That is correct, they had to be approved.

18   Q.  And the approval process was -- explain the approval

19   process, real quick.

10:56:34   20   A.  The work would be submitted to a nominee named by the AVKO

21   Foundation.  That person would have two weeks to review the

22   work.  At any time during those first two weeks, they can

23   return to us with comments and complaints, they could approve

24   it.  And at that time, once they were returned to us, if there

10:56:56   25   are comments and complaints, we had to do one of two things:

Morrow - direct by Grothouse

16

1  We either had to accept their comments and complaints and agree

2  to make those changes or we had to send it to a third-party as

3  an appeal.

4          Originally, there was a particular individual named as

10:57:10  5  that appeal.  That person's name was Paul Holtz.  He's the

6  president of Class on Demand.  It's a company in Hoffman

7  Estates that is in a similar business.

8          He chose not to take part as the appellate authority.

9  So we went through a process in negotiating a new appellate

10:57:31  10  authority with AVKO, which was a gentleman by the name of Jerry

11  Bailey, who is the president in Dynamic Literacy, which is a

12  company that publishes a vocabulary program.

13  Q.  And you followed the settlement agreement, insofar as that

14  you submitted three names to AVKO?

10:57:45  15  A.  That's correct.  We got them three names and allowed them

16  to say, I like this guy or I don't like that guy; whatever they

17  like.

18  Q.  And out of three names, AVKO accepted Jerry Bailey,

19  correct?

10:57:55  20  A.  Correct.

21  Q.  Okay.  And then you submitted those works to Jerry Bailey,

22  correct?

23  A.  Yes.

24  Q.  And on what date did he approve those works?

10:58:01  25  A.  April 27th, 28th of this year.

1  Q.  And after that date, after that approval date, was AVKO

2  allowed to sell any Sequential Spelling works, 1 through 7, to

3  non-individuals?

4  A.  No.

10:58:17  5  Q.  Okay.  And to be sure, you abided by the terms of the

6  settlement agreement, correct?

7  A.  Yes, we have.

8  Q.  The settlement agreement required you to release and

9  dismiss with prejudice all claims against AVKO, did you do that

10:58:29  10  or did Wave 3 do that?

11  A.  We did, yes, on March 9th.

12  Q.  The settlement also has a very clear right of review

13  process.  Did you follow that review process?

14  A.  We have, yes, for all revised works.

10:58:41  15  Q.  The settlement agreement has a non-disparagement clause.

16  Did you follow the non-disparagement clause, you have followed

17  that?

18  A.  Yes.

19  Q.  The settlement agreement requires Wave 3 to pay $25,000 by

10:58:55  20  June 1st, 2016.  Did Wave 3 pay that money?

21  A.  Yes, we paid on May 25th.

22  Q.  The settlement agreement requires you to remit 6 percent

23  royalty payment.  Did you do that after the first quarter?

24  A.  Yes, we did.  We paid it on June 6th.

10:59:06  25  Q.  Okay.  You mentioned before that the Wave 3 is entitled to

Morrow - direct by Grothouse

18

1    50 percent margin of the Sequential Spelling 1 sales that were

2    -- that AVKO made to distributors after the settlement

3    agreement before approval.  Have you received those royalties

4    yet?

10:59:22    5    A.  No, we have not.

6    Q.  Okay.  As the settlement agreement makes clear, you have

7    the exclusive license to sell Sequential Spelling works, and

8    derivatives thereof.

9            MR. GROTHOUSE:  I'm going to hand over what I have

10:59:55   10    marked as Plaintiff's Exhibit Number 2.

11           (Document tendered to the Court.)

12   BY MR. GROTHOUSE:

13   Q.  And --

14           THE COURT:  Wait a second.

11:00:06   15           MR. GROTHOUSE:  No problem.

16           (Brief pause)

17           THE COURT:  Go ahead.

18   BY MR. GROTHOUSE:

19   Q.  The settlement agreement says that:

11:00:22   20           "... approval shall not be unreasonably withheld

21           ..."

22           what was your understanding of the approval

23   standard?

24   A.  When we say "unreasonably withheld," we understand that the

11:00:33   25   goal of the approval process is to assure that the quality of

1    the product is sustained and hopefully increased.  The goal is

2    not to achieve some side issue.  Not to determine some side

3    question.  It's not "I like it" or "I don't like it," it's does

4    it help children learn, that's the standard.

11:00:55    5    Q.  And to be clear, before you can sell your products, you

6    have to get them approved?

7    A.  Correct.  They have to go through the approval process,

8    yes.

9    Q.  And the agreement called for good faith and fair dealing,

11:01:12    10    so you assumed that AVKO would work with you reasonably for the

11    approval process?

12    A.  That's correct.

13    Q.  This is one of many e-mails.  This is an e-mail -- well

14    I'll let you establish the foundation.  Do you recognize this?

11:01:21    15    What this is?

16    A.  Yes, this is an e-mail that I received very recently from

17    Mr. McCabe.

18    Q.  And what does the e-mail say?

19    A.  (Reading:)

11:01:26    20         "... Dear Mr. Morrow, you said, "I am certain to

21         become successful at marketing, once you decide

22         to adhere to your agreement by ending your

23         constant interference.  May I expect that to

24         occur soon?"  AVKO has adhered to the terms of

11:01:41    25         the settlement agreement.  I have not interfered.

1         As to your online version of Sequential Spelling,

2         which I hope will succeed, I got no further in

3         the reviewing process than Lesson One ..."

4           just FYI, there are 108 lessons in a level:

11:01:54  5           "... your sentence for the word sin must be

6         replaced with one which a child can understand

7         and/or will make some theological sense.  "Do not

8         expect me to absolve you of your sin" is

9         unacceptable, there is no point in my reviewing

11:02:08  10         the rest of the online version if you do not

11         change that sentence."

12  Q.  Okay.  So long story short, he basically withheld approval

13  just based on one sentence?

14  A.  That's correct.

11:02:17  15  Q.  Okay.  Going on, I'm going to hand --

16  A.  Just one second.  Just so you understand the scale we're

17  talking about here, there are 4500 sentences in every level.

18  Q.  Okay.  Next I want to establish the fact that AVKO and

19  Mr. McCabe knew the meaning of the settlement agreement.

11:02:36  20      They knew that the exclusive license was granted to

21  Wave 3, and that AVKO could not license any of the works to

22  non-individuals.

23      MR. GROTHOUSE:  I am going to hand, Your Honor, what's

24  marked for identification purposes as Plaintiff's Exhibit

11:02:53  25  Number 3.  Obviously, you don't have to read through all the

1    e-mails.  They are basically just e-mails between Mr. McCabe,

2    the president of AVKO, and Wave 3 since the settlement

3    agreement occurred in February 24th.

4                    (Document tendered to the Court.)

11:03:09    5                    MR. GROTHOUSE:  I will direct the Court's attention to

6    specific parts of those e-mails.  Specifically on --

7                    (Brief pause)

8                    MR. GROTHOUSE:  So it should be page 4.

9                    THE COURT:  Stop for a second.

11:04:04    10                    MR. GROTHOUSE:  Sure.

11                    THE COURT:  I'm reading page 3.

12                    MR. GROTHOUSE:  Okay.

13                    THE COURT:  It's an interesting page.

14                    (Brief pause)

11:04:11    15                    MR. GROTHOUSE:  Page 4.

16                    THE COURT:  Hang on.  Stop.

17                    MR. GROTHOUSE:  Oh, I'm sorry.

18                    (Brief pause)

19                    THE COURT:  Okay, page 4.

11:04:30    20                    MR. GROTHOUSE:  Okay.

21    BY MR. GROTHOUSE:

22    Q.  So on page 4, where it starts with "if," can you please

23    read -- oh, sorry.

24                    To establish the foundation of the document, do you

11:04:42    25    recognize what this is?

Morrow - direct by Grothouse

22

```
 1   A.  Yes, this is an e-mail, and a series of them, are received
 2   from Mr. McCabe.
 3   Q.  And what date is that e-mail?
 4   A.  Just a moment.
 5             (Brief pause).
 6   BY THE WITNESS:
 7   A.  It's March 8th, I believe.
 8             Yes, it's March 8th.
 9   Q.  Well, it's right here (indicating).
10   A.  Okay, March 9th.
11   Q.  Okay.
12   A.  Gotcha.
13   Q.  So if you read that sentence where it starts with "if."
14   A.  (Reading:)
15          "...If, in the agreement we made, you accept a
16          small change from "exclusive" to nonexclusive,
17          you could publish with new ISBN numbers the WAVE
18          3 Sequential Spelling Series which would then
19          allow AVKO to license others such as Inquisicorp
20          to reproduce and distribute the classic AVKO
21          Sequential Spelling."
22          THE WITNESS:  If you want explanations of those terms,
23   Your Honor, I'm happy to provide that.
24   BY MR. GROTHOUSE:
25   Q.  So basically, AVKO was trying to renegotiate the settlement
```

11:04:46

11:05:06

11:05:38

1  agreement to give itself -- to allow it to license to other

2  people, correct?

3  A.  This isn't even renegotiating, it's destroying it.

4  Q.  Okay.  Now, let me direct your attention to page 15.

5  Do you recognize what this is?

6  A.  Give me a second.

7  (Brief pause.)

8  BY THE WITNESS:

9  A.  All right.  This is another e-mail from Mr. McCabe to me

10  dated May 11 of this year.

11  BY MR. GROTHOUSE:

12  Q.  Okay.  And can you read the paragraph where it starts with

13  "and."

14  A.  (Reading:)

15  And by the way, all our mutual distributors will

16  be able to purchase whatever AVKO product they

17  desire from a firm that has acquired a license

18  from AVKO to reproduce and distribute all the

19  AVKO materials with the exception of your Wave 3

20  Learning, Inc. Sequential Spelling Levels 1-7

21  derivatives."

22  Q.  So basically, what is Mr. McCabe representing on behalf of

23  AVKO?

24  A.  That he has unilaterally taken away my exclusive license

25  and he's allowed someone else to sell the same thing I'm

11:06:00

11:06:10

11:06:43

1    selling in the same place I'm selling it.

2    Q.  And what date was this?

3    A.  May 11 of this year.

4    Q.  And Wave 3 filed a lawsuit shortly thereafter, correct?

11:06:55    5    A.  That is correct.

6    Q.  And you noticed up a TRO, correct?

7    A.  Yeah.  Yes, you did.

8    Q.  And then what happened in the meantime?

9    A.  In the meantime, his attorneys -- his former attorneys had

11:07:09    10    asked that we forbear bringing the TRO because there was going

11    to be leadership change in AVKO.

12          The board was -- the board, which I don't believe

13    exists, but he claimed there was a board, and the board was

14    going to elect a new president who, presumably, would be more

11:07:30    15    reliable in terms of following this agreement.

16          So we forbore and gave them the time to get the board

17    meeting together and have that election.

18    Q.  And when was this board meeting supposed to take place?

19    A.  Ah, Father's Day.  What's that?  June 19th.

11:07:43    20    Q.  And then did this board meeting take place?

21    A.  No.

22    Q.  Did Mr. McCabe -- was Mr. McCabe removed by the board as

23    president?

24    A.  No.

11:07:52    25    Q.  Okay.  Now, so just to be clear, AVKO has not paid you the

1  royalties on its sales so far, correct?

2  A.  That is correct.

3  Q.  And -- okay.

4       MR. GROTHOUSE:  I'm going to now hand the Court what

5  plaintiff has marked as Plaintiff's Exhibit Number 4 for

6  identification purposes only.

7       (Document tendered to the Court.)

8       MR. GROTHOUSE:  Okay.  Just to give some background,

9  this is the filing that Mr. McCabe --

10      MS. SAPER:  "Filing" used loosely.

11      MR. GROTHOUSE:  Yeah, this is the e-mail or filing

12  that Mr. McCabe submitted to Judge Ellis and to the Court on

13  Thursday.

14      This is paragraph 7 where he clearly admits that, in

15  the fourth line:

16      "... AVKO has licensed JJH Publishing to publish

17      all AVKO copyrighted materials with the one

18      exception, the Wave 3 revised versions of

19      Sequential Spelling."

20      So this is a clear concession or admission that AVKO

21  has, in fact, sold or licensed the works, Sequential Spelling

22  works 1 through 7, to non-individuals, particularly JJH

23  Publishing, which, in turn, is selling these works to other

24  distributors.

25

BY MR. GROTHOUSE:

Q.  Now, to be clear, Mr. Morrow, can you please tell me how, when you sell this material to distributors, how long do they usually keep that inventory?

11:09:29   A.  It's a relatively short time.  It depends on the distributor.  The largest ones tend to order weekly or biweekly, the smaller ones tend to order every two months. Some of them are in the medium size, about every month.

            THE WITNESS:  They're like anyone else in business,

11:09:45   right now, Your Honor, no one wants to hold inventory.

BY MR. GROTHOUSE:

Q.  Okay.  And there are a few distributors -- or I should say a number of distributors, and I'll just name three:  Sunlight, Rainbow Resource, and Brighter Child.

11:09:57           When was the last time that you sold any inventory to these three individuals -- these three companies?

A.  Brighter Child would be not even this year.  Rainbow would've been in May.  Rainbow is the one that orders weekly; they're very reliable.

11:10:16           What was the other one you named?  Sunlight?  That would've been 2011.

Q.  Okay.  And because the settlement agreement was entered into on February 24th, in your opinion, based on your experience with these companies, would they have any inventory

11:10:33   left?

1    A.  They might have a very limited inventory of -- the 6 and 7

2    levels, the 6 and 7 levels sell relatively slowly.  It's

3    possible they might have level 6 and 7, maybe.  Level 1,

4    Level 2, Level 3, completely impossible for one in a

11:10:51    5    million.

6    Q.  And do they -- do those companies have inventory today?

7    A.  Yes, they do.

8    Q.  Are they selling it online?

9    A.  Yes, they are.

11:11:00    10    Q.  Can you explain why they have any inventory if you have not

11    sold them?

12    A.  They would've had to purchased it from AVKO or from AVKO's

13    licensee, JJH Publishing.

14    Q.  Now, to be clear, Mr. Morrow, why can't you wait to get

11:11:38    15    relief?  Why can't you wait to get relief for this?

16    A.  The educational market is highly seasonal.  And the home

17    education private school market tends to peek in July and

18    August.  The period from May through September is most of the

19    year's sales.

11:11:52    20    Now, the home education market, which is about 80

21    percent of my market, has an additional facet that makes it

22    very, very disturbing to lose.

23    Mrs. Smith buys because Mrs. Jones, her next door

24    neighbor, bought the year before, and Mrs. Jones has told

11:12:09    25    Mrs. Smith it's a great product.

1    Every time what would've been one of my sales goes to

2  all about spelling, or spelling you see, or spelling power,

3  that's a mom who's going to tell her friends in her small group

4  that, I bought all about spelling.  You know, if she had an

11:12:28  5  opportunity to buy from Sequential Spelling, she'd be telling

6  her friends that I bought Sequential Spelling, this is what you

7  should buy instead; Mrs. Jones and Mrs. Smith and Mrs. Johnson,

8  all these women are telling -- excuse me -- their friends that

9  they should buy something other than my product.

11:12:43  10  Q.  So are you afraid of losing these customers forever?

11  A.  Permanently, and their friends, and that's the problem.

12  Q.  Let's talk about Wave 3's investment in this product since

13  the settlement agreement.

14  A.  We undertook a loan in excess $60,000 in order to pay the

11:13:00  15  $25,000 payment that was due June 1st to pay my good friends

16  here, who I truly enjoy (indicating), and to begin the process

17  of changing over to the new revised editions that were approved

18  by AVKO.  I've invested another $40,000 of my own.

19  Q.  Can you talk about the online version that you're investing

11:13:19  20  in.

21  A.  We are attempting to move this product online, because the

22  parents prefer an online version because, I hate to say it

23  because it sounds bad:  When you're home educating, you mom,

24  you dad, you're the teacher.  Especially if you have multiple

11:13:36  25  children, it can be very difficult.  Any bit of work that you

1   can take off of a piece of paper and put on to a machine, is
2   one less thing that you have to do.  So they really love
3   online.

4          We have been investing heavily this year to build an
11:13:51  5   online version.  It's the exact same words, exact same
6   sentences, done the exact same way, it's just when it's online,
7   mom doesn't have to teach it; when it's on paper, mom has to
8   teach it.

9   Q.  So you invested a lot of the money into this over the last
11:14:04  10   few months?

11   A.  A great deal.  And we're still investing more.

12   Q.  And that you've invested a lot of your time into this?

13   A.  I've invested a great deal of my time.  Several hundred
14   hours, yes.

11:14:10  15   Q.  And you're relying on the exclusive license to be able to
16   invest?

17   A.  Yes.

18          THE WITNESS:  In the absence of an exclusive license,
19   Your Honor, none of this is worth doing.

11:14:18  20   BY MR. GROTHOUSE:

21   Q.  You sent out an e-mail shortly after the settlement
22   agreement to distributors, correct?

23   A.  Yes, I did.

24   Q.  And what did that e-mail say?

11:14:23  25   A.  It said, happy news, AVKO and Wave 3 have come to an

1    amicable solution, a resolution to their challenges, from here

2    on out, we've been granted an exclusive license to sell these

3    products in the United States and Canada, we look forward to

4    receiving your orders.

11:14:42   5    Q.  On this e-mail that you sent, did you give this e-mail to

6    AVKO's attorneys to review it?

7    A.  Yes.  Yeah, we waited about three weeks.

8    Q.  Okay.  So you sent this e-mail saying that you have the

9    exclusive license.

11:14:54   10   A.  Correct.

11   Q.  What is your fear now that JJH Publishing and AVKO are now

12   selling?

13          THE WITNESS:  Well, it's making me look at a liar,

14   Your Honor.  I mean, I've sent out communication saying, "I'm

11:15:04   15   the guy, I'm the guy," and now AVKO and JJH Publishing are

16   saying, "no, no, no, he's not the guy, we're the guy."

17          And you have to have some sympathy for the

18   distributors.  Who's the guy?  You know, this guy Morrow says

19   he's the guy, this guy AVKO says he's the guy.  Who's the guy?

11:15:20   20          They don't want to get in trouble, Your Honor.  They

21   don't want to get in trouble.  They know what the statute says

22   about copyright infringement.  They don't want to work with the

23   wrong person.  So they say, no, thank you, we're not going to

24   play.

11:15:30   25

1    BY MR. GROTHOUSE:

2    Q.  So to be clear, you're not only worried just about lost

3    sales and loss of investment, but you're also worried about

4    reputational harm?

11:15:36    5    A.  Oh, yeah.

6           THE WITNESS:  Right now, Your Honor, my reputation

7    isn't the greatest,  so ...

8    BY MR. GROTHOUSE:

9    Q.  Can you quantify, at all, that reputational harm?

11:15:44    10    A.  In terms of what?  Sales I lost just this year?  Probably

11    $45,000 just in the last three months.

12    Q.  Can you measure the harm to your business and your

13    reputation?

14    A.  Never.  Never.  I --

11:15:57    15           THE WITNESS:  Let's take a big one, Your Honor.

16    Inquisicorp, big company.  They buy a third of all the product.

17    If they don't come back to me, is it because I did something or

18    was it because of this?  I don't know.  And they're incredibly

19    important to me because they're one of those hugely influenced

11:16:09    20    organizations in the marketplace, Your Honor.

21           People look at Inquisicorp does and they say, that's

22    what we want to do.  And right now, I have no relationship with

23    them at all because they're scared to death.

24    BY MR. GROTHOUSE:

11:16:28    25    Q.  And talk about competitors to Sequential Spelling.  There

1    are other spelling programs out there.

2    A.  Since this has all been going on, a new competitor has come

3    up.  Now, I should say this, I love the guy who came up with

4    it.  It's Demme Learning.  They're really great people, but

11:16:41    5    they come with a really -- and they come with a really great

6    program that was zero a year ago.  And it's doing great because

7    I can't fight it.  If I could fight it, I could slow it down.

8    Q.  What do you mean by "fight it"?

9    A.  I would be able to --

11:16:53    10    THE WITNESS:  Right now I'm not doing no marketing at

11    all, Your Honor.  I have no ads.  I'm not doing anything on the

12    Internet.  Literally, I'm just selling whatever people call me

13    up and order.

14    If I had that money, if I had a clear field, I'd be

11:17:05    15    doing advertising, I'd be doing interviews, I would be giving

16    articles to magazines.  None of which these things I'm doing

17    because right now, the more I do that, the more he'll resist

18    and it'll be more of this, Morrow says this, AVKO says that.

19    BY MR. GROTHOUSE:

11:17:20    20    Q.  So to be clear, every week and every month that you don't

21    have clarity in the marketplace, you lose ground to

22    competitors?

23    A.  And the thing is, in a lot of cases, I don't even know why

24    I'm losing the ground.

11:17:31    25    Q.  And you're afraid that this damage is irreversible?

1  A.  No, I'm not afraid it's irreversible.  I'm certain it is.

2  Q.  Okay.  One last thing.  In the settlement agreement for

3  next year, there's a benchmark that's $225,000 you have to

4  reach, correct?

11:17:45  5  A.  Correct.

6  Q.  How much money does this average about per month that you

7  have to sell?

8  A.  $19,000.

9  Q.  So you have to sell $19,000 per month?

11:17:54  10  A.  Yeah.

11  Q.  For the month of June, how much sales were you able to

12  make?

13  A.  Zero.

14       MR. GROTHOUSE:  That's all, Your Honor.

11:18:06  15       THE COURT:  I have a couple of minor questions.  The

16  case number?

17       MS. SAPER:  Yes, so procedurally, Your Honor, because

18  the settlement agreement has a provision mandating

19  confidentiality, we filed the complaint under seal.  The entire

11:18:24  20  --  all the parties, everything was suddenly under seal.  So we

21  had motioned it up to, you know, to err on the side of caution,

22  to keep the complaint and the material under seal until we had

23  an opportunity to present it to you.

24       So once the seal is removed, at least with respect to

11:18:41  25  the parties involved, then, I think, it can appear on Pacer.

1  It can be retrievable.

2        THE COURT:  And what was Judge Ellis doing in this

3  case?

4        MS. SAPER:  Judge Ellis wasn't doing anything in the

11:18:57  5  case.  The case was initially before Judge Darrah.  The case

6  settled with the help of Judge Finnegan, magistrate judge.  And

7  because the settlement agreement in the case was missed with

8  prejudice, he was no longer --

9        MR. GROTHOUSE:  The court did not retain jurisdiction

11:19:14  10  after that.

11        MS. SAPER:  Correct.  So when we re-filed it -- when

12  we initially filed the complaint, it was assigned to Judge

13  Norgle, I believe, who was the emergency judge at the time.  We

14  then revoked the notice, because we were attempting to

11:19:30  15  negotiate a settlement.  Then when we went to re-notice the

16  TRO, they assigned the case to Judge Ellis.  Judge Ellis told

17  us this morning that because the underlying case was before

18  Judge Darrah, she would transfer it to Judge Darrah.  So it

19  back to Judge Darrah.  Judge Darrah is out, I believe, on

11:19:48  20  vacation, which brought us back to you since you were the

21  emergency judge.

22        MR. GROTHOUSE:  Basically, under the local rules, even

23  when cases are dismissed with prejudice and the court no longer

24  retains jurisdiction, the case is still assigned to the

11:20:01  25  original judge.  Even though they don't have any jurisdiction

1  and the original dispute was dismissed with prejudice, when

2  there's a breach of settlement, it's supposed to be assigned to

3  the original judge.  So it was mistakenly assigned to Judge

4  Ellis, so she, on Thursday or Friday, put in a transfer order

11:20:14  5  to --

6       MS. SAPER:  No, this morning.  The transfer order was

7  put in this morning.  We were notified at 8:30 this morning

8  that Judge Ellis was not the judge to hear this TRO.

9       MR. GROTHOUSE:  Then she told us to contact Judge

11:20:26  10  Zagel's courtroom, because that's who it was going to be

11  transferred to, so we did --

12       MS. SAPER:  No, Judge Darrah.

13       MR. GROTHOUSE:  Excuse me.  Judge Darrah, yeah.

14  Excuse me, my fault.  And then Judge Darrah is out until next

11:20:37  15  month.  So we obviously --

16       MS. SAPER:  We're now before you.

17       MR. GROTHOUSE:  Are now before you as the emergency

18  judge.

19       To be clear, Your Honor, I just want to say one last

11:20:50  20  thing.  We worked very hard to:  One, make sure that Wave 3

21  followed every single provision of the settlement agreement.

22       It was very frustrating for Wave 3 to do this in the

23  face of AVKO continually breaching and continually sending

24  really nasty e-mails.  It was very hard for Wave 3 to pay all

11:21:12  25  this money to follow the terms of the settlement when the other

1    side was breaching constantly.

2         We also, in good faith, after we first filed this

3    suit, in good faith negotiated with the other side.  We took

4    them at their word that there would be a change of the guard.

11:21:29   5    That Mr. McCabe would seem to be the impetus behind all of

6    these problems.  We understood that he would be removed or

7    otherwise reassign on the June 19th board meeting.  And when

8    that did not happen, we then re-filed and noticed up this

9    TRO.

11:21:57   10    THE COURT:  I will attempt to straighten out the

11   number issue, because, basically, what I have read, which is

12   the complaint, it reads, as it should, as a separate case

13   dependent upon what happened in the prior case.  And I have

14   what appears to be a reply, but I can't treat it as a reply

11:22:34   15   essentially because there's no known filer.  And in relatively

16   short order, that issue will be resolved.

17        When did you get the reply to the plaintiff's

18   complaint?

19        MS. SAPER:  Friday afternoon.

11:23:00   20        (Brief pause).

21        THE COURT:  And the person, McCabe, resides in

22   Michigan?

23        MR. GROTHOUSE:  His original attorneys, Brian and Adam

24   of Wolek --

11:23:35   25        MS. SAPER:  And Noack.

1          MR. GROTHOUSE:  -- and Noack.  They are Chicago

2     counsel.  They were working -- they were responsible for --

3     they represented AVKO throughout the litigation, and then they

4     represented AVKO during the settlement, and then we were in

11:23:50   5     conversations with them after the settlement.

6          As Mr. McCabe makes clear in his filing, those

7     attorneys refused to file some of the things that Mr. McCabe

8     wanted to file.  Out of their own ethics, they didn't believe

9     that McCabe had a rational basis.

11:24:09  10          But I guess that's neither here nor there, but they

11     were representing him all the way up until --

12          MS. SAPER:  Probably two weeks ago.

13          MR. GROTHOUSE:  Probably two weeks ago.

14          MS. SAPER:  And informed of the re-notice.

11:24:24  15          THE COURT:  I'm thinking, when does Darrah get back?

16          THE CLERK:  August, I believe.  The beginning of

17     August.

18          THE COURT:  Okay.  So I think we're going to have this

19     for a while.

11:24:55  20          What have I got on Thursday?

21          THE CLERK:  Just hearings throughout the day, all the

22     way from 9:15 until noon.

23          THE COURT:  Then let's set this one for noon on

24     Thursday, because we'll issue it and it'll be longer than

11:25:48  25     48 hours before I see it again.

Morrow - direct by Grothouse

38

1          (Brief pause).

2          THE COURT:  And the only defendant is AVKO Educational

3     Research Foundation, Inc.?

4          MR. GROTHOUSE:  Correct.

11:26:21     5     THE COURT:  And we'll see if anybody else shows up.

6          I have what appears to be an appropriately drafted

7     counts in the complaint.  So what we'll be doing on Thursday is

8     not discussing the structure of it, but discussing the question

9     of remedy if Wave 3 is interested, and if, by some chance, AVKO

11:27:04    10     shows up with a representative, they may have their own issues.

11          I am operating under the premise, which is so far

12     undenied, that this is a period of time in which the product is

13     sold more than it is at other times, which means that there's

14     some incentive not to let this sit.  And I'm pretty sure that

11:27:40    15     would be the view of Judge Darrah, as well.

16          And we'll see.  And a lot of it will depend not only

17     on Wave 3, but if anybody else shows up.

18          MS. SAPER:  So to be clear, Your Honor, would you like

19     us to present more information regarding what an appropriate

11:28:01    20     remedy would be in terms of an injunction or -- I'm not clear.

21          THE COURT:  There aren't very many of them.  One of

22     them is injunction.  And given the nature of this case, my bet

23     would be that the only thing that would be at issue was the

24     continued business of AVKO with respect to the products coming

11:28:29    25     from Wave 3, and we'll see where we go.  And I don't think I

1  have anything else that I want to specify now because I don't

2  know enough.

3           MR. GROTHOUSE:  Understand.

4           THE COURT:  But we'll see.

11:28:57  5           MS. SAPER:  I'm very sorry, Your Honor.  I'm still

6  very unclear.  What would you like us to present or --

7           THE COURT:  Well, what I want to hear is if anybody is

8  going to complain about this complaint.  And one of the ways

9  that that can be done, in fact the only way it can be done is

11:29:18  10  for AVKO Educational Research Foundation to write a piece of

11  paper or make a speech to me about why I should deal with what

12  I anticipate will be objections and motions on behalf of Wave

13  3, the purpose of which is to stop the use of this product or

14  products, there are a volume of them, from anyone other.

11:30:00  15           I think the argument will be that I should permit no

16  circulation and sale of the product, Wave 3 Learning,

17  Incorporated, and maybe AVKO has got an answer.

18           They certainly don't have an answer here.  Although,

19  from my perspective, the defendant's reply to the complaint has

11:30:28  20  got a lot of detail in it, which usually doesn't happen

21  quickly.  And it's one of the reasons why I pick Thursday

22  because it's possible, given what was written, although there's

23  no one who actually properly filed this, it may give me some --

24  it will give me some idea of what steps ought to be taken.

11:30:55  25           MS. SAPER:  (Nodding).

1          THE COURT:  And we'll see.

2          MR. GROTHOUSE:  And to be clear, Your Honor, on

3    Thursday, if you have any questions about any of the claims,

4    allegations, facts that Mr. McCabe made in this filing, or

5    other filings he may file before then, we'd be glad to answer

6    all of them.

7          THE COURT:  Well, we'll see.

8          MS. SAPER:  How shall we give -- I mean, we've been

9    communicating via e-mail with former counsel.  Will the Court

10   also apprise the defendants or how will notice be given?

11         THE COURT:  Well, the only people who are -- the only

12   entity that is entitled is AVKO Educational Research

13   Foundation, Incorporated.  And if --

14         MR. GROTHOUSE:  One --

15         Oh, I'm sorry.

16         THE COURT:  No, go ahead.

17         MR. GROTHOUSE:  One concern we do have, Your Honor, is

18   the fact that Mr. McCabe has made accusations against his

19   lawyers, and lawyers in general, that there's a conspiracy to

20   run up legal bills, that he could do a better job than his

21   lawyers, and that he doesn't want to spend any money on

22   lawyers.  So our concern is that he won't seek counsel, and,

23   you know, that's a way for him to delay anything from

24   happening.

25         THE COURT:  If it is my judgment that he is seeking

1  only to delay, then that is attached to a different remedy than

2  the one of having him come in and saying, essentially as a

3  witness, because he's not a party.  Although, it's difficult to

4  see how AVKO itself can respond under the circumstances here

11:32:52  5  unless they get to use the services of the individual who has,

6  apparently, stated views of the facts in this case.

7       The difficulty that would happen, but it's a

8  difficulty for AVKO, if somebody comes here and says, this

9  happened, that happened, a variety of other things happened,

11:33:36  10  and you, judge, should do X, Y and Z.  The ability for that

11  person to speak on behalf of the corporation is severely

12  hampered.

13       MR. GROTHOUSE:  One last thing, Your Honor.  We

14  e-mailed Brian Noack who is the former counsel for AVKO, and he

11:34:00  15  informed us -- it's an e-mail on July 8th.  I can give it to

16  you.  He informed us that Mr. McCabe --

17       THE COURT:  Stop.  Hand it to me.

18       (Document tendered to the Court.)

19       MR. GROTHOUSE:  He informed us that Mr. McCabe, or Don

11:34:18  20  McCabe, reassigned from AVKO on June 30th and that Robert

21  McCabe, his son, is running the company until the next board

22  meeting when the president will be elected.

23       So it's my understanding that Mr. McCabe, the person

24  who filed or submitted that, quote/unquote, file, has no

11:34:34  25  authority to do so, even if he's -- I mean, obviously he

1    doesn't have authority because he's not a lawyer and he can't

2    represent any corporation, but additionally, we are under the

3    understanding, based on his former attorney representation,

4    that he reassigned and has no authority to represent or to --

11:34:51    5    THE COURT:  He doesn't have that authority.  He's a

6    witness.

7    MR. GROTHOUSE:  Okay.  I understand.

8    THE COURT:  He's not a party.

9    MR. GROTHOUSE:  Okay.  I understand what you're

11:34:58    10    saying.

11    THE COURT:  If you think it would be useful, from the

12    point of view of the plaintiff here, to also notify or seek the

13    presentation of Robert McCabe, but as it stands now, on the

14    papers I have, he's just another witness.

11:35:25    15    MS. SAPER:  (Nodding).

16    MR. GROTHOUSE:  (Nodding).

17    MS. SAPER:  So, Your Honor, everything is under seal.

18    So the minute order, how will it work, procedurally, for us to

19    notify AVKO of the Thursday noon appearance?

11:35:39    20    THE COURT:  I'm giving you the right and authority to

21    serve notices on AVKO itself and on both of the McCabes.

22    MS. SAPER:  Is electronic mail okay?

23    THE COURT:  It's about the only way you are going to

24    get there fast enough.

11:36:04    25    MS. SAPER:  Yes.

1    THE COURT:  I think we should stop now and you should

2  go to your office and do this stuff that I know you have to

3  do.

4    MS. SAPER:  Okay.

11:36:17  5    MR. GROTHOUSE:  Thank you, Your Honor.

6    MS. SAPER:  Thank you, Your Honor.

7    THE COURT:  Thank you.

8

9    (Which concluded the proceedings had on this

10    date in the above entitled cause.)

11

12

13    *    *    *    *    *    *    *    *

14

15

16  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

17    RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

18

19  /s/Blanca I. Lara                    July 20, 2016

20

21

22

23

24

25