**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**FILED**

2018 JUN 14

JUN 14 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| WAVE 3 LEARNING, INC., a Nevada Corporation,    )<br>)<br>*Plaintiff*    )<br>)<br>v.    )<br>)<br>AVKO EDUCATIONAL RESEARCH )<br>FOUNDATION, INC., a Michigan )<br>501(C)3 Non Profit Corporation and )<br>Donald J. McCabe, an individual )<br>)<br>*Defendant*    ) | Civil Case No.: 2016-cv-05643<br><br>Judge Jorge L. Alonso |

**DEFENDANT DONALD J. MCCABE'S
EMERGENCY REQUEST
FOR IMMEDIATE ENFORCEMENT
OF PAYMENT PROVISIONS OF THE
FEBRUARY 24, 2016 SETTLEMENT AGREEMENT**

**NATURE OF THE ACTION**

1. Plaintiff Wave 3 Learning, Inc. has refused to comply with articles 2 and 5 of the Settlement Agreement. This amounts to $50,000.00 in yearly payments and an amount I estimate to be somewhere in the neighborhood $1,000.00 worth of royalties not paid on their sales for the year 2017 and the first quarter of 2018. There is also **Article 11 Release** which states: "Any further litigation about the issues and materials herein will be subject only to this agreement and Wave 3 shall be liable for past damages of $100,000.00." The total of what Wave 3 is obligated to pay according to the terms of the agreement is over $151,000.00

## REASON FOR EMERGENCY REQUEST

The reason is that AVKO finds itself in a life or death situation. It was the extremely high cost of this current (and past) litigation to AVKO that has brought us to this point. It should be noted that AVKO was already bankrupt[1] at the time when the Plaintiff Wave 3 amended their frivolous and malicious amended complaint to include me as a defendant. Perhaps, this life or death situation could have been avoided were it not for the actions of AVKO's atttorney Mason Cole's mishandling of the Plaintiff's complaint regarding "appearances" of the words "sequential and spelling" on www.org. This, added to his threats to flipcause.org, resulted in flipcause.org closing down AVKO's only real mechanism for maintaining its mission, i.e., its website, www.avko.org.

AVKO out of necessity must close by June 30, 2018.

It cannot ethically and legally continue its existence if it has no means to maintain its mission as a 501(c)3 organization. If and only if the Plaintiff Wave 3 Learning is made to comply before June 30, 2018, will AVKO then have the ability to (1) re-create its website, (2) find a location to house the Bernice Webb Memorial Library, (3) publish the materials it is allowed to publish, (4) have sufficient income to re-hire its staff and maintain its mission, as well as (5) be able to pay through installments its debt to the Plaintiff and its other creditors.

## JURISDICTION AND VENUE

2. I accept the jurisdiction of this court and its venue.

## PARTIES

---

[1] Bankrupt meaning its liabilities exceeded its assets.

3. Plaintiff Wave 3 Learning, Inc. is a Nevada corporation with its mailing address (a mail box in a UPS store) located at 126 E. Wing St., Suite 240, Arlington Heights, Illinois 60004. I believe its principal place of business is in Thomas A. Morrow's residence.[2]

4. Defendant AVKO Educational Research Foundation, Inc. is a membership organization as well as a Michigan 501(C)3 nonprofit corporation that no longer has a principal place of business. It only has an address, a mail box in the Clio, Michigan UPS store 2169 W. Vienna Rd., Suite 183, Clio, Michigan.

5. I, as the co-defendant, currently live at 3084 Willard Rd., Birch Run, MI. 48415

## BACKGROUND

6. In 2010 Thomas A. Morrow as the CEO, President, and major stockholder of Home School Holdings, Inc. ("HSH") and I, as the Research Director for the AVKO Educational Research Foundation, Inc. (AVKO), signed a publishing agreement which gave HSH exclusive rights only in the U.S. and Canada to the reproduction and distribution of the over 40 AVKO copyrighted books referred to "The Works."[3] *See* **Exhibit 4**. In 2011 AVKO filed suit against HSH, Wave 3 Learning, Inc. ("Wave 3"), and Thomas Morrow for breach of contract, fraud, etc. The result of the litigation was that Judge Ludington dismissed most of AVKO's complaint because AVKO's attorney, Ms. Susan Woodrow, **against AVKO's stated wishes**, withdrew HSH from the lawsuit.

---

[2] This is where Thomas A. Morrow insisted that my grandson Jason McCabe deliver a number of cartons of books he claimed to have been shorted in June, 2010.

[3] In Judge Ludington's decision he wrote the number 720 books. This came about from AVKO's attorney being unable to properly read an AVKO order blank. The last book listed had a order number of 720. No matter how hard I have tried, the attorneys hired by AVKO never gave me the opportunity to edit and eliminate errors in their court filings..

The Court also ruled that there was a valid unwritten contract between Wave 3 and AVKO granting nonexclusive publishing rights and that Wave 3 was to complete the first of the two payments of $300,000. Wave 3 did not comply. AVKO after giving notice for failure to comply, terminated Wave 3's license. Despite the clause in The Publishing Agreement[4] in which he agreed that any disputes would be settled in Michigan Courts, and despite Judge Ludington's ruling that AVKO maintained the copyrights, Wave 3 filed in Illinois for a declaratory judgment that Wave 3 owned the copyrights to "The Works." Three times Judge Virginia Kendall dismissed the case. AVKO's attorney Brian Noack rather than filing show cause complaints in the Michigan Courts which I wanted him to do, insisted that we wait until Judge Kendall ruled in AVKO's favor and then file in Illinois with additional charges of infringement and improper use of AVKO's trade mark of Sequential Spelling. As Judge Kendall finally dismissed the case on the grounds her Court lacked jurisdiction, there was no decision rendered as to the ownership of the copyrights. This cost AVKO over $100,000 for absolutely nothing.

Then, Brian Noack filed for AVKO what he considered was the proper and most lucrative way of suing Wave 3. Eventually, Wave 3 finally agreed to a settlement hearing. At this hearing, AVKO's attorneys, Brian Noack and Adam Wolek, discovered (or so they told me) that Thomas Morrow and Wave 3 were basically bankrupt and we would have to settle for very little. So I signed the Settlement Agreement. *See* **Exhibit 1**.

7. In exchange for mutual dismissal of claims, AVKO and Wave 3 came to an Agreement which was signed by Thomas A. Morrow and myself somewhere after 8:30

---

[4] See Exhibit 4 written by Thomas A. Morrow and agreed to by me.

p.m. on February 24, 2016. In that agreement (*See* **Exhibit 1**) under the second[5] paragraph 10 **Miscellaneous**, (10.6) written by the attorneys for both sides was the clause **"No amendment or modification may be made to this agreement unless it is in writing and signed by both parties."** Within hours this provision was breached. While I was somewhere on I-94 or I-96 traveling slowly on the snow covered expressways, Dahlia Saper, Thomas A. Morrow for Wave 3 and Brian Noack **secretly** came to a mutually beneficial modification via email to The Settlement Agreement. *See* **Exhibit 2**. It was based on this "illegal" modification that Judge Zagel unknowingly ordered AVKO to pay the "quarterly installments" which Thomas Morrow understood to be yearly. *See* **Exhibit 2**. Note that when as a witness for AVKO I tried to convince Judge Zagel that since Wave 3 at that time owed AVKO over $75,000.00 we should be able to merely credit Wave 3 with the amount rather than pay it, Wave 3's attorney claimed that the settlement agreement must be followed to the letter. Today, Wave 3's attorneys are taking the opposite position claiming that Wave 3 does not have to pay the Settlement Agreement's mandated payments because AVKO owes Wave 3 more in fines and attorney fees. Estoppel. Estoppel. Estoppel.

8. The Agreement under 2 **Settlement Payment** says: Beginning on or before the Effective Date, Wave 3 shall pay to AVKO the sum of one hundred thousand dollars ($100,000.00)…" It also states: **"Failure to pay the full Settlement Amounts within 14 business days of the effective date of this agreement terminates the entire agreement unless the parties agree in writing to extend this deadline."** As the

---

[5] The first paragraph 10 was **Right of Review** The attorneys for both sides refused my requests to even discuss correcting the numbering of the paragraphs or any other of the over twenty glaring errors through negotiation.

Effective Date as defined in the Settlement Agreement is the date it was signed by both parties, and as there was no agreement in writing and signed by both parties to extend this deadline, the Settlement Agreement was terminated by Wave 3's failure to pay the full Settlement Amount by March 10, 2016. This would logically mean that Wave 3 had no basis in law to file this suit or its "Emergency" TRO which was handled by Judge Zagel. As two of the authors of the Settlement Agreement, Ms. Saper and Matthew Grothouse had to have full knowledge of the Settlement Agreement, Plaintiff's attorneys should have known about the previous breaches of the agreement by Wave 3, but decided that because they knew AVKO could not get an attorney in time, they could get away with their frivolous and malicious filings, including the amended complaint in which it is obvious that Plaintiff added me as a defendant in hopes of destroying my personal legacy. *See* **Exhibit 6**. There was nothing more to gain from AVKO. Plaintiff had now achieved the first part of Thomas A. Morrow's "promise" to destroy AVKO and myself. *See* **Exhibit 6.**

In its amended complaint, Plaintiff accused AVKO of refusing to pay Wave 3 its Royalties. This accusation is moot. Judge Zagel granted Wave 3's petition in which this was claimed. I directed AVKO to pay those royalties even though I felt that the Settlement agreement only called for it being paid yearly (and so did Thomas A. Morrow (*See* **Exhibit 2**). I also felt that since Wave 3 at that time owed AVKO a little less than $75,000.00 that we could just apply it against what was owed AVKO. Wave 3 took the position that the Settlement Agreement was to be followed to the letter. Judge Zagel agreed. AVKO paid. Note, however, despite Plaintiff's lawyers knowledge of the principle of Estoppel, Plaintiff has changed its position on that. They now contend that

they do not need to pay AVKO the royalties due it because AVKO owes them more. Estoppel. Estoppel. Estoppel.

Plaintiff in its amended complaint used the disparaging remark "Holding himself out as President of AVKO, McCabe misrepresented to a third party (Joe Hipps/JJH Publishing) that AVKO had the power under the Settlement Agreement to unilaterally terminate (and did terminate) Wave 3's exclusive license." That is absolutely false on three counts. First of all, I was the President. Secondly, I did not misrepresent anything. When I said that after August 4, 2016 I might be able to re-license them, the operative word is "might." I did not say *would* or even *could*. I merely followed Judge Zagel's order to terminate **all** licenses.

Plaintiff also stated that "Plaintiff's counsel made it clear that 'AVKO cannot terminate its exclusive license to Wave 3 and Judge Zagel did not order AVKO to do so." I maintain that the word *all* means *all.* Judge Zagel ordered that AVKO terminate **all** licenses. Judge Zagel did not rescind or modify that order. I firmly believe Plaintiff's counsel does not have the authority to tell the Court that AVKO cannot carry out the Court's order to terminate *all* licenses. If Plaintiff's counsel thought that the Judge did not have that authority, Plaintiff's counsel should have asked the Court to modify its ruling from the word *all* to "*any* license other than the one granted Wave 3 through The Settlement Agreement." As AVKO did not have an attorney at that time, I'm sure Judge Zagel would have granted that request by default. However, he wasn't asked and he didn't change or modify that ruling.

For Wave 3's history of the litigation that Plaintiff placed on its website see Exhibit 3. And as it should be evident to all by AVKO's virtually zero sales, Plaintiff's claims of

AVKO causing Wave 3 financial harm are without merit. All one has to do is read the emails Thomas A. Morrow sent to distributors to understand that he was the cause of Wave 3's decline in sales, not AVKO. **See Exhibit 5**.

   As AVKO has no attorney at this time, I can only pray that the Court will not allow the Plaintiff to destroy the 44 years of work AVKO has done on behalf of those who have been failed by the educational system. Please, order Wave 3 to comply with the terms of the Settlement Agreement and to do so before June 30, 2018.

Certificate of Service

The undersigned hereby certifies that on June 9, 2018 the foregoing

**DEFENDANT DONALD J. MCCABE'S RESPONSE TO**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**
**AND HIS COUNTERCOMPLAINT**

was sent to be filed with the Clerk of Court through the United States Postal Service. The

Clerk will then send a notification of such filings to Plaintiff's Counsel of Record,

Matt Grothouse
Saper Law Offices, LLD
505 N. LaSalle, Suite 350
Chicago, IL 60054
(312) 527 4120

I certify that only the Counsel for the Plaintiff is a member of the CM/ECF.

I can be reached at DonMcCabe1@gmail.com

by telephone (810) 686-9281

by mail at 3084 Willard Rd., Birch Run, MI

I further certify that I have personally emailed the Plaintiff's Counsel a copy of this

document.

Donald J. McCabe

June 9, 2018

# Order of Exhibits in 1st Amended Complaint

1. The Settlement Agreement (February 24, 2016)

2. Illegal modification of Settlement Agreement emails February 25, 2016

3. Wave 3's website History of AVKO

4. June 4, 2010 Publishing Agreement

5. Wave 3's emails to distributors

6. Morrow's emails threatening to destroy AVKO and me

Exhibit 1

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT (the "Agreement") is made and entered into by and among AVKO Educational Research Foundation, Inc. and Donald J. McCabe (collectively "AVKO"), and Wave 3 Learning, Inc. and Thomas A. Morrow (collectively "Wave 3"). AVKO and Wave 3 are sometimes referred to herein collectively as the "Parties." This Agreement shall be effective on the date of the last signature required for full execution by both AVKO and Wave 3 (the "Effective Date").

WHEREAS, AVKO filed an action in the United States District Court for the Northern District of Illinois, Eastern Division, against Wave 3, Case No. 1:15-cv-3393 (the "Lawsuit"), for unfair competition and false designation of origin under the Lanham Act, unfair competition under Illinois common law, unjust enrichment, deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, tortious interference with a business expectancy, breach of contract, and copyright infringement.

WHEREAS, Wave 3 filed a countersuit in the United States District Court for the Northern District of Illinois, Eastern Division, against AVKO, Case No. 1:15-cv-3393 (the "Countersuit"), for breach of contract, tortious interference with a prospective business relationship, trade libel, punitive damages, and alter ego.

WHEREAS, the Parties seek to resolve this dispute and the respective allegations amicably, and without the inconvenience and additional burdens of further litigation.

WHEREAS, Wave 3 denies all liability for the claims brought by AVKO.

WHEREAS, AVKO denies all liability for the claims brought by Wave 3.

WHEREAS, the Parties have agreed to compromise and settle all claims that have been brought or could have been brought, against each other in the Lawsuit and Countersuit without any party admitting liability or damages.

WHEREAS, the Parties desire to keep the terms of their settlement confidential.

NOW, THEREFORE, in exchange for the mutual covenants and conditions set forth below, the consideration of which is expressly acknowledged by each party, the Parties further agree as follows:

### RECITALS

1.   Representations and Warranties.

The Parties represent and warrant that each party that is a legal entity is duly organized, validly existing and in good standing under the laws of the location of its formation, and has all requisite power, authority or capacity, as applicable, to execute, deliver and perform this Agreement. No other person or entity is required to execute this Agreement for it to be binding as intended.

1

The Parties represent and warrant that they have personally or through their attorneys investigated all facts surrounding the various claims, controversies and disputes, and are fully satisfied with the terms, conditions and effects of this Agreement.

The Parties represent and warrant that no promise or inducement has been offered or made except as herein set forth, and that this Agreement is executed without reliance upon any statement or representation by any other party or the agent of any other party.

Wave 3 represents and warrants that no other copying of AVKO content has occurred.

The Parties represent and warrant that their gross revenues are fairly and accurately represented by the tax documents they shared with each other.

2.    Settlement Payment.

Beginning on or before the Effective Date, Wave 3 shall pay to AVKO the sum of one hundred thousand dollars ($100,000.00) (the "Settlement Amount") in annual installments of twenty-five thousand dollars ($25,000) until satisfaction of the Settlement Amount. The first payment will be due on June 1, 2016. Upon satisfaction of the Settlement Amount, AVKO acknowledges the receipt and sufficiency of this payment, and that it is in consideration of the releases and other provisions contained in this Agreement. In addition to the Settlement Amount, Wave 3 shall pay to AVKO a six percent (6%) royalty on Wave 3's gross revenue that year.

Wave 3 shall pay the Settlement Amount by wire transfer, and any associated transmittal fees, or by providing a certified or cashier's check payable to "Wolek & Noack," attorneys for AVKO, to be deposited in a trust for AVKO, in order that AVKO's attorneys can verify compliance with this Agreement, and AVKO authorizes delivery of said check to Wolek & Noack. Failure to pay the full Settlement Amount within 14 business days of the effective date of this Agreement terminates this entire Agreement unless the Parties agree in writing to extend this deadline.

3.    Materials at Issue

AVKO shall grant and hereby grants an exclusive license in the United States and Canada, and a worldwide nonexclusive license to the below titles and their derivatives (collectively "Sequential Spelling"):

- Sequential Spelling Level 1 Teacher Guide
- Sequential Spelling Level 2 Teacher Guide
- Sequential Spelling Level 3 Teacher Guide
- Sequential Spelling Level 4 Teacher Guide
- Sequential Spelling Level 5 Teacher Guide
- Sequential Spelling Level 6 Teacher Guide

2

- Sequential Spelling Level 7 Teacher Guide

- Sequential Spelling Level 1 Student Response Book

- Sequential Spelling Level 2 Student Response Book

- Sequential Spelling Level 3 Student Response Book

- Sequential Spelling Level 4 Student Response Book

- Sequential Spelling Level 5 Student Response Book

- Sequential Spelling Level 6 Student Response Book

- Sequential Spelling Level 7 Student Response Book

4.  Sequential Spelling Website

In the event the Agreement is terminated, Wave 3 shall sell the www.sequentialspelling.com domain to AVKO at the same price it was originally purchased for.

5.  Annual Revenue Requirement.

In the event that Wave 3's sales don't meet the thresholds in the below table, Wave 3's exclusive license is revoked and replaced by a nonexclusive license.

| Year | Revenue |
| --- | --- |
| 2017 | $225,000 |
| 2018 | $250,000 |
| 2019 | $275,000 |
| 2020+ | $300,000 |

6.  AVKO Sales.

AVKO shall be permitted to sell all of its copyrighted materials on its website or other channels to the extent that it is to individuals and not distributors. *Until there is an approved version of Sequential Spelling I (one) Teacher Guide, AVKO has the right to sell such material to ~~straight~~ and AVKO and Wave 3 will split the gross margins 50%*

7.  Copyright Use.

Wave 3 understands and believes that AVKO is the sole and exclusive owner of the *and some* copyrights at issue in this lawsuit and all associated federal intellectual property registrations and pending registration applications, with the exception of this license as hereby granted. Wave 3

*its distributors*

3      2/24/2016

admits the validity of all copyrights at issue in this lawsuit and all associated intellectual property registrations and applications.

8.    Trademark Use.

Wave 3 understands and believes that AVKO is the sole and exclusive owner of the *Sequential Spelling* trademark at issue in this lawsuit and all associated federal intellectual property registrations and pending registration applications, with the exception of this license as hereby granted. Wave 3 admits the validity of all trademarks at issue in this lawsuit and all associated intellectual property registrations and applications.

9.    Audit.

AVKO shall have the right to use an auditor of its choice to audit Wave 3's financial records upon reasonable notice of no fewer than fourteen (14) days. In the event the auditor discovers a discrepancy of greater than three percent (3%) between the revenue reported to AVKO and Wave 3's actual revenue, Wave 3 shall pay all past-due royalties with a five percent (5%) interest award and pay the costs of the auditor.

10.   Right of Review

Wave 3 shall submit all of its existing Sequential Spelling materials to AVKO for approval prior to printing or publishing any new materials. Wave 3 shall be expressly permitted to sell the remainder of its existing stock of materials. Wave 3 shall not be permitted to print or sell any further Sequential Spelling materials without the express authorization of an individual expressly designated by AVKO for such a purpose. Such authorization shall not be unreasonably withheld. If the Parties cannot agree to the reasonableness of the withheld authorization, then the question will be submitted to Paul Holz. If Paul Holz does not issue a decision on approval within two weeks, the Parties shall submit three names of persons to decide the approval within the question. If one of those names overlaps, that person shall decide the reasonableness of the approval. If there are no name overlaps, the Parties shall return to Judge Finnegan and she will select an individual from those three names.

Such an individual will be granted no fewer than fourteen (14) from receipt of the item to provide an authorization or rejection. This time period is per item and is cumulative. For example, if two books are received on the same day, the individual will have eight weeks to provide an authorization or rejection. In the event there is a dispute regarding the approval of any Sequential Spelling materials that cannot be resolved by the Parties, the Parties will agree on a neutral third party to settle the dispute.

11.   Release.

Conditioned upon the representations and warranties of the Parties, payment of the Settlement Amount, and other obligations set forth herein, AVKO hereby releases and forever discharges Wave 3 from all claims, demands, damages and costs arising out of, or directly or indirectly connected in any way with, the claims and allegations asserted by AVKO in the

4

Lawsuit and/or any matters, events, acts or omissions which could have been asserted by or on behalf of AVKO in the Lawsuit.

Conditioned upon the representations and warranties of the Parties, payment of the Settlement Amount, and other obligations set forth herein, Wave 3 hereby releases and forever discharges AVKO from all claims, demands, damages and costs arising out of, or directly or indirectly connected in any way with, the claims and allegations asserted by Wave 3 in the Countersuit and/or any matters, events, acts or omissions which could have been asserted by or on behalf of Wave 3 in the Countersuit.

The Parties shall dismiss with prejudice the Lawsuit within 14 days after the Agreement being signed. AVKO hereby releases and forever discharges Wave 3, from any and all actions, causes of action, claims, demands, damages, and costs relating to the Lawsuit through and including the Effective Date.

Wave 3 hereby releases and forever discharges AVKO, from any and all actions, causes of action, claims, demands, damages, and costs relating to the Countersuit through and including the Effective Date. Upon termination of the Agreement under the conditions set forth herein, Wave 3 shall immediately stop publishing, selling or distributing any materials mentioned herein. Any further litigation about the issues and materials herein will be subject only to this Agreement, and any further litigation will be pursuant to this Agreement, and Wave 3 shall be liable for the $100,000.00 for past damages.

Within 14 days, Wave 3 shall change any indication of ownership to reflect the license rights mentioned herein.

12.    Tolling of Any Statutes of Limitations

The Parties hereby agree that any statute of limitations periods, estoppel, and laches defenses are hereby waived, and to the extent the license ends, any such defense is tolled for the duration of this agreement.

13.    No Admission of Liability.

It is understood and agreed that this Agreement and other consideration recited herein does not constitute an admission on the part of either party of any liability and that this Agreement represents a compromise and settlement of disputed claims.

8.     Confidentiality.

The Parties agree that the facts and circumstances leading up to and surrounding this Agreement, the settlement of this dispute and controversy, and the facts and circumstances involved in the Lawsuit as described in the complaint, shall be kept private and confidential by the Parties, and that the Parties shall not communicate the terms of this Agreement or any other fact or circumstance surrounding the settlement of the dispute and controversy arising from the facts and circumstances discussed in this Agreement or the Lawsuit to any individual, entity, or other third-party, except as otherwise expressly provided below.

5

No party, nor an attorney for or a representative of a party, shall in any way communicate, publish, reveal, disclose, or characterize any terms, information, terms or details of this Agreement or the underlying circumstances or litigation, including the amount paid, except the Parties may state that it was "settled amicably" or state that the settlement is subject to a confidentiality provision. The Parties further expressly acknowledge and agree that if either party breaches the terms of the Agreement, the aggrieved party shall be entitled to all remedies available at law or in equity.

The confidentiality provision set forth in this section shall not prohibit communication or disclosures that are required by law, court order or subpoena, including disclosures necessitated by litigation in which any of the parties to this Agreement are involved. To the extent any party deems a communication or disclosure to be required by law or by court order, the communication or disclosure shall be limited to those persons or entities "needing to know" and shall be limited to the specific information requested or ordered.

The Parties agree that the confidentiality provisions set forth herein constitute material terms of this Agreement. The Parties agree that no part of the Settlement Amount is being paid for confidentiality but rather the consideration for such confidentiality is the mutual agreement of the Parties to abide by it.

9.    Non-disparagement.

The Parties agree that they will not make any statement now, or at any time in the future, to representatives of any media or to any other person or entity, which is disparaging of the other Parties' reputation or disparaging of the character, competence or reputation of any officer, director, executive, shareholder, agent, employee, insurer, or attorney of the other Party which could, if publicized, cause any person or entity related to one of the Parties to any humiliation or embarrassment, or which could cause the public to question the competence, reputation or character of any of these persons or entities.

10.    Miscellaneous.

10.1    Fees. The Parties to this Agreement shall bear their own attorneys' fees, costs and other expenses associated with the Lawsuit and Countersuit. If litigation is commenced in connection with this Agreement, the prevailing party shall be entitled to an award of its reasonable attorney's fees, and court and other direct costs.

10.2    Jurisdiction. This Agreement shall be exclusively governed by and construed in accordance with Illinois law without reference to its conflicts of law rules. The United States District Court for the District of Illinois, Eastern Division, or the appropriate state court located in Illinois, shall have exclusive jurisdiction over any legal action or proceeding arising out of or relating to this Agreement. For any action or proceeding that arises out of or relates to this Agreement, each of the undersigned expressly consents to personal jurisdiction and venue of each court specified in this section and hereby expressly waives any objection to same.

10.3    Severability, Waiver and Survival. If any term of this Agreement is held invalid, illegal, or unenforceable by a court of competent jurisdiction, that term shall be severed from this Agreement and the remaining terms shall continue in full force. No delay, omission, or failure

6

by any Party to exercise any right or remedy provided to it in this Agreement shall be deemed to constitute waiver or acquiescence, and any Party may exercise such right or remedy in the manner it deems expedient. Any Agreement provision that may reasonably be interpreted as being intended by the Parties to survive this Agreement's termination or expiration shall survive any such termination or expiration.

10.4     Interpretation. This Agreement shall be construed within its fair meaning and in interpreting this Agreement no inference shall be drawn against the drafting Party. Headings, the title of this Agreement, and the terms used to reference each Party as used in this Agreement are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section or in any way affect this Agreement.

10.5     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that signatures transmitted electronically, whether sent via facsimile or as attached files to emails (e.g., .PDF), shall be acceptable to bind the Parties and shall not in any way affect this Agreement's validity.

10.6     Entire Agreement. This Agreement sets forth the Parties' entire agreement and understanding relating to its subject matter and merges and supersedes all prior agreements, writings, commitments, discussions and understandings between them. The Agreement's terms are contractual and not mere recitals. No amendment or modification may be made to this Agreement unless it is in writing and signed by each Party.

10.7     Binding Agreement. The terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective predecessors, successors, transferees and permitted assigns. Notwithstanding the foregoing, this Agreement is not a third party beneficiary contract and shall not be construed to be for any third party's benefit, and no third party shall have any claim or right of action hereunder.

10.8     Independent Investigation.     Each Party:    (i) has read and understood this Agreement and agrees to all of its terms and conditions; (ii) independently evaluated the desirability of entering into this Agreement and is not relying on any representation, guarantee or statement other than as set forth herein; and (iii) has been afforded the opportunity to seek the advice of legal counsel regarding its rights and obligations set forth in this Agreement and has either sought or refused such counsel and accordingly has negotiated this Agreement either on its own or through its respective counsel.

**[THE   REMAINDER   OF   THIS   PAGE   HAS   BEEN   LEFT   BLANK INTENTIONALLY]**

7

IN WITNESS WHEREOF, each Party executes this Agreement either personally or by a duly authorized representative and agrees to be bound by this Agreement's terms and conditions.

By: AVKO Educational Research Foundation, Inc.
Name: _Donald J. McCabe_
Title: _President_
Date: _2/24/16_

By: Wave 3 Learning, Inc.
Name: _Thomas Morrow_
Title: _President_
Date: _2/24/16_

By: Donald J. McCabe
Date: _2/24/16_

By: Thomas A. Morrow
Date: _2/24/16_

Exhibit 2

Brian Noack <BrianN@wonoip.com> 7/8/16

to me, RobertM195, Adam

Don, Robert,


At your request, please find the modifications to the settlement agreement below. The payment from Wave 3 represented 6% of the first quarter of sales. Payments will continue on a quarterly basis throughout the life of the agreement. As you may recall, AVKO has the right to audit these figures at any time pursuant to the agreement.


Best,


**Brian T. Noack**

briann@wonoip.com

P: 239.671.1103

F: 708.843.0509


**Wolek & Noack**

233 S Wacker Dr.

Suite 2140

Chicago, IL 60606

---

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply

e-mail.

**From:** Brian Noack <BrianN@wonoip.com>
**Date:** Thursday, February 25, 2016 at 3:01 PM
**To:** 'Daliah Saper' <ds@saperlaw.com>, 'Matt Grothouse' <matt@saperlaw.com>
**Cc:** Adam Wolek <adamw@wonoip.com>
**Subject:** Re: AVKO & Wave 3 Settlement

Hi Daliah,

We agree to Mr. Morrow's deal of making the audit privilege two-sided in exchange for quarterly royalty payments and the change in verbiage from "that year" to "the duration of this agreement." Out of an abundance of caution, we are responding to you rather than him to avoid any potentially impermissible communications with a represented party. We trust you'll pass along our acceptance.

Please let me know if you have any questions.

Best,

Brian

**Brian T. Noack**

briann@wonoip.com

P: 239.671.1103

F: 708.843.0509

**Wolek & Noack**

233 S Wacker Dr.

Suite 2140

Chicago, IL 60606

---

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

**From:** Thomas Morrow <thomas@wave3learning.com>
**Date:** Thursday, February 25, 2016 at 12:26 PM
**To:** 'Daliah Saper' <ds@saperlaw.com>, Adam Wolek <adamw@wonoip.com>
**Cc:** 'Matt Grothouse' <matt@saperlaw.com>, Brian Noack <BrianN@wonoip.com>
**Subject:** RE: AVKO & Wave 3 Settlement

When it was originally written, I understood the payment to be once annually.

I tell you what; I'll make you a deal. There is something we missed, too.

We need to make the audit privilege two sided since AVKO is going to be selling my products (level one teacher guide) for a time and will still be selling their stuff from the website to individuals only. We need to have confidence that everything on both sides is on the up and up.

Subject to that agreement, quarters is fine.

Best regards,

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

Ph: 1-888-WAV-3LRN (928-3576)

**From:** Daliah Saper [mailto:ds@saperlaw.com]
**Sent:** Thursday, February 25, 2016 11:35 AM
**To:** Adam Wolek <adamw@wonoip.com>; Thomas Morrow <thomas@wave3learning.com>
**Cc:** Matt Grothouse <matt@saperlaw.com>; Brian Noack <BrianN@wonoip.com>
**Subject:** Re: AVKO & Wave 3 Settlement

I am cc'ing Thomas for his confirmation.

On Thu, Feb 25, 2016 at 10:39 AM, Adam Wolek <adamw@wonoip.com> wrote:

Daliah, Matt,

To clarify a potential ambiguity in the contract, "In addition to the Settlement Amount, Wave 3 shall pay to AVKO a six percent (6%) royalty on Wave 3's gross revenue that year[,]" means that in addition to the Settlement Amount, Wave 3 shall pay to AVKO a six percent (6%) royalty on a quarterly basis on Wave 3's gross revenue for the duration of this agreement.

As we discussed, please confirm that you agree with this

interpretation.

Best regards,

Adam

**Adam Wolek**
adamw@wonoip.com
P: 312.860.9006
F: 708.843.0509

**Wolek & Noack**
233 S. Wacker Drive
Suite 2140
Chicago, IL 60606
www.wonoip.com

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

--

**Daliah Saper**

312.527.4100

www.saperlaw.com

**\*\*Get to know Saper Law:** http://youtu.be/Q2g0zprTiQl

**\*\*Book Daliah Saper:** http://youtu.be/P4h4bpuAKRQ

Attachments area
Preview YouTube video Saper Law - Holiday Event 2014 at Grind Spaces -
Chicago



Preview YouTube video Daliah Saper / Saper Law Media Reel





**Don McCabe <donmccabe1@gmail.com>** Jan 8

to Eric

This is the unauthorized change in the Settlement Agreement reached by Wolek and Noakc with Ms. Saper by email. The only party benefiting from this agreement is Wolek and Noack as whatever payment to AVKO would just go to Wolek and Noack directly.

May God smile on you today.

Don McCabe, President and Research Director Emeritus,
AVKO Educational Research Foundation
3084 Willard Road Birch Run, MI 48415-9404
Phone: (810) 686-9283     Fax: (810) 686-1101
[Website] http://www.avko.org

Click here to Reply or Forward

3.1 GB (20%) of 15 GB used
Manage
Terms - Privacy
Last account activity: 1 hour ago
Details

Exhibit 3

From May 23, 2016 email to Morrow and Saper regarding his website.

Mr. Morrow,

Despite the agreement made, you have on your website www.sequentialspelling.com the following:

"In a nutshell, the original author sold us the rights to the Sequential Spelling product lin e.

He then sued us for copyright infringement and lost by summary judgement.  (sic)

He then brought suit again in a different court.  Even though we felt confident we would win completely again,

the expense had become so onerous that we agreed to a settlement.

One term of the settlement  was that we change the color scheme of the covers.

Hence, the "New Revised" editions."

Falsehood: (1) Original author sold:
Truth: AVKO licensed.

Misleading and partially false: Sequential Spelling product line
Truth: AVKO educational materials referred to as "The Works."

Falsehood: (2) He then sued us for copyright infringement.
Truth: AVKO sued.
Misleading by omission and partially false: AVKO also sued for fraud in the inducement and breach of contract.

Falsehood: and lost by summary judgement (sic).
Truth: Because AVKO's attorney without permission from AVKO removed from the case Home School Holdings and Home School Inc. whose president, CEO, and major stockholder of both was Thomas Morrow, the Judge ruled he and Wave 3 could not be charged with what happened prior to the signing of the Publishing Agreement. The judge did rule that the agreement was in effect and that Wave 3 owed AVKO the remaining $550,000.

FALSEHOOD: He then brought suit ....

TRUTH: Then Wave 3 brought suit in a different court (violating the Publishing Agreement) for a declaratory judgment that Wave 3 owned the copyrights and three times his petition was dismissed. Then AVKO filed suit in the same court Wave 3 filed in.

Misleading but a **violation of the Confidentiality agreement**:
One term of the settlement was that we change the color scheme of the covers.

Exhibit 4

# Publishing Rights Agreement Between Home School Holdings, Inc. and AVKO Educational Research Foundation, Inc.

This agreement between Home School Holdings, Inc, a Florida corporation (HSH) and the AVKO Educational Research Foundation, Inc., a Michigan non-profit corporation (AVKO), governs the purchase of the publishing rights throughout the world to all of the curricular and instructional aid publications of AVKO, which is available both in print and electronically delivered as referenced in Exhibit A below and referred to as "The Works."

AVKO agrees not to allow any other party to publish "The Works" (See Exhibit A) within the United States and Canada. AVKO agrees to allow HSH to publish "The Works" and sell "The Works" anywhere in the world. AVKO further agrees NOT to grant any other party the right to publish any part of "The Works" outside the United States and Canada without HSH's permission and proper compensation. AVKO further agrees to allow HSH the right to secure a buyer for the exclusive or even non-exclusive publishing rights for any specific area of the world such as India, Russia, Latin America, South America, Europe, South Pacific, or Africa. HSH agrees to give a mutually agreed upon percentage of the proceeds of such sale to AVKO or AVKO to HSH as the case may be. Both AVKO and HSH need to agree on the exact distribution of proceeds of such a sale *if* and when such an occasion were to arise.

## 1. The Basics

  **a.** HSH has its primary offices at 2700 S. River Rd. Suite 106 Des Plaines, IL 60018. It can be reached by phone at 847.391.5079, by fax at 800.760.7015, and by email to Thomas.morrow@home-school-inc.com. All communications may be directed to Thomas Morrow.

  **b.** AVKO has its primary offices at 3084 Willard Road, Birch Run, MI 48415. It can be reached by phone at 866.285.6612, by fax at 810.686.1101, by email at DonMcCabe@aol.com. All communications may be directed to Don McCabe.

## 2. The Exchange

  **a)** In exchange for the payments described below, AVKO agrees to provide HSH the content of "The Works" in Microsoft Word®—the complete list of which is on the attached Exhibit A). The physical inventory of "The Works" will be made available for purchase by HSH at the prices listed in Exhibit B.

  AVKO reserves the right to retain sufficient copies of "The Works" for its own usage.

  **b)** HSH agrees to make all of the publications and instructional aids referred to as "The Works" available for purchase, both in print and electronically within nine months of the signing of his agreement   and to update and improve them to increase their reach and presence in the market. HSH agrees to provide AVKO with no fewer than two (2) desk copies of any updated materials previously published by AVKO.

## 3) The Payment

  **a.** HSH will deliver a cashier's check or wire transfer to AVKO in the amount of $50,000 (fifty thousand dollars) **upon closing**; and stock certificates in HSH worth $250,000 (two hundred fifty thousand dollars) worth of shares in HSH   Note: HSH is a public company

and these shares would be tradable in accordance with SEC regulations on, first, the OTC market and then the NASDAQ when the Company moves its listing. The price per share determined at the mid-point of the closing bid-ask spread the day before the day of closing for purposes of the payment to AVKO.

**b.** As soon after closing as HSH has realized a gross revenue of $300,000 (three hundred thousand dollars) from publications covered by this agreement (see Exhibit A), HSH will pay an additional $50,000 in cash and provide certificates for another $250,000 (two hundred fifty thousand dollars) worth of shares in HSH. The price per share determined at the mid-point of the closing bid-ask spread the day before the day of payment.

**d.** Should HSH realize revenue greater than $300,000 (three hundred thousand dollars) in the first year from the date of closing, (See 3b. above), AVKO will receive an additional $10,000.00 and certificates for an additional $10,000.00 worth of shares in HSH (price determined as above) for every full $300,000.00 of increase.

**e) CLOSING SHALL BE FRIDAY, JUNE 4, 2010.**

**4) Other Payments and Obligations**

**a.** AVKO agrees to make Don McCabe available as a member of the Product Advisory Board which HSH may soon inaugurate. As part of the Board, Mr. McCabe is to advise HSH and the employees on issues related to the development and assembly of curriculum, curriculum packages, and instructional aids. AVKO also agrees to make Mr. McCabe available to accept at least 3 (three) scheduled speaking engagements on behalf of HSH each year if they are offered. Travel and reasonable incidental expenses to be defrayed by HSH.

**b.** HSH further agrees to reimburse AVKO for Don McCabe's services as a member of the Product Advisory Board at the rate of $50.00 per hour or $3,000.00 per quarter beginning November 1, 2010 or whenever the Board shall be inaugurated, whichever is greater, and $2,000.00 for each speaking engagement he accepts on behalf of HSH.

**c.** HSH agrees to continue to serve AVKO's existing distributors in a friendly and appropriate manner, only discontinuing their distribution agreements for violations of those agreements, non-payment, or at the request of the distributor.

**d.** AVKO, its employees and agents agree to keep confidential all information about HSH they receive that is not publicly available.

**e.** HSH agrees to keep all information it receives from AVKO confidential, except as disclosure may be required by the Securities and Exchange Commission or other regulatory bodies.

**f.** AVKO has the right to audit the books and records of HSH at any time after closing at its own expense with 24 hours notice.

**g.** AVKO retains the right to distribute "The Works" to individual persons via its website, e-books, phone orders, and community sales. AVKO retains the right to provide free electronic copies of "The Works" to its members. HSH agrees to sell "The Works" to AVKO at 60% discount from its suggested retail price, on consignment; AVKO may

determine its own sale prices to AVKO customers. AVKO will remit payment to HSH for consignment sales within 30 days of merchandise sales.

h. AVKO retains the right to continue to print, for in-house and non-sale purposes, "The Works" as they were at the time of Closing. AVKO retains the right to continue to print and sell any of "The Works" that HSH has not had printed and made available for sale.

i. HSH agrees to maintain and uphold the Sequential Spelling DVD agreement between AVKO and Instructional Media Innovations (IMI). HSH agrees to fully execute this contract so that all 7 Sequential Spelling DVDs have been manufactured, produced, and sold. AVKO and HSH agree to have AVKO staff continue to oversee the production of these Sequential Spelling DVDs with IMI.

j. HSH agrees to not produce altered forms of Sequential Spelling, excluding minor alterations to the directions, superficial typographic errors, or cover/binding changes, until 3 months after the release of the Sequential Spelling 2 DVD. Notice of changes and any revised versions must be delivered to IMI at its corporate office or via electronic mail at least one month before the sale of these revised versions.

k. HSH agrees to continue to distribute and sell Sequential Spelling DVDs as long as the Sequential Spelling brand (or changed-name versions) are distributed and sold by HSH or any future owner of HSH or the publishing rights to "The Works", or until stipulated by written, contractual agreements between HSH and IMI.

**5. Term of the Agreement; Default; Termination**

**a.** The agreement is intended to continue indefinitely.

**b.** The agreement immediately terminates and the right to publish "The Works" reverts to AVKO if HSH does not make the payments listed in this agreement or if HSH violates any provision of this agreement.

**c.** All other disputes will be resolved through negotiation between the HSH and AVKO.

**6. Controlling Law; Disputes**

**a.** Should there ever be a dispute that cannot be resolved amicably between the parties, this agreement shall be governed by the law of the State of Michigan; the parties agree to the jurisdiction of the courts of Saginaw County, Michigan. If HSH relocates to Grand Rapids, then the parties agree to the jurisdiction of the courts of Kent County, Michigan.

**b.** If the parties agree to binding arbitration, each party shall bear its own expenses to resolve the dispute. If any dispute is resolved in court or as a result of legal settlement subsequent to the filing of suit, the prevailing party shall be entitled to receive reimbursement of its reasonable attorney's fees.

**c.** The parties agree not to file suit against one another until at least 45 days have passed from the written notification of the concern that has arisen in order to give the parties time to resolve it.

| For AVKO Educational Research | For Home School Holdings, Inc. |
|---|---|
| | |
| Donald J. McCabe | Thomas Morrow |
| Date:_____ | Date:_____ |

Witnessed by: _____

Date:_____

**Exhibit A –"The Works"**

1. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 1

2. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 2

3. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 3

4. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 4

5. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 5

6. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 6

7. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 7

8. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 8

9. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 9

10. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 10

11. The Patterns of English Spelling with their Word Families put into Sentence Context Vols. 1-5

12. The Patterns of English Spelling with their Word Families put into Sentence Context Vols. 6-10

13. The Patterns of English Spelling with their Word Families put into Sentence Context Vols. 1-10

14. Word Families in Sentence Context

15. Sequential Spelling 1

16. Sequential Spelling 2

17. Sequential Spelling 3

18. Sequential Spelling 4

19. Sequential Spelling 5

20. Sequential Spelling 6

21. Sequential Spelling 7

22. Speech to Spelling

23. Student Response Book for Sequential Spelling

24. Engaging Language Kit 1

25. Engaging Language Kit 2

26. Engaging Language Kit 3

27. Engaging Language Kit 4

28. Engaging Language Kit 5

29. Engaging Language Kit 6

30. Engaging Language Kit 7

31. Engaging Language Kits 1-7

32. Sequential Spelling for Adults

33. Individualized Spelling

34. If it is to be it is up to me to do it.

35. If it is to be it is up to US to HELP.

36. Mechanics of English Spelling

37. The Tricky Words

38. The IT-ss and the TOOZE, Apostrophes and the I before E Rule Made Easy

39. Reading Teacher's List of Over 5,000 Basic Spelling Words

40. Readings for Fluency

41. Let's Write Right

42. Rimes and More Rhymes

43. Starting at Square One

44. Individualized Keyboarding

45. Individualized Keyboarding Teacher Edition

46. The Teaching of Reading and Spelling: a Continuum from Kindergarten through College

47. To Teach a Dyslexic

48. Get Outta My Face! Get Offa My Case!

49. 220 Names and Faces, 220 Dolch Words Are Too Many for Students with Memories like Mine.

Exhibit B

| Item ID | Item Description | Full Price | Unit Cost | Number | Total |
|---------|------------------|-----------|-----------|--------|-------|
| 100w | TPES1-10w/WFSC | 359.90 | 120.00 | 2 | 240.00 |
| 101-5W | TPES 1-5 w/WFSC | 179.95 | 60.00 | 4 | 240.00 |
| 101W | TPES w/ WFSC #1 | 39.95 | 13.00 | 4 | 52.00 |
| 102W | TPES & WFSC #2 | 39.95 | 13.00 | 4 | 52.00 |
| 103W | TPES & WFSC #3 | 39.95 | 13.00 | 4 | 52.00 |
| 104W | TPES & WFSC #4 | 39.95 | 13.00 | 4 | 52.00 |
| 105W | TPES & WFSC #5 | 39.95 | 13.00 | 4 | 52.00 |
| 106w | TPES 6 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 106-10W | TPES 6-10w/WFSC | 179.95 | 60.00 | 4 | 240.00 |
| 107W | TPES 7 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 108W | TPES 8 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 109W | TPES 9 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 110W | TPES 10 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 215 | Reading Teacher's List of 5000 | 29.95 | 10.00 | 4 | 40.00 |
| 240 | Word Families in Sentence Context | 39.95 | 13.00 | 4 | 52.00 |
| 60 | Readings for Fluency | 14.95 | 6.00 | 4 | 24.00 |
| 301H | Seq Sp 1 70 cases 50 ea | 14.95 | 2.00 | 3500 | 7000.00 |
| 302H | Seq Sp 2   3 cases 75 | 14.95 | 2.00 | 225 | 450.00 |
| 303H | Seq Sp 3 27 cases 75 | 14.95 | 2.00 | 2025 | 4050.00 |
| 304H | Seq Sp 4 13 cases 75 | 14.95 | 2.00 | 975 | 1950.00 |
| 305H | Seq Sp 5   3 cases 80 | 14.95 | 2.00 | 240 | 480.00 |
| 306H | Seq Sp 6   3 cases 80 | 14.95 | 2.00 | 240 | 480.00 |
| 307H | Seq Sp 7   3 cases 80 | 14.95 | 2.00 | 240 | 480.00 |
| 310 | Seq Sp Response Bk 30 cases 55 | 9.95 | 2.00 | 1650 | 3300.00 |
| 321 | Speech to Spelling | 14.95 | 4.00 | 10 | 40.00 |
| 331 | Rimes & More Rhymes | 39.95 | 10.00 | 10 | 100.00 |
| 332H | Let's Write Right HS | 39.95 | 10.00 | 10 | 100.00 |
| 350 | SS for Adults | 14.95 | 4.00 | 10 | 40.00 |
| 361 | Sequential Spelling 1 DVD | 39.95 | 10.00 | 50 | 500.00 |
| 362 | Sequential Spelling 2 DVD | 39.95 | 10.00 | 50 | 500.00 |
| 380 | Engaging Language Kit  1-7 | 79.95 | 20.00 | 5 | 100.00 |
| 381 | Engaging Language Kit  1 | 12.95 | 4.00 | 10 | 40.00 |
| 382 | Enagaing Language Kit 2 | 12.95 | 4.00 | 10 | 40.00 |
| 383 | Engaging  language Kits  3 | 12.95 | 4.00 | 10 | 40.00 |
| 384 | Engaging Language Kit 4 | 12.95 | 4.00 | 10 | 40.00 |
| 385 | Engaging Language Kit 5 | 12.95 | 4.00 | 10 | 40.00 |
| 386 | Engaging Language Kit 6 | 12.95 | 4.00 | 10 | 40.00 |
| 387 | Engaging Language Kit 7 | 12.95 | 4.00 | 10 | 40.00 |
| 401 | Individualized Keyboarding | 12.95 | 4.00 | 50 | 200.00 |
| 450 | Starting At Square One | 59.95 | 15.00 | 5 | 75.00 |

| 500 | The Tricky Words | 14.95 | 4.00 | 5 | 20.00 |
|---|---|---|---|---|---|
| 650 | The Teaching of Reading | 59.95 | 15.00 | 5 | 75.00 |
| 660 | Get Outa My Face Get Offa My | 19.95 | 4.00 | 10 | 40.00 |
| 663 | To Teach a Dyslexic 8 cases 44 | 14.95 | 3.50 | 352 | 1232.00 |
| 712 | Individualized Spelling | 29.95 | 5.00 | 10 | 50.00 |
| 715 | If It Is To Be HELP | 14.95 | 4.00 | 10 | 40.00 |
| 716 | If It Is To Be DO IT | 29.95 | 5.00 | 10 | 50.00 |
| 720 | I Before E, Apostrophes, it-ss & tooz | 14.95 | 5.00 | 10 | 50.00 |
| Grand Total | | | | | 23,038.00 |

Exhibit 5

Inquisicorp Corporation dba Sonlight
8042 S. Grant Way
Littleton, CO 80122

April 20, 2016

Dear Wayne and Tim:
It is my pleasure at long last to provide you with the distribution agreement we will use going forward,
the future price list, and a rundown of our plans for the future.

Let's begin with the Distribution Agreement. As you will see, it now includes a requirement for a
Minimum Advertised Price. This is an important change which will serve to improve financial returns for
all distributors and enhance the product line's prestige. This is the largest change we are making to how
we have interacted up to now. You are not required to sign this agreement, but, if you elect not to,
please see the important legal directions below.

If you elect to sign the Distribution Agreement, we want to carry out this transition in an orderly way, so
we will send out new images, descriptions and so forth for your websites and catalogs in late
September. If you need them even earlier, please feel free to ask.

Beginning this fall, a PR campaign will begin to introduce the new coming editions. We have a 2017
promotional budget of $75,000 so it is our intention to make a very large splash; this is three times more
than we have ever spent before. There will be opportunities for cooperative advertising, naming
Sonlight as a "preferred" vendor if you wish to take part. I will be coming to visit all the distributors who
sign their Distribution Agreements late summer / early fall to show them the new versions and discuss
plans for 2017.

If you elect NOT to sign the Distribution Agreement:
1. You must end all use of the Sequential Spelling Levels 1-7 trademarks in your advertising,
   catalogs, materials and on your website(s).
2. You may continue to sell any product you acquired from us ever until the inventory is liquidated.
3. Any product you acquired from AVKO before February 25, 2016 may be sold without constraint.
4. Any product you acquired from AVKO on or after February 25, 2016 may only be sold in
   accordance with the following constraint: you must report these purchases to us and provide
   copies of the invoice(s) for these purchases. You may not under any circumstances make any
   further purchases from AVKO without becoming liable for copyright and trademark
   infringement. If you do not report these purchases to us, any sales of these items will be
   regarded as copyright infringement and we will act accordingly to defend our exclusive right to
   the copyrights and trademarks in the US and Canada.

If you have any questions regarding this letter, the changeover, the new prices and agreements, please
feel free to call or email.

Exhibit 6

**A History of Malicious Emails and Threats by Thomas Morrow:**

**Email Fri, Mar 4, 2011**

TM gives AVKO 45 days notice "as per our agreement." In it he claims that

1. he has been defrauded,
2. AVKO failed to inform them of Inqisicorp's dissatisfaction with W3L's new version of Sequential Spelling
3. AVKO failed to inform them of another party owning the website sequentialspelling.com
4. AVKO is and has "always been in breach of our agreement."
5. AVKO is currently operating an online store on CBD.com (Actually the "store" was where W3L's books were being sold that Christian Book Stores bought from W3L)
6. AVKO has offered Kindle versions of The Works
7. AVKO has not signed over the copyrights.

> To cure these breaches and torts we will require:
>
> $16,000.00 in refund of overpayment
>
> Completion of the Trademark and Copyright assignment documentation

> Should you choose not to cure:
>
> You may rest assured we will bring suit following the conclusion of the selling season.
>
> You will need to disclose to Board Member candidates that they can be made personally liable for the outcome of our suit against the Foundation and you personally. Please don't...then they will have cause to sue you, too.

On March 13, 2011 TM emails:

> You are not authorized to address customers, Mr. McCabe. My relationship with you has been fraught with fraud, malfeasant and sundry misbehavior **THAT NEEDS TO STOP! (sic)**
>
> You are already on course for a lawsuit that will likely end AVKO. I suggest you amend your inappropriate behavior and attitude IMMEDIATELY and pretend that you are able to act your age whenever you have an opportunity to interact with customers if you have any desire to see AVKO outlive you.

On July 19, 2011 TM emails McCabe's grandson Brian in an attempt to get Brian to convince his grandfather to settle "amicably."

> I am also willing to bring suit and destroy AVKO and your G-pa's estate if I have to. The decision is Don's, so I hope you can help all of us out. I know of all the people in the world, your voice is the one he hears most with both respect and affection.

The complete e-mail was put into evidence by Wave 3. It is quoted in its entirety at the end of this exhibit.

Two days later, TM emails McCabe's son Robert in which he states:

If we can avoid litigating, I would prefer that, but I also am not interested in arbitration as I am very confident the law will bear me out completely if this goes in front of a judge and/or jury. Should it do so, I will be seeking $350,000 in compensatory damages, specific performance with regard to the defamation and punitives (sic) that I expect probably would not exceed $1,050,000. Still that adds up to a number that would likely wipe out both AVKO and your dad's estate. I don't like making threats, implied or explicit, but you need to understand the downside you are looking at if this is not quickly resolved with respect for the law as it is written and interpreted.

**The reason for selecting the Illinois Courts was both malicious and in violation of the terms of the agreement W3L supposedly was following.**

In the June 4, 2010 agreement signed by TM on p. 4, Part 6 Controlling Law; Disputes: it states:

a. Should there ever be a dispute that cannot be resolved amicably between the parties, this agreement shall be governed by the law of the state of Michigan; the parties agree to the jurisdiction of the courts of
Saginaw County, Michigan. If HSH relocates to Grand Rapids, then the parties agree to the jurisdiction of the courts of Kent County, Michigan.

b. If the parties agree to biding arbitration, each party shall bear its own expenses to resolve the dispute. If any dispute is resolved in court or as a result of legal settlement subsequent to the filing of suit, the prevailing party shall be entitled to receive reimbursement of its reasonable attorney's fees.

c. The parties agree not to file suit against one another until at least 45 days have passed from the written notification of the concern that has arisen in order to give the parties time to resolve it.

Why did W3L file its two cases against AVKO in Illinois rather than in Michigan (as the agreement specifies) and without 45 days notice (as the agreement specifies? AVKO strongly suspects the reason was to **drive up AVKO's expenses**.

W3L purports to be following the applicable terms of the June 4, 2014 agreement and uses it as a stepping stone to argue its case when in the agreement itself it states:

The agreement immediately terminates and the right to publish "The Works" reverts to AVKO if HSH (or now TM and/or W3L) does not make the payments listed in this agreement or if HSH (TM and/or W3L) violates any provision of this agreement.

The parenthetical phrases are AVKO's.

### A few of the "lies" or contradictions of W3L and TM

In Case No.: 1:11-cv-13381-TLL-CEB DEFENDANT THOMAS MORROW'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES:

In answer to INTERROGATORY NO. 9 Question b. which asked

> State why you failed to operate under the general terms of the Publishing Rights Agreement after you signed it on June 4, 2010 by continuing to disregard key terms of agreement after January 29, 2011.

TM/W3L answered

> After January 29, 2011, all key terms were adhered to that could have been adhered to but for Mr. McCabe's actions.

There was no action by McCabe that would have prohibited W3L/TM from providing AVKO with desk copies of any changed works. PDF's would have cost W3L nothing except a few key strokes of the computer.

Under 2 b) **The Exchange** of the Agreement "HSH agrees to make all of the publications ... available for purchase..." and under 2 a) agrees that "The Works will be made available for purchase by HSH at the prices listed in Exhibit B." There are at least 11 books that cannot be purchased from W3L at the prices listed in Exhibit B

There was no action by McCabe that would have prohibited W3L/TM from giving the 45 day notice or from filing its claim in Michigan.

There was no action by McCabe that would have prohibited W3L/TM from paying the $600,000 for the licensing fee or $550,000 assuming AVKO would receive permission from HSH to apply its $50,000 down payment to what W3L/TM's balance. See statement immediately below that clearly states the $50,000 was HSH's

In Case No.: 1:11-cv-13381-TLL-CEB **DEFENDANTS WAVE 3 LEARNING, INC AND THOMAS MORROW'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on p. 13 it states "Defendant Thomas Morrow paid $50,000 to Plaintiff on behalf of Home School Holdings in his official capacity" and on p. 14 "...no contract was formed between Plaintiff AVKO and Defendant Wave 3 Learning."

Wave 3's self-incriminating exhibit:

Case: 1:14-cv-01948 Document #: 48-5 Filed: 02/06/15 Page 2 of 2 PageID #:990

From: Thomas Morrow <thomas@wave3learning.com>
Date: Tue, Jul 19, 2011 at 1:07 PM

Subject: A Favor Request
To: Brian McCabe <yirzmbrian@gmail.com>

**Hey, Brian.****

** **

I hope things are going well. I expect you are pretty busy with
research over the Summer, so I will keep this short.****


** **

Your G-pa and I are likely to soon find ourselves in litigation.
I can't honestly claim to like him much, but I do respect him
and I would never wish the joys of litigation on anyone. Having
been around that particular block several times, both winning
and losing, I know it is no fun either way. A man Don's age should
be enjoying his garden and travelling and seeing
family, not getting himself embroiled in discovery
and depositions and all the stress it implies.****
** **

If you agree that he would be better off without this stress
and strain, I would appreciate it if you could spend a moment
or two chatting with him about it. I am willing to settle this
as amicably as possible. I am also willing to bring suit and
destroy AVKO and your G-pa's estate if I have to. The decision
is Don's, so I hope you can help all of us out. I know of all
the people in the world, your voice is the one he hears most
with both respect and affection.****
** **

Thanks whatever you decide and best regards,****

**Thomas Morrow****
President****