CD

RECEIVED

2018 AUG -6 PM 2:42

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

# FILED

AUG 0 6 2018 ⊮

**THOMAS G BRUTON**
**CLERK, U.S DISTRICT COURT**

| | |
|---|---|
| **WAVE 3 LEARNING, INC., a Nevada Corporation,** ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| v. ) | **Civil Case No.: 2016-cv-05643** |
| ) | |
| **AVKO EDUCATIONAL RESEARCH** ) | **Judge Jorge L. Alonso** |
| **FOUNDATION, INC., a Michigan** ) | |
| **501(C)3 Non Profit Corporation and** ) | |
| **Donald J. McCabe, an individual** ) | |
| ) | |
| *Defendant* ) | |
| ) | |

## DEFENDANT DONALD J. MCCABE'S
## EMERGENCY REQUEST
## FOR IMMEDIATE SANCTION
## OF ATTORNEYS DAHLIA SAPER, MATTHEW GROTHOUSE, MASON COLE,
## ADAM WOLEK AND BRIAN NOACK

### NATURE OF THE ACTION

1. Plaintiff Wave 3 Learning, Inc. and Thomas A. Morrow has used the attorneys Dahlia

Saper and Matthew Grothouse as well as colluding with AVKO's attorneys Adam Wolek.and

Brian Noack, and Mason Cole to deliberately destroy the AVKO Educational Research

Foundation, Inc. and so completely destroy my assets so as to make me without a home of

my own and surviving only on my $793.00 monthly social security payment and my Bridge

Card.

### REASON FOR EMERGENCY REQUEST

The reason is that AVKO no longer exists. I no longer have sufficient income to live without state assistance. It matters not how you rule on the pending motions. If you rule in my favor, it still will not be enough to reinstate AVKO so that it can resume its mission. To do so would take over two million dollars. Even if you awarded that amount to AVKO as a result of Wave 3's egregious actions, Wave 3 and Thomas A. Morrow would immediately declare bankruptcy. He has already done that at least once. And if he doesn't declare bankruptcy, he still would not be able to pay anything close to the amount AVKO would require to resume its mission. **See Exhibit 1**.

## JURISDICTION AND VENUE

2. I accept the jurisdiction of this court and its venue.

## PARTIES

3. Plaintiff Wave 3 Learning, Inc. is a Nevada corporation with its mailing address (a mail box in a UPS store) located at 126 E. Wing St., Suite 240, Arlington Heights, Illinois 60004. I believe its principal place of business is in Thomas A. Morrow's residence.

4. Defendant AVKO Educational Research Foundation, Inc. was a membership organization as well as a Michigan 501(C)3 nonprofit corporation. It no longer has a principal place of business. It only has an address, a mail box in the Clio, Michigan UPS store 2169 W. Vienna Rd., Suite 183, Clio, Michigan. The rental for that box will expire before the end of this month. AVKO has zero funds so it will not be able to renew it.

5. I, as the co-defendant, have no place of my own. My mailing address is Box 121, Clio, MI, 48420. Where I sleep depends upon which friend or relative can put up my snoring. Hopefully, with the help of the State of Michigan, I will soon be able to find appropriate and affordable housing for an 85-year-old who cannot drive.

## **BACKGROUND**

See my motions yet to be ruled on. More importantly, see Exhibit 1 "It's the Law" by

AVKO volunteer Sean Loughenquay. This will be sent to law schools in the U.S. with

permission for them to use as they see fit. It is also being sent to all the relevant social

media and educational media outlets that I can find. It is being sent as my last effort to at

least let the educational world know what has happened to AVKO. I do not expect any

positive results. If something good does come as a result, I am sure I will have been in

my grave for many years.

### Request for Judicial Action

1. Appropriate Sanctions on all the attorneys previously listed.

2. An article for the appropriate legal journal written by or directed to be written by the

Court regarding responsibilities of both lawyers and judges to help prevent unscrupulous

litigants and their lawyers to destroy small non-profit organizations as well as small

businesses that cannot afford high-priced attorneys.

Certificate of Service

The undersigned hereby certifies that on August 1, 2018 the foregoing

**DEFENDANT DONALD J. MCCABE'S REQUEST FOR SANCTIONS**

was sent to be filed with the Clerk of Court through the United States Postal Service. The

Clerk will then send a notification of such filings to Plaintiff's Counsel of Record,

Matt Grothouse
Saper Law Offices, LLD
505 N. LaSalle, Suite 350
Chicago, IL 60054
(312) 527 4120

I certify that only the Counsel for the Plaintiff is a member of the CM/ECF.

I can be reached by email at DonMcCabe1@gmail.com

Please do **NOT** call AVKO's former telephone (810) 686-9283

as that number now belongs to my ex-wife as part of our divorce settlement.

I can be reached by regular mail at Box 121, Clio MI, 48420

I further certify that I have personally emailed the Plaintiff's Counsel a copy of this

document.

Donald J. McCabe

August 1, 2018

# Order of Exhibits

1   It's the Law   News Release to media, to law schools, and social media including Cost to resume AVKO's mission

A   Settlement Agreement (February 24, 2016)
B   1st breach of Agreement. Wave 3 without AVKO's knowledge modified Agreement within hours of the signing.
A1  Morrow's 2009 proposed contract. He admits AVKO owns the copyrights.
A2  Morrow's SEC filing - commits perjury with false filing of contract with AVKO.
A3  1st Contract "Plain English Publishing Agreement" between AVKO & HSH
A4  Copy of $50,000 check for HSH coming from Morrow's personal account.
A5  Subscription Agreement (Morrow's attempt to defraud AVKO)
J6  Settlement Agreement signed in front of Judge Ludington & later refuted by Morrow
J7  Judge Ludington's ruling of implied contract whose terms Morrow refused to follow.
J8  Judge Ludington's ruling that AVKO owns the copyrights. Morrow refused to agree.
J9  Judge Ludington's ruling that Wave 3 must make the payments. Morrow refused to pay.

1. The Settlement Agreement (February 24, 2016)

2. Illegal modification of Settlement Agreement emails February 25, 2016

3. Wave 3's website History of AVKO

4. June 4, 2010 Publishing Agreement

5. Wave 3's emails to distributors

6. Morrow's emails threatening to destroy AVKO and me

Exhibit 1

It's the Law!
by Sean Loughenquay,
an AVKO volunteer

How does an 85-year-old, who founded the AVKO Educational Research Foundation in 1974 and who is the author of over 70 unique educational works end up homeless?

The answer is simple. **It's the law!** Judges and lawyers often work together in their own self-interest (Present Judge excluded). Money. Lawyers are often allowed by judges to lie and subvert the truth. Strong allegations? Yes. Can it be? You be the judge. The following is the story of how Thomas A. Morrow fulfilled his threats issued in 2010 to destroy AVKO and Don McCabe's legacy if McCabe did not assign the copyrights of all AVKO's materials to Wave 3 Learning. All of this is in the public record. Today, there is no AVKO. McCabe is **bankrupt and homeless**. He is surviving on his $793.00 monthly social security and his Bridge Card.

To understand why Thomas A. Morrow has spent so much of his money **on litigation to obtain the copyrights** to **all** the AVKO materials, not just *Sequential Spelling*, it is necessary to know the nature of these materials. They are unique and can be used by parents as well as teachers and educational researchers to help all students, including the dyslexic, to learn to read. Unless this essay produces unexpectedly good results which would enable AVKO to resume its mission, **no longer will any parent, teacher or educational researcher have access to:**

1. A source book in which all the patterns of English Spelling can be found which would enable a teacher to teach all **-at** words together **vertically** such as *at, bat, cat, fat, flat, rat, brat, frat, gat, hat, mat, Nat, gnat, pat, spat, Sprat, chat, tat, stat*, etc., **or horizontally** as in *bat, bats, batted, batting, batter, batters, battered, battering, battery, batteries*.

2. A handwriting book that teaches reading and spelling **AS** it teaches the alphabet **in patterns not after**.

3. A non-alphabetical sequencing of the teaching of the letters of the alphabet that maximizes that number of phonically regular words that can be read and spelled in the shortest time. That is, a, b, c, d, **r, s, t, y** … Once those eight letters are taught there are at

least 178 phonically regular words that can be read. As each letter is added the number of words available grow almost exponentially. Compare the AVKO technique to the traditional that first teaches all 26 letters with their lower case, UPPER CASE versions of manuscript (printed) and cursive (handwritten) plus the multiple font versions that push the number of alphabetic symbols that must be learned to well over 150 before we even begin to teach reading and writing. Somehow most children still learn to read despite their improper (but traditional) instruction. But as we all know, many don't.

4. A typing book that teaches reading and spelling **by patterns AS** it teaches the alphabet. No other typing book does so.

5. A spelling book series that requires NO STUDY, and NO MEMORIZATION, It is the only spelling series that is based on the most most reliable method of learning spelling, that is IMMEDIATE student **self-correction** of words by patterns.

6. A listing of over 5,000 basic spelling words in exact statistical order of their ease of learning. Other than the words *I* and *a*, the easiest is the word ***in*** and the most difficult is ***psychology***. The last time any study was made regarding word difficulty was in 1953!

7. A listing, definition, and description of the five types of spelling patterns: the Simple, Fancy, Insane, Tricky, and Scrunched Up. No other program exists that identifies these rather obvious groups of words that require different methods of instruction.

8. A lesson plan book for an adult community education course for those parents who want to help their child improve their reading/spelling skills. Despite the need, there are no adult community courses for them anywhere in the United States. Classes for yoga, cake decorating, foreign languages, yes. Classes for parents who want to learn how to tutor their own children in reading and spelling. No.

9. A tutor's book and a student's book for those parents who want to help their children improve their reading/spelling skills.

How did McCabe come to develop these unique materials that will soon be in the dust bin of history? Well, it probably began with his learning of the extremely phonetically regular Russian language. This came as a result of his being sent to the Army Language School by

the Army Security Agency shortly after graduating from the University of Detroit. When he returned to civilian life in 1957, there was a great recession. No jobs were available except in education. McCabe, who never wanted to teach, swallowed his pride and went back to college and took all the education courses required for certification. In 1969, when the American Federation of Teachers (AFT) and the National Education Association (NEA) were battling each other for recognition as the bargaining agent for the Flint, Michigan Community Schools, McCabe became a member of both organizations and was instrumental in bringing about an agreement between both groups allowing them to work together as equal partners. The result was The United Teachers of Flint which allowed individual members to choose which state and national organization they would belong to. Flint was the first in the nation to do so, and to this day is probably the only school system whose teachers are backed by both the AFT and NEA.

In an attempt to destroy the new union, the administration promoted leader after leader into administrative positions. But it was clear the school administration knew it could not control the independent thinking McCabe. So they tried a new tactic on him. They attempted to drive McCabe out by stripping him of his 12th grade College Prep English classes and giving him the worst students to teach. When McCabe quickly discovered that most of his students' reading levels were 4th grade or lower, he set about to discover what it was they had **not learned** that normal students **had learned**. He then checked to see if what they had **not learned** were ever specifically taught in the curriculum. They were not. On his way toward a Ph.D. in reading, he discovered that he himself was a dyslexic. He also discovered that the leading experts in the field of reading, put the **blame** on their **victims** for their inability to teach and called these students learning disabled, dyslexic, or just plain lazy and stupid. From 1969 to 1973 McCabe worked with the "impossible" students and discovered that by using a common sense approach his students could learn to read. In 1973 he first copyrighted *Word Families* (from which *The Patterns of English Spelling Volumes 1-10* were eventually derived). He also copyrighted *Sequential Spelling 1-5* from which the classic versions of *Sequential Spelling 1-7* were derived. Wave 3's revised editions known in the Settlement Agreement as the **MATERIALS AT ISSUE** are **derivatives** of these. During this period McCabe also copyrighted *Reading via Typing* and the A*VKO Teacher's Manual* both of which were forerunners of later books written by McCabe and copyrighted by AVKO.

In June, 1974 David O'Connell, Elmer Whaley, Jr., Alberta Smith, Thomas Scott, and McCabe formed the AVKO Educational Research Foundation, Inc. AVKO was granted non-profit tax-exempt status as a 501(c)3 membership organization in 1975. On November 9, 1975 McCabe transferred the four copyright registrations to AVKO. The transfers of his copyrights to AVKO were completed on 02/17/76, and are recorded at vol 1575 page 141 – 144 of the Register of Copyrights.[1]

From the very beginning, McCabe and AVKO's Board of Directors were convinced they could achieve their mission within twenty-five years. They planned to get grants via their non-profit status, develop the materials, find a publisher, and find a 501(c)3 organization to which to leave its assets and go out of existence by the year 2000. Although McCabe was successful in creating the materials and techniques to help anyone help anyone else learn to read and spell, AVKO was not successful in finding a viable publisher nor a non-profit that could ensure the spread of the AVKO materials and techniques. Mott Media, Inquisicorp, Inc., The Texas Reading Institute, as well as Ohio State University made offers that were unacceptable.[2]

During this period from 1966 to 1975, before taking all of the required courses to be a certified reading instructor and to qualify for a doctorate in reading, McCabe discovered his students had little or no training in phonics. So, if a student misread a word such as "advice" McCabe would have him write the pattern **ice** a number of times and then have him change **ice** to l**ice** to sl**ice** and **ice** to r**ice** and pr**ice**, etc. This method was working until one day the word was "technique." McCabe wrote down –**ique**, and his mind went blank. McCabe could not come up with *antique*, *unique*, *boutique*, *Angelique*, *Mozambique*, or even *pique*. McCabe, as he tells it in his autobiography *To Teach a Dyslexic*, was saved by the bell. McCabe went to the Dean of Instruction and told him that teaching by word families had been around for

---

[1] When the copyrights were transferred, they were evaluated by Dr. James Rutledge (Genesee Intermediate District) as worth $992,500.00.

[2] The one example of many over the years that best exemplifies the problem McCabe faced is that of Ohio State University (OSU). One summer, in the late 1980s, five members of the OSU's Special Education Department took the university's jet to Flint, rented a limousine, and visited AVKO. After being shown the AVKO materials and remarking repeatedly about the tremendous "gestalt" of the materials, they announced that they were indeed interested. The next week a letter came from OSU's attorneys informing AVKO that if AVKO would immediately ship (at AVKO's expense) all AVKO's inventory and all AVKO's equipment as well sending them a certified check closing out AVKO's bank accounts, and if McCabe would sign the legal document provided they would accept a transfer of the copyrights. There was no room for negotiation or guarantees.

centuries and that there just had to be a book containing all the word families in the English language. The Dean agreed. McCabe told him to forget about requisitioning such a book. If he could locate it, McCabe would pay for it out of his own pocket. The Dean called the major libraries including the Library of Congress and found out that no such book existed.

One day in the Teachers' Lounge when McCabe was complaining about the fact that there wasn't any such resource, one of his buddies said to him, "McCabe, you're a linguist. You got a whole summer coming up. Why don't you do it?" McCabe, as he tells it, was just ignorant enough to think he could do it and stubborn enough that once he got into compiling the word families, he just couldn't quit. Of course, McCabe didn't complete the task in one summer. However, after over ten years of working at it, McCabe did complete the task and it is now called the *Patterns of English Spelling, Volumes 1-10.*

The first tentative version McCabe simply called it *AVKO Word Families* which McCabe copyrighted. Shortly thereafter McCabe created and copyrighted *Reading via Typing* and *AVKO Word Families in Sentence Context* and then McCabe had them registered.

After establishing AVKO McCabe continued to teach students how to read and spell at Flint Northwestern High School, Zimmerman Junior High, The Flint Alternative Junior High, and at the Michigan Regional Juvenile Detention Center. All the while McCabe was teaching, McCabe was also as an unpaid volunteer actively running the AVKO Educational Research Foundation and developing and refining his materials and techniques.In 2001, AVKO survived a fire which destroyed most of the office and production departments. The computers with the original books and essential information were saved.

By the time he was 60, McCabe began searching for possible publishers for the AVKO materials because he had already had one heart attack. After McCabe had his second heart attack and open heart surgery at age 62, McCabe increased his efforts. Although offers were made by others, they did not meet the board's criteria. After his 3rd heart attack in 2006 at age 73, McCabe was told by the Cleveland Clinic more surgery was out of the question and that McCabe would have to rely on blood thinners and other medications. Consequently, McCabe continued looking for a possible replacement publisher.

McCabe confesses to being one of the oldest dyslexic curmudgeons with ADHD (Attention Deficit HyperActive Disorder) as well as having a slightly elevated sense of self-worth in the field of education. If you want to find out how McCabe became what McCabe is today you can always read his autobiography, *To Teach a Dyslexic.* .

What *To Teach a Dyslexic* mostly covers are the events in McCabe's life that allowed him to learn to read, to distrust authority, discover what it is that poor readers cannot read, and discover that the phonics and the sight words traditionally taught are not sufficient for logical (dyslexic) minds to learn. As McCabe pointed out on AVKO's website (now, closed as the result of **the law**) where he translated all major definitions of dyslexia, the fault is in the "traditional instructional methods and materials" not in the victims of poor teaching. It is not surprising that his ignorance and stubbornness which led him to creating a system that works has not resulted in fame and fortune for McCabe. He didn't expect that it would.

After all, McCabe claims, the man who made the **greatest medical discovery of all time**, the man who saved more lives than any other man in all of history, never achieved fame while alive. And after he died he never really received historical fame. Maybe it was because his discovery that saved so many lives **was too simple**. His discovery? Doctors and surgeons should wash their hands! That man was Dr. Ignaz Semmelweiss.

McCabe's educational discoveries are on a par with the medical discoveries of Semmelweiss, simple, effective and totally ignored by the educational experts today just as the medical authorities ignored Semmelweiss's discovery back in the 19th Century.

Throughout the past fifty years McCabe has tried to get help from the leaders in the educational community. As McCabe tells it, he should have known better. Those who **can**--do. Those who **can't**--teach. Those, who **can't teach,** get their **P**iled **H**igher and **D**eeper degrees and teach the teachers. Big educational publishers get the "name" Ph.D.s to write their books and curriculum. The Ph.D.s get their graduate students to write their books for them. The "experts" are not about to admit that they and those whose shoulders they stand upon have been missing the simplest of points. No one had found a method of teaching that worked with 99% of the students, until McCabe, a stubborn, ignorant, ADHD dyslexic who never wanted to be a teacher, let alone a teacher of illiterate juvenile delinquents, made some

very simple logical deductions and, like Semmelweiss, by using his common sense rather than traditional theories, found a method of teaching that worked.

The fact is, McCabe never expected to live that long. Longevity is not in the McCabe genes. his father was the longest living male in his family and he only lived to be 62 years old. McCabe is now 85 years old and in dangerously poor health. McCabe has survived three heart attacks and triple by-pass surgery. McCabe has chronic congestive heart failure, high blood pressure and a leaky heart valve as well as untreatable A-fib. McCabe would like to live long enough to see what he has struggled to bring to this world at least get into the hands of someone or some group capable of getting the **over 70 AVKO materials**--not just *Sequential Spelling*--into wide spread usage.

In the year 2009, McCabe thought he had found such a person. It was Thomas A. Morrow who was the CEO of Home School Holdings, Inc. (HSH). McCabe met him at the Florida Home Educators Association Conference where he had a large booth. McCabe approached him in hopes of acquiring him as an additional distributor for AVKO, but Morrow immediately began talking in terms of acquiring AVKO. It took McCabe a while to explain to him that he could never acquire AVKO as AVKO is a non-profit membership organization. McCabe told Morrow, however, that he could acquire the publishing rights. The following weekend (May 31, 2009) Morrow visited AVKO and the negotiations began. Thomas Morrow impressed McCabe with his resumé of accomplishments. These can still be found on the internet in his February 11, 2009 CBS interview on the Charles Osgood show. The following is a summary of the interview"The ABC's of Homeschooling."

> **In just three short years Thomas Morrow, a former Fortune 500 executive has built a multi-million dollar business from scratch that now supplies educational material to more than 47,000 families around the world. He did this while home schooling his own children. HSH's yearly sales are in the low millions and expected to go up, quite a bit.**

This, of course, was not true. But Morrow was glib enough to con the producers of the CBS Charles Osgood show as well as the multiple investors in HSH that was heavily in debt at that time and still is today.

McCabe, in turn, apparently impressed Thomas Morrow with the educational value and financial potential of the materials he had developed. Otherwise McCabe has no other explanation as to why Thomas Morrow went to such lengths in all his attempts to obtain by using **the law** in multiple attempts to steal AVKO's copyrights.

Thomas Morrow has:

1. lied in official court and government documents, (See Exhibit A2)

2. had his attorneys lie in official court documents,

3. twice attempted to trick McCabe into signing a subscription agreement that would have made AVKO and himself liable for purchasing $250,000 worth of stock at .05 a share that was at the time worth slightly less than .001, (See Exhibit A5)

4. signed a settlement agreement in front of Judge Ludington and then later refuted it, See Exhibit A6

5. ignored Judge Ludington's ruling that AVKO owned all the copyrights in question and that Wave 3 acquired only a non-exclusive license, See Exhibits J7 and J8

6. refused to comply with Judge Ludington's ruling that Wave 3 must pay what the agreement (license) called for, See Exhibit J9

7. ignored AVKO's cancellation of Wave 3's publishing license for failure to pay the license fees agreed to and the royalties,

8. used the advance notice that AVKO would file a breach of contract suit in Michigan, to give him time to file suit against AVKO in Illinois[3] asking for a declaratory judgment that Wave 3 owned the copyrights,

9. ignored Judge Kendall's initial rulings that Wave 3 could not make a claim for copyrights without a written document clearly assigning the copyrights to it,

10. **manufactured** a written document assigning his personal copyrights to Wave 3 Learning,

---

[3] This was a violation of the "working agreement" which called for proper notice and filing in Michigan.

11. filed a second identical suit while the first one was still in litigation and in which he again claimed that he, Thomas Morrow, assigned his copyrights to Wave 3.

12. convinced AVKO's attorneys that he was willing to settle and on February 24, 2016 signed a settlement agreement with AVKO that was written by four attorneys mostly in Morrow's presence.

13. and within **twenty-four hours of the signing**, Morrow and Wave 3 **violated the Settlement Agreement** which said no modification can be made unless in writing and signed by both parties. This he and his attorney Dahlia Saper did unbeknownst to anyone at AVKO. He did this in collusion with his attorney and AVKO's attorneys.by making an agreement via email that modified the payment schedule as written in the Settlement Agreement. See Exhibit B

14. and **refused to make all the mandatory payments** as required by the Settlement Agreement.

## Quick Background of the litigation between Wave 3 and AVKO since 2011..

- **Thomas Morrow** drafted all the proposed contracts during the initial negotiations (2009-2010) including the one[4] in which **he** stated **AVKO owned the copyrights** and claimed that Home School Holdings, Inc. (HSH) owned the publishing rights. See **Exhibit A1**. In all other contracts proposed during initial negotiations and in the emails between Morrow and McCabe **during negotiations the words *copyright* or *copyrights* were never used.**

- In an attempt to get HSH listed on the open stock market, in January, 2010 Thomas Morrow as CEO claimed (**under penalty of perjury**) in an SEC filing that HSH had purchased the publishing rights (not copyrights) to the AVKO materials and submitted a *false document dated December 2009* as evidence. **See Exhibit A2**.

- Thomas Morrow for HSH and Donald McCabe for the AVKO Educational Research Foundation signed a "Plain English Publishing Agreement" on June 4, 2010. The

---

[4] A proposed three-way contract with a signing date of September 9, 2009 with AVKO, HSH, and Instructional Media Innovations, Inc. (IMI)

agreement was for $600,000 and called for two payments of $300,000 consisting of $50,000 cash and $250,000 worth of stock. **See Exhibit A3.**

- AVKO received only $50,000. Wave 3 Learning, Inc. (Wave 3) in various legal documents claimed the check was from HSH, Thomas Morrow, and even Wave 3 itself which did not come into existence until June 18, 2010 two weeks later. (**See Exhibit A4**).

- By claiming at the last minute that a signed subscription (**purchase**) agreement was necessary for AVKO to be given the stock, Thomas Morrow twice attempted to convince AVKO to agree to **purchase** stock from HSH at $0.05 a share when its true value was less than $0.001. **(See Exhibit A5) This was a blatant attempt to swindle AVKO out of $500,000.** However, as this happened when Thomas Morrow was CEO of Home School Holdings and as AVKO's attorney without AVKO's consent dismissed HSH from the suit, the judge ruled that **the law** made the charge of fraud in the inducement inadmissible.

- When Thomas Morrow left HSH and created Wave 3, AVKO still believed that the reputed multi-millionaire former Fortune 500 executive Thomas Morrow could spread the news that all children could be taught to read by selling the over 40 different AVKO educational materials -- not just Sequential Spelling. Hence AVKO attempted to work with Wave 3 using the June 4, 2010 contract as its basic template until such time as Thomas Morrow could come up with an acceptable replacement contract. It was the established negotiating protocol for Thomas Morrow to write and Don McCabe to edit.

- AVKO gave Wave 3 approximately 9 months to get started and to begin to fulfill its part of the bargain. When Wave 3 did not, AVKO's *pro bono* attorney gave notice and then filed suit for infringement and fraudulent inducement.

- Because AVKO failed to produce a $75,000 bond in time, the TRO motion was denied. Because AVKO's attorney **without the consent of AVKO** dropped HSH from the lawsuit and because **Wave 3 could not be party to the contract** as it **wasn't in existence at the time the contract was signed**, all the charges related to copyright infringement and fraud in the inducement were dismissed. **That's the law**.

- At the settlement hearing Thomas Morrow signed an agreement for Wave 3

handwritten in front of Judge Ludington. McCabe also signed it. McCabe also signed the subsequent formally drafted agreement as well to settle. (**See Exhibit J 6**) Thomas Morrow refused. Thus, AVKO had no reason to believe that Wave 3 would keep the agreement arrived at on **February 24, 2016**. In fact, Thomas Morrow violated this agreement within hours of its signing.

- Judge Ludington ruled that AVKO had given Wave 3 an implied license to reproduce and distribute the AVKO materials. **See Exhibit J 7.**

- Judge Ludington also ruled that **the copyrights did NOT transfer** to the licensee for publishing. **See Exhibit J 8.**

- Wave 3 ignored the Court's ruling and to this day **continues to claim copyright ownership**.[5]

- Judge Ludington ruled that Wave 3 must pay the $550,000 for the license. **See Exhibit J 9.**

- Wave 3 ignored that Court's ruling as well and has not paid AVKO anything.[6] Following the protocol in the implied contract, AVKO informed Wave 3 that they were in breach of the contract by not paying the agreed upon amount while continuing to publish.

- Before AVKO could file suit for breach of contract and without following the "contract's protocol,[7] **Wave 3 twice filed suit in Chicago** for a declaratory judgment that it owned the copyrights. **See Exhibit J 10**.

- The second filing came before the first one had yet to be settled. Both filings contained a **"manufactured"** document claiming Morrow had assigned *"his"* copyrights to Wave 3.

- After Judge Virginia Kendall dismissed the case on the grounds she lacked jurisdiction, she gently chastised both attorneys for wasting their clients' money. In AVKO's case,

---

[5] Despite signing the settlement agreement of February 23, 2016 in which clearly states AVKO owns the copyrights, Wave 3 still claims it owns the copyrights.

[6] On May 25, 2016 Wave 3 made a $25,000 payment directly to AVKO's attorneys, none of which was given to AVKO.

[7] The implied license mandated all court actions be filed in Saginaw County, Michigan and prior notice be given.

over $70,000.

- **On May 18, 2015** AVKO now filed suit No. 15-cv-3393 which was conducted in the courtroom of Judge James W. Darrah. The case dragged on with legal expenses for AVKO climbing well over $100,000.

- During January and the first few weeks of February, 2016, AVKO's attorneys Brian Noack and Adam Wolek became convinced that Wave 3 wanted to settle. In preparation for a settlement hearing Noack demanded that AVKO hire Epsilon Economics, a firm noted for its expertise in evaluating the worth of intellectual property. The cost for the evaluation was nearly $10,000. McCabe strongly objected to it. However, Noack's arguments that Epsilon's independent evaluation would lead to a very healthy settlement (probably over $1,000,000) convinced AVKO's legal committee to do it over McCabe's objections.

- **On February 24, 2016** In the presence of Judge Sheila Finnegan a settlement agreement was reached to determine: (1) Who owned the **copyrights** to the AVKO materials **NOT JUST** THE MATERIALS AT ISSUE. Answer: AVKO. (2) How much in damages Wave 3 would have to pay AVKO if any litigation related to the settlement agreement were to be pursued. Answer: $100,000 paragraph 11. (3) What would Wave 3 be allowed to publish exclusively. Answer: **Only** THE MATERIALS AT ISSUE .and **NOT** the classic versions of *Sequential Spelling 1-7*. (4) The conditions under which AVKO has the right to refuse to approve publication of **THE MATERIALS AT ISSUE**. (5) What AVKO retains: a right to sell to anybody everything except THE MATERIALS AT ISSUE. (6) The schedule of the payments to be made. Answer: **$100,000 on or before the effective date, the date of signing**. **See Exhibit A** for the Settlement Agreement.

- **On February 25, 2016** in less than 15 hours after the signing, AVKO's attorneys Brian Noack and Adam Wolek,**WITHOUT CONSULTING OR NOTIFYING AVKO**, made an email amendment to The Settlement Agreement with Wave 3's attorneys and Thomas Morrow that benefited **only AVKO's attorneys** and Wave 3. **See Exhibit B**. This amendment/modification **was in violation of The Settlement Agreement,**

paragraph 10.6 on page 9 which clearly states: **"No amendment or modification may be made to this agreement unless it is in writing and signed by each party."**

- **Wave 3's attorneys are also in violation of <u>Article 8 Illinois Code of Conduct Rule 1.1: Competence [9] (d)</u>** A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent…" in this case making an agreement without putting it in writing and having it signed by each party. As the attorneys themselves wrote this provision into the Agreement, they cannot possibly plead ignorance. <u>See Exhibit 1</u>.

Had Judge Zagler known this, he may not have been so quick to grant by default all Wave 3's claims for sanctions on AVKO. <u>But that's the law!</u> Only an attorney can represent a corporation. McCabe's arguments were considered irrelevant and inadmissible. <u>That's the law</u>.

- **<u>On March 9, 2016</u>** Judge Darrah closed the case. This is the date AVKO's attorney Brian Noack claimed in an email and letter to AVKO on **<u>July 12, 2016</u>** that they (Wolek & Noack) had ceased representing AVKO and closed its case. It should be noted that the attorneys made **32 separate charges to the tune of $5,642.40** from the time they claimed the case was closed to AVKO's notification that they would no longer serve as counsel.

- **<u>On May 27, 2016</u>** Wave 3 filed a complaint and a TRO and put it under seal. Wave 3 notified Brian Noack, but **<u>Brian Noack failed to notify AVKO.</u>** Apparently, he felt he no longer represented AVKO and was not obliged to do so.

- **<u>On June 29, 2016</u>** Wave 3's attorney Dahlia Saper emailed Noack and asked if he would accept service. In the email she stated:

  > Should *<u>the parties not be able to reach an agreement</u>* addressing the damage created by AVKO's breach of the settlement agreement by July 15, Wave 3 will be left with no choice but to proceed with serving AVKO with a complaint and associated injunction motion that it originally filed under seal on May 27, 2016. *(Emphasis added)*

It should be noted that Wave 3 made no attempt to reach an agreement with AVKO--only with the attorneys who claimed they no longer represented AVKO.

- **On July 8, 2016** AVKO's attorney informed Wave 3's attorney that Noack & Wolek no longer represented AVKO.

- **On July 12, 2016** (two business days later!) AVKO received notice that Wave 3 had re-noticed the Complaint and the TRO that they previously filed on May 27, 2016. The hearing was to be heard **July 19** by Judge Sara Ellis. AVKO was informed that a representative could attend as a witness by telephone. It never happened.

- **From July 14th through the 17th,** Thomas Morrow asked Don McCabe for AVKO's approval of a new online version of Sequential Spelling. AVKO objected to the change from McCabe's sentence for the spelling word *sin*:"It's a sin to tell a lie" to Thomas Morrow's"Do not expect me to absolve you of your sin." Thomas Morrow reacted with "Do not expect me to absolve you of your sins." This, most clergy would consider blasphemy. .

- **July 19, 2016** Wave 3 was informed "The case is not properly before Judge Ellis and she is not the emergency judge so you may contact Judge Darrah's chambers for guidance." A hearing before Judge Zagel was then scheduled for **July 21**. That was **two days'** notice for AVKO.

- **July 21, 2016** The TRO hearing was held at which Thomas Morrow testified. Mr. McCabe, AVKO's president was available as a witness by telephone but wasn't called on the telephone. Judge Zagel granted Wave 3's TRO in which it stated AVKO is:

    …TEMPORARILY RESTRAINED from selling to non-individuals, licensing others (sic) persons or entities to sell...Sequential Spelling Levels 1-7 material and all derivatives thereof...and shall cease misrepresenting to third parties its rights and Wave 3 Learning, Inc.'s rights to Sequential Spelling Levels 1-7 material..." and stated that "on August 2, AVKO shall provide a certification that it has (1) ceased all sales and terminated **all** licenses of Sequential Spelling Levels 1-7 material and all derivatives thereof to non-individuals, including and especially JJH Publishing; and (2) ceased misrepresenting the rights of misrepresenting (sic) to third parties the rights of the parties to Sequential Spelling Levels 1-7 material and all derivatives thereof.

- **On July 22** McCabe emailed Wave 3's attorney and J. J. Hipps:

In reluctant but respectful compliance to the Hon. Judge James B. Zagel's Temporary Restraining Order dated July 21, 2016, and following the instruction of AVKO's vice-president and acting CEO of AVKO, Robert McCabe, AVKO is hereby terminating both your licenses to duplicate and distribute (i.e.) sell "Sequential Spelling Levels 1-7 material and all derivatives thereof..."

The preceding paragraph is AVKO's "certification that it has (1) ceased all sales and **terminated all licenses** of Sequential Spelling Levels 1-7 material and all derivatives thereof to non-individuals, including and especially JJH Publishing..." Emphasis added

As Wave 3 is the only other licensee, AVKO must also terminate its license.

However, it is **possible** that after 3:30 p.m. On August 4, 2016, **AVKO will be able to re-license Wave 3** the publishing of their **revised editions of Sequential Spelling 1-7** and subsequent derivatives.

AVKO certainly wants to see a good online version of Sequential Spelling on the market. Its approval process however, has been interrupted by Wave 3 and by the TRO.

Likewise, it is **possible** that after 3:30 p.m. on August 4, 2016 AVKO will be **able to** re-license **JJH Publishing the classic version of Sequential Spelling 1-7**.

Note that in the official complaints that followed, Wave 3 has alleged

AVKO told JJH Publishing that AVKO "**would**" restore their license.

Deliberately lying in official complaints is not complying with **Article 8**

**Illinois Code of Conduct Rule 1.1:**

**On July 25**, AVKO sent Wave 3 an Offer of Settlement, which was basically the same as the one of February 24, but eliminating most of the ambiguities and various problems within it. . Instead of responding to the offer **to negotiate**, at 6:36 p.m. on July 25, 2016, AVKO was given notice that **in less than 24 hours** there was to be an EMERGENCY MOTION FOR ENTRY OF RULE TO SHOW CAUSE WHY DEFENDANT SHOULD NOT BE HELD IN CONTEMPT OF COURT.

● **On July 26**, Judge Zagle without calling or taking testimony from anyone at AVKO and with no counsel for AVKO present stated that:

The Court is imposing a fee on Defendant for each day that **Mr. McCabe** and Defendant do not comply with the Court's Temporary Restraining Order issued on 7/21/16. The fee shall be $3,000 per day for the first 5 days, $6,000 per day for the next 7 days, and $10,000 per day for the following 7 days unless or until Defendant is in compliance with the Court's Order. Plaintiff is awarded attorneys' fees and costs incurred in filing and appearing on its Motion for a Rule to Show Cause. Further relief may be granted if Defendant remains in non-compliance with the law. **Hearing previously set for 8/2/16 at 9:30 a.m. before Judge Darrah will stand**. The Clerk is directed to unseal this matter in its entirety, with the exception of Exhibit "A" which contains the confidential Settlement Agreement executed on 2/24/16.

- **On July 28**, Wave 3's attorney (in an email to Mr. McCabe which was cc'd to JJH Publishing) **violated the confidentiality clause of the Settlement Agreement** in her first sentence which states: See **Exhibit J 17.**

  The Settlement Agreement plainly and clearly provides that Wave 3 has an exclusive license to the titles of Sequential Spelling Levels 1-7 (both Teacher Guides and Student Response Books) *and* all derivatives thereof.

This statement to JJH Publishing is false which makes it **misrepresentation** as well a violation of the confidential provision agreed to in **the Settlement** Agreement. The exclusive license was only for the **Materials at Issue.**

AVKO disputes Wave 3's attorney's claim and her subsequent claim to the copyrights. As copyright holders do not have to get permission for any changes to their works, Wave 3 would not have had to ask for AVKO's permission for changes. Certainly, Attorney Saper should know it isn't the titles that are licensed--it is the works themselves. Titles are used for identification purposes only. Attorney Saper did not use the titles correctly to identify what materials were at issue!

**On August 2, 2016** McCabe appeared in Judge Zagel's court. Neither he nor anyone else at AVKO was told that the hearing was to be rescheduled as Judge Darrah was on vacation. The trip cost AVKO two days of travel plus expenses.

**On September 9, 2016** Wave 3 filed a motion to amend its complaint against AVKO to add McCabe as a defendant. Note: If Wave 3 believed it had a case against AVKO the only logical explanation for adding McCabe as a defendant was to force McCabe into bankruptcy if AVKO couldn't pay the fines they hoped to receive. This is further implied proof of the **malicious** nature of Wave 3's filings as predicted by his previous threats to McCabe, McCabe's son and McCabe's grandson. **See Exhibit 6**.

On September 15, 2016 the court granted Wave 3's motion to amend its complaint. AVKO and McCabe were given 14 days to answer.

**On October 12th** the Court received McCabe's answer to Wave 3's complaint and put it on the docket the next day.

**On November 3, 2016** AVKO and McCabe signed a retainer agreement to have Cole Sadkin, LLC as their legal representatives. This came after months of searching the internet and trying to get help from the Chicago Bar Association.

**On November 4, 2016** AVKO and its attorneys first received notification of Judge Alonso's order of October 28, 2016 to prepare a "Joint Status Review."

From this point on until Wave 3 **maliciously and frivolously** filed a show cause motion, there had only been motions made for summary judgment by Wave 3 and motions for dismissal by AVKO's attorneys. AVKO had been waiting since February 21st when the last show cause motion was filed. This AVKO believes should have been immediately dismissed by the Court under the common sense concept of "**No harm, no foul**." Under **Illinois Rules of Professional Conduct, Rule VIII. Articles 3.1, 3.3 and 8.4 legal action for the sole purpose of destroying an opponent by forcing unnecessary legal expenses is forbidden.**

The Emergency TRO that Wave 3 filed purported that AVKO's actions were interfering with Wave 3's sales. In fact, they did not. Wave 3's loss of distributors can be directly tied to Thomas Morrow's letters to them explaining that in order to sell Sequential

Spelling they should sign a contract with Wave 3 and any violation of that contract would immediately involve them in litigation. See **Exhibit 5**.

**On December 16, 2016** AVKO received an email from Joe Hipps, President of Instructional Media Innovations, Inc. (IMI) which is the co-owner of the copyrights to the DVD versions of *Sequential Spelling 1-5*. In the email, he accuses Thomas Morrow of **attempted extortion and tortious interference** with his business as his distributors have stopped ordering from him for **fear of legal reprisals by Wave 3**. It seems that the distributors were willing to forgo the small profits they might receive from sales of Sequential Spelling for fear of having to spend many thousands of dollars in legal fees if they bought a single DVD from IMI. **See Exhibit 5**.

The last motions by Wave 3 had only one motive. Destroy AVKO and McCabe. There no longer is an operating www.avko.org website. There no longer is an AVKO. The contracted employees had been dismissed because there no longer was money to pay them. The owner of 3084 Willard Rd, Birch Run, Mi 48415 terminated AVKO's lease for failure to comply with the terms of payment. What little assets in the form of its library and antiquated equipment was of necessity abandoned by AVKO.

As McCabe's wife was justifiably annoyed with her personal credit card debts of around $20,000 comprised of AVKO's legal payments, she filed for divorce and was granted the house and all its furniture. McCabe was granted only his personal possessions which does not include any jewelry nor a car. Being totally blind in one eye and with macular degeneration and a cataract in the other eye, McCabe no longer drives and thus has no use for a car.

At this point, it matters not whether Judge Alonso rules for or against AVKO. AVKO has to go out of existence. It cannot continue its mission without a minimum of more than two million dollars to start all over again. First of all, AVKO would have to hire a CEO. McCabe is too old and is physically unable to perform that task. The following is a

cost sheet listing the various amounts of money necessary for AVKO to resume its mission.

# Estimated Cost to Resume AVKO's mission

| | | |
|---|---|---|
| Payment of Debts (most of which is related to legal expenses). | | $850,000 |
| New Website................................................................. | | $22,000 |
| 3 year salary guarantee for CEO of AVKO................. | $75,000 | $225,000 |
| 3 year salary guarantee for two staff members @ $15.00 hr........ | | $97,200 |

Total Management Expenses........................................................... 1,194,200

Renew Inventory AVKO materials minimum 1,000 copies

| | |
|---|---|
| ............Sequential Spelling 1-7 + Response Book.... | $32,000 |
| ............Patterns of English Spelling (10 volumes).. | $100,000 |
| ............Spelling by Patterns (3 volumes)................. | $20,000 |
| ............Individualized Spelling................................... | $5,000 |
| ............Individualized Keyboarding........................... | $5,000 |
| ............If it is to be it is up to me (3 volumes)`......... | $15,000 |
| ............Word Families in Sentence Context (10 v.).. | $50,000 |
| ............Starting at Square One.................................. | $10,000 |
| ............Teaching of Reading from K thru College... | $10,000 |
| ............It-ss & Tooze Made Easy................................ | $5,000 |
| ............I Before Made Easy........................................ | $5,000 |
| ............Apostrophes Made Easy................................. | $5,000 |
| ............The Tricky Words........................................... | $5,000 |
| ............Get Outta My Face, Get Offa My Case........ | $10,000 |
| ............To Teach a Dyslexic....................................... | $5,000 |
| ............Let's Write Right............................................ | $5,000 |
| ............Rimes and More Rhymes................................ | $5,000 |
| ............Readings for Fluency...................................... | $5,000 |
| ............Reading Teacher's List of Basic Words... | $5,000 |

$302,000

| Mission Expenses | |
|---|---|
| Educational Conferences & Exhibits.......... | $300,000 |
| Advertising.................................................. | $300,000 |
| Leasing of Office/Tutoring Space................ | $50,000 |
| Replace Furniture, Fixtures, Equipment..... | $100,000 |
| Telephone, Heat, Electricity, etc................. | $150,000 |

$900,000

Total Estimated Cost to enable AVKO to resume its mission   2,396,200

Exhibit 1

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT (the "Agreement") is made and entered into by and among AVKO Educational Research Foundation, Inc. and Donald J. McCabe (collectively "AVKO"), and Wave 3 Learning, Inc. and Thomas A. Morrow (collectively "Wave 3"). AVKO and Wave 3 are sometimes referred to herein collectively as the "Parties." This Agreement shall be effective on the date of the last signature required for full execution by both AVKO and Wave 3 (the "Effective Date").

WHEREAS, AVKO filed an action in the United States District Court for the Northern District of Illinois, Eastern Division, against Wave 3, Case No. 1:15-cv-3393 (the "Lawsuit"), for unfair competition and false designation of origin under the Lanham Act, unfair competition under Illinois common law, unjust enrichment, deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, tortious interference with a business expectancy, breach of contract, and copyright infringement.

WHEREAS, Wave 3 filed a countersuit in the United States District Court for the Northern District of Illinois, Eastern Division, against AVKO, Case No. 1:15-cv-3393 (the "Countersuit"), for breach of contract, tortious interference with a prospective business relationship, trade libel, punitive damages, and alter ego.

WHEREAS, the Parties seek to resolve this dispute and the respective allegations amicably, and without the inconvenience and additional burdens of further litigation.

WHEREAS, Wave 3 denies all liability for the claims brought by AVKO.

WHEREAS, AVKO denies all liability for the claims brought by Wave 3.

WHEREAS, the Parties have agreed to compromise and settle all claims that have been brought or could have been brought, against each other in the Lawsuit and Countersuit without any party admitting liability or damages.

WHEREAS, the Parties desire to keep the terms of their settlement confidential.

NOW, THEREFORE, in exchange for the mutual covenants and conditions set forth below, the consideration of which is expressly acknowledged by each party, the Parties further agree as follows:

### RECITALS

1.    Representations and Warranties.

The Parties represent and warrant that each party that is a legal entity is duly organized, validly existing and in good standing under the laws of the location of its formation, and has all requisite power, authority or capacity, as applicable, to execute, deliver and perform this Agreement. No other person or entity is required to execute this Agreement for it to be binding as intended.

1

The Parties represent and warrant that they have personally or through their attorneys investigated all facts surrounding the various claims, controversies and disputes, and are fully satisfied with the terms, conditions and effects of this Agreement.

The Parties represent and warrant that no promise or inducement has been offered or made except as herein set forth, and that this Agreement is executed without reliance upon any statement or representation by any other party or the agent of any other party.

Wave 3 represents and warrants that no other copying of AVKO content has occurred.

The Parties represent and warrant that their gross revenues are fairly and accurately represented by the tax documents they shared with each other.

2.     Settlement Payment.

Beginning on or before the Effective Date, Wave 3 shall pay to AVKO the sum of one hundred thousand dollars ($100,000.00) (the "Settlement Amount") in annual installments of twenty-five thousand dollars ($25,000) until satisfaction of the Settlement Amount. The first payment will be due on June 1, 2016. Upon satisfaction of the Settlement Amount, AVKO acknowledges the receipt and sufficiency of this payment, and that it is in consideration of the releases and other provisions contained in this Agreement. In addition to the Settlement Amount, Wave 3 shall pay to AVKO a six percent (6%) royalty on Wave 3's gross revenue that year.

Wave 3 shall pay the Settlement Amount by wire transfer, and any associated transmittal fees, or by providing a certified or cashier's check payable to "Wolek & Noack," attorneys for AVKO, to be deposited in a trust for AVKO, in order that AVKO's attorneys can verify compliance with this Agreement, and AVKO authorizes delivery of said check to Wolek & Noack. Failure to pay the full Settlement Amount within 14 business days of the effective date of this Agreement terminates this entire Agreement unless the Parties agree in writing to extend this deadline.

3.     Materials at Issue

AVKO shall grant and hereby grants an exclusive license in the United States and Canada, and a worldwide nonexclusive license to the below titles and their derivatives (collectively "Sequential Spelling"):

- Sequential Spelling Level 1 Teacher Guide

- Sequential Spelling Level 2 Teacher Guide

- Sequential Spelling Level 3 Teacher Guide

- Sequential Spelling Level 4 Teacher Guide

- Sequential Spelling Level 5 Teacher Guide

- Sequential Spelling Level 6 Teacher Guide

2

- Sequential Spelling Level 7 Teacher Guide
- Sequential Spelling Level 1 Student Response Book
- Sequential Spelling Level 2 Student Response Book
- Sequential Spelling Level 3 Student Response Book
- Sequential Spelling Level 4 Student Response Book
- Sequential Spelling Level 5 Student Response Book
- Sequential Spelling Level 6 Student Response Book
- Sequential Spelling Level 7 Student Response Book

4.    Sequential Spelling Website

In the event the Agreement is terminated, Wave 3 shall sell the www.sequentialspelling.com domain to AVKO at the same price it was originally purchased for.

5.    Annual Revenue Requirement.

In the event that Wave 3's sales don't meet the thresholds in the below table, Wave 3's exclusive license is revoked and replaced by a nonexclusive license.

| Year | Revenue |
|------|---------|
| 2017 | $225,000 |
| 2018 | $250,000 |
| 2019 | $275,000 |
| 2020+ | $300,000 |

6.    AVKO Sales.

AVKO shall be permitted to sell all of its copyrighted materials on its website or other channels to the extent that it is to individuals and not distributors. Until there is an approved version of Sequential Spelling I (one) Teacher Guide, AVKO has the right to sell Sequential wave 3 will split the gross margins 50% material to AVKO and the old Sequential Spelling.

7.    Copyright Use.

Wave 3 understands and believes that AVKO is the sole and exclusive owner of the copyrights at issue in this lawsuit and all associated federal intellectual property registrations and pending registration applications, with the exception of this license as hereby granted. Wave 3 its distributors

2/24/2016

3

admits the validity of all copyrights at issue in this lawsuit and all associated intellectual property registrations and applications.

8.    Trademark Use.

Wave 3 understands and believes that AVKO is the sole and exclusive owner of the *Sequential Spelling* trademark at issue in this lawsuit and all associated federal intellectual property registrations and pending registration applications, with the exception of this license as hereby granted. Wave 3 admits the validity of all trademarks at issue in this lawsuit and all associated intellectual property registrations and applications.

9.    Audit.

AVKO shall have the right to use an auditor of its choice to audit Wave 3's financial records upon reasonable notice of no fewer than fourteen (14) days. In the event the auditor discovers a discrepancy of greater than three percent (3%) between the revenue reported to AVKO and Wave 3's actual revenue, Wave 3 shall pay all past-due royalties with a five percent (5%) interest award and pay the costs of the auditor.

10.    Right of Review

Wave 3 shall submit all of its existing Sequential Spelling materials to AVKO for approval prior to printing or publishing any new materials. Wave 3 shall be expressly permitted to sell the remainder of its existing stock of materials. Wave 3 shall not be permitted to print or sell any further Sequential Spelling materials without the express authorization of an individual expressly designated by AVKO for such a purpose. Such authorization shall not be unreasonably withheld. If the Parties cannot agree to the reasonableness of the withheld authorization, then the question will be submitted to Paul Holz. If Paul Holz does not issue a decision on approval within two weeks, the Parties shall submit three names of persons to decide the approval question. If one of those names overlaps, that person shall decide the reasonableness of the approval. If there are no name overlaps, the Parties shall return to Judge Finnegan and she will select an individual from those three names.

Such an individual will be granted no fewer than fourteen (14) from receipt of the item to provide an authorization or rejection. This time period is per item and is cumulative. For example, if two books are received on the same day, the individual will have eight weeks to provide an authorization or rejection. In the event there is a dispute regarding the approval of any Sequential Spelling materials that cannot be resolved by the Parties, the Parties will agree on a neutral third party to settle the dispute.

11.    Release.

Conditioned upon the representations and warranties of the Parties, payment of the Settlement Amount, and other obligations set forth herein, AVKO hereby releases and forever discharges Wave 3 from all claims, demands, damages and costs arising out of, or directly or indirectly connected in any way with, the claims and allegations asserted by AVKO in the

4

Lawsuit and/or any matters, events, acts or omissions which could have been asserted by or on behalf of AVKO in the Lawsuit.

Conditioned upon the representations and warranties of the Parties, payment of the Settlement Amount, and other obligations set forth herein, Wave 3 hereby releases and forever discharges AVKO from all claims, demands, damages and costs arising out of, or directly or indirectly connected in any way with, the claims and allegations asserted by Wave 3 in the Countersuit and/or any matters, events, acts or omissions which could have been asserted by or on behalf of Wave 3 in the Countersuit.

The Parties shall dismiss with prejudice the Lawsuit within 14 days after the Agreement being signed. AVKO hereby releases and forever discharges Wave 3, from any and all actions, causes of action, claims, demands, damages, and costs relating to the Lawsuit through and including the Effective Date.

Wave 3 hereby releases and forever discharges AVKO, from any and all actions, causes of action, claims, demands, damages, and costs relating to the Countersuit through and including the Effective Date. Upon termination of the Agreement under the conditions set forth herein, Wave 3 shall immediately stop publishing, selling or distributing any materials mentioned herein. Any further litigation about the issues and materials herein will be subject only to this Agreement, and any further litigation will be pursuant to this Agreement, and Wave 3 shall be liable for the $100,000.00 for past damages.

Within 14 days, Wave 3 shall change any indication of ownership to reflect the license rights mentioned herein.

12.  Tolling of Any Statutes of Limitations

The Parties hereby agree that any statute of limitations periods, estoppel, and laches defenses are hereby waived, and to the extent the license ends, any such defense is tolled for the duration of this agreement.

13.  No Admission of Liability.

It is understood and agreed that this Agreement and other consideration recited herein does not constitute an admission on the part of either party of any liability and that this Agreement represents a compromise and settlement of disputed claims.

8.   Confidentiality.

The Parties agree that the facts and circumstances leading up to and surrounding this Agreement, the settlement of this dispute and controversy, and the facts and circumstances involved in the Lawsuit as described in the complaint, shall be kept private and confidential by the Parties, and that the Parties shall not communicate the terms of this Agreement or any other fact or circumstance surrounding the settlement of the dispute and controversy arising from the facts and circumstances discussed in this Agreement or the Lawsuit to any individual, entity, or other third-party, except as otherwise expressly provided below.

5

No party, nor an attorney for or a representative of a party, shall in any way communicate, publish, reveal, disclose, or characterize any terms, information, terms or details of this Agreement or the underlying circumstances or litigation, including the amount paid, except the Parties may state that it was "settled amicably" or state that the settlement is subject to a confidentiality provision. The Parties further expressly acknowledge and agree that if either party breaches the terms of the Agreement, the aggrieved party shall be entitled to all remedies available at law or in equity.

The confidentiality provision set forth in this section shall not prohibit communication or disclosures that are required by law, court order or subpoena, including disclosures necessitated by litigation in which any of the parties to this Agreement are involved. To the extent any party deems a communication or disclosure to be required by law or by court order, the communication or disclosure shall be limited to those persons or entities "needing to know" and shall be limited to the specific information requested or ordered.

The Parties agree that the confidentiality provisions set forth herein constitute material terms of this Agreement. The Parties agree that no part of the Settlement Amount is being paid for confidentiality but rather the consideration for such confidentiality is the mutual agreement of the Parties to abide by it.

9.    Non-disparagement.

The Parties agree that they will not make any statement now, or at any time in the future, to representatives of any media or to any other person or entity, which is disparaging of the other Parties' reputation or disparaging of the character, competence or reputation of any officer, director, executive, shareholder, agent, employee, insurer, or attorney of the other Party which could, if publicized, cause any person or entity related to one of the Parties to any humiliation or embarrassment, or which could cause the public to question the competence, reputation or character of any of these persons or entities.

10.    Miscellaneous.

10.1    Fees. The Parties to this Agreement shall bear their own attorneys' fees, costs and other expenses associated with the Lawsuit and Countersuit. If litigation is commenced in connection with this Agreement, the prevailing party shall be entitled to an award of its reasonable attorney's fees, and court and other direct costs.

10.2    Jurisdiction. This Agreement shall be exclusively governed by and construed in accordance with Illinois law without reference to its conflicts of law rules. The United States District Court for the District of Illinois, Eastern Division, or the appropriate state court located in Illinois, shall have exclusive jurisdiction over any legal action or proceeding arising out of or relating to this Agreement. For any action or proceeding that arises out of or relates to this Agreement, each of the undersigned expressly consents to personal jurisdiction and venue of each court specified in this section and hereby expressly waives any objection to same.

10.3    Severability, Waiver and Survival. If any term of this Agreement is held invalid, illegal, or unenforceable by a court of competent jurisdiction, that term shall be severed from this Agreement and the remaining terms shall continue in full force. No delay, omission, or failure

6

by any Party to exercise any right or remedy provided to it in this Agreement shall be deemed to constitute waiver or acquiescence, and any Party may exercise such right or remedy in the manner it deems expedient. Any Agreement provision that may reasonably be interpreted as being intended by the Parties to survive this Agreement's termination or expiration shall survive any such termination or expiration.

10.4    Interpretation. This Agreement shall be construed within its fair meaning and in interpreting this Agreement no inference shall be drawn against the drafting Party. Headings, the title of this Agreement, and the terms used to reference each Party as used in this Agreement are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section or in any way affect this Agreement.

10.5    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that signatures transmitted electronically, whether sent via facsimile or as attached files to emails (e.g., .PDF), shall be acceptable to bind the Parties and shall not in any way affect this Agreement's validity.

10.6    Entire Agreement. This Agreement sets forth the Parties' entire agreement and understanding relating to its subject matter and merges and supersedes all prior agreements, writings, commitments, discussions and understandings between them. The Agreement's terms are contractual and not mere recitals. No amendment or modification may be made to this Agreement unless it is in writing and signed by each Party.

10.7    Binding Agreement. The terms and provisions of this Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective predecessors, successors, transferees and permitted assigns. Notwithstanding the foregoing, this Agreement is not a third party beneficiary contract and shall not be construed to be for any third party's benefit, and no third party shall have any claim or right of action hereunder.

10.8    Independent Investigation. Each Party: (i) has read and understood this Agreement and agrees to all of its terms and conditions; (ii) independently evaluated the desirability of entering into this Agreement and is not relying on any representation, guarantee or statement other than as set forth herein; and (iii) has been afforded the opportunity to seek the advice of legal counsel regarding its rights and obligations set forth in this Agreement and has either sought or refused such counsel and accordingly has negotiated this Agreement either on its own or through its respective counsel.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY]

7

IN WITNESS WHEREOF, each Party executes this Agreement either personally or by a duly authorized representative and agrees to be bound by this Agreement's terms and conditions.

By: AVKO Educational Research Foundation, Inc.
Name: _Donald J. McCabe_
Title: _President_
Date: _2/24/16_

By: _Donald J. McCabe_
Date: _2/24/16_

By: Wave 3 Learning, Inc.
Name: _Thomas Morrow_
Title: _President_
Date: _2/24/16_

By: _Thomas A. Morrow_
Date: _2/24/16_

8

Exhibit 2

Brian Noack <BrianN@wonoip.com> 7/8/16

to me, RobertM195, Adam

Don, Robert,

At your request, please find the modifications to the settlement agreement below. The
payment from Wave 3 represented 6% of the first quarter of sales. Payments will continue
on a quarterly basis throughout the life of the agreement. As you may recall, AVKO has the
right to audit these figures at any time pursuant to the agreement.

Best,

**Brian T. Noack**

briann@wonoip.com

P: 239.671.1103

F: 708.843.0509

**Wolek & Noack**

233 S Wacker Dr.

Suite 2140

Chicago, IL 60606

---

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the
intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended
recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply
e-mail.

**From:** Brian Noack <BrianN@wonoip.com>
**Date:** Thursday, February 25, 2016 at 3:01 PM
**To:** 'Daliah Saper' <ds@saperlaw.com>, 'Matt Grothouse' <matt@saperlaw.com>
**Cc:** Adam Wolek <adamw@wonoip.com>
**Subject:** Re: AVKO & Wave 3 Settlement

Hi Daliah,

We agree to Mr. Morrow's deal of making the audit privilege two-sided in exchange for quarterly royalty payments and the change in verbiage from "that year" to "the duration of this agreement." Out of an abundance of caution, we are responding to you rather than him to avoid any potentially impermissible communications with a represented party. We trust you'll pass along our acceptance.

Please let me know if you have any questions.

Best,

Brian

**Brian T. Noack**

briann@wonoip.com

P: 239.671.1103

F: 708.843.0509

**Wolek & Noack**

233 S Wacker Dr.

Suite 2140

Chicago, IL 60606

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

**From:** Thomas Morrow <thomas@wave3learning.com>
**Date:** Thursday, February 25, 2016 at 12:26 PM
**To:** 'Daliah Saper' <ds@saperlaw.com>, Adam Wolek <adamw@wonoip.com>
**Cc:** 'Matt Grothouse' <matt@saperlaw.com>, Brian Noack <BrianN@wonoip.com>
**Subject:** RE: AVKO & Wave 3 Settlement

When it was originally written, I understood the payment to be once annually.

I tell you what; I'll make you a deal.   There is something we missed, too.

We need to make the audit privilege two sided since AVKO is going to be selling my products (level one teacher guide) for a time and will still be selling their stuff from the website to individuals only.   We need to have confidence that everything on both sides is on the up and up.

Subject to that agreement, quarters is fine.

Best regards,

Thomas Morrow

President

Wave 3 Learning, Inc.

126 E. Wing St. Ste 240

Arlington Heights, IL 60004

Ph: 1-888-WAV-3LRN (928-3576)

**From:** Daliah Saper [mailto:ds@saperlaw.com]
**Sent:** Thursday, February 25, 2016 11:35 AM
**To:** Adam Wolek <adamw@wonoip.com>; Thomas Morrow <thomas@wave3learning.com>
**Cc:** Matt Grothouse <matt@saperlaw.com>; Brian Noack <BrianN@wonoip.com>
**Subject:** Re: AVKO & Wave 3 Settlement

I am cc'ing Thomas for his confirmation.

On Thu, Feb 25, 2016 at 10:39 AM, Adam Wolek <adamw@wonoip.com> wrote:

Daliah, Matt,

To clarify a potential ambiguity in the contract, "In addition to the Settlement Amount, Wave 3 shall pay to AVKO a six percent (6%) royalty on Wave 3's gross revenue that year[,]" means that in addition to the Settlement Amount, Wave 3 shall pay to AVKO a six percent (6%) royalty on a quarterly basis on Wave 3's gross revenue for the duration of this agreement.

As we discussed, please confirm that you agree with this interpretation.

Best regards,

Adam

**Adam Wolek**
adamw@wonoip.com
P: 312.860.9006
F: 708.843.0509

**Wolek & Noack**
233 S. Wacker Drive
Suite 2140
Chicago, IL  60606
www.wonoip.com

CONFIDENTIALITY NOTE: This message and any attachments are from a law firm. They are solely for the use of the intended recipient and may contain privileged, confidential or other legally protected information. If you are not the intended recipient, please destroy all copies without reading or disclosing their contents and notify the sender of the error by reply e-mail.

--

Daliah Saper

312.527.4100

www.saperlaw.com


**\*\*Get to know Saper Law**: http://youtu.be/Q2g0zprTiQI

**\*\*Book Daliah Saper**: http://youtu.be/P4h4bpuAKRQ


Attachments area
Preview YouTube video Saper Law - Holiday Event 2014 at Grind Spaces - Chicago





Preview YouTube video Daliah Saper / Saper Law Media Reel



**Don McCabe <donmccabe1@gmail.com>** Jan 8

to Eric

This is the unauthorized change in the Settlement Agreement reached by Wolek and Noakc with Ms. Saper by email. The only party benefiting from this agreement is Wolek and Noack as whatever payment to AVKO would just go to Wolek and Noack directly.

May God smile on you today.

Don McCabe, President and Research Director Emeritus,
AVKO Educational Research Foundation
3084 Willard Road Birch Run, MI 48415-9404
Phone: (810) 686-9283    Fax: (810) 686-1101
[Website] http://www.avko.org

Click here to Reply or Forward

3.1 GB (20%) of 15 GB used
Manage
Terms - Privacy
Last account activity: 1 hour ago
Details

Exhibit 3

From May 23, 2016 email to Morrow and Saper regarding his website.

Mr. Morrow,

Despite the agreement made, you have on your website www.sequentialspelling.com the following:

"In a nutshell, the original author sold us the rights to the Sequential Spelling product line.

He then sued us for copyright infringement and lost by summary judgement.  (sic)

He then brought suit again in a different court.  Even though we felt confident we would win completely again,

the expense had become so onerous that we agreed to a settlement.

One term of the settlement  was that we change the color scheme of the covers.

Hence, the "New Revised" editions."


Falsehood: (1) Original author sold:
Truth: AVKO licensed.

Misleading and partially false: Sequential Spelling product line
Truth: AVKO educational materials referred to as "The Works."

Falsehood: (2) He then sued us for copyright infringement.
Truth: AVKO sued.
Misleading by omission and partially false: AVKO also sued for fraud in the inducement and breach of contract.

Falsehood: and lost by summary judgement (sic).
Truth: Because AVKO's attorney without permission from AVKO removed from the case Home School Holdings and Home School Inc. whose president, CEO, and major stockholder of both was Thomas Morrow, the Judge ruled he and Wave 3 could not be charged with what happened prior to the signing of the Publishing Agreement. The judge did rule that the agreement was in effect and that Wave 3 owed AVKO the remaining $550,000.

FALSEHOOD: He then brought suit ....
TRUTH: Then Wave 3 brought suit in a different court (violating the Publishing Agreement) for a declaratory judgment that Wave 3 owned the copyrights and three times his petition was dismissed. Then AVKO filed suit in the same court Wave 3 filed in.

Misleading but a **violation of the Confidentiality agreement**:
One term of the settlement was that we change the color scheme of the covers.

Exhibit 4

# Publishing Rights Agreement Between Home School Holdings, Inc. and AVKO Educational Research Foundation, Inc.

This agreement between Home School Holdings, Inc, a Florida corporation (HSH) and the AVKO Educational Research Foundation, Inc., a Michigan non-profit corporation (AVKO), governs the purchase of the publishing rights throughout the world to all of the curricular and instructional aid publications of AVKO, which is available both in print and electronically delivered as referenced in Exhibit A below and referred to as "The Works."

AVKO agrees not to allow any other party to publish "The Works" (See Exhibit A) within the United States and Canada. AVKO agrees to allow HSH to publish "The Works" and sell "The Works" anywhere in the world. AVKO further agrees NOT to grant any other party the right to publish any part of "The Works" outside the United States and Canada without HSH's permission and proper compensation. AVKO further agrees to allow HSH the right to secure a buyer for the exclusive or even non-exclusive publishing rights for any specific area of the world such as India, Russia, Latin America, South America, Europe, South Pacific, or Africa. HSH agrees to give a mutually agreed upon percentage of the proceeds of such sale to AVKO or AVKO to HSH as the case may be. Both AVKO and HSH need to agree on the exact distribution of proceeds of such a sale *if* and when such an occasion were to arise.

## 1. The Basics

**a.** HSH has its primary offices at 2700 S. River Rd. Suite 106 Des Plaines, IL 60018. It can be reached by phone at 847.391.5079, by fax at 800.760.7015, and by email to Thomas.morrow@home-school-inc.com. All communications may be directed to Thomas Morrow.

**b.** AVKO has its primary offices at 3084 Willard Road, Birch Run, MI 48415. It can be reached by phone at 866.285.6612, by fax at 810.686.1101, by email at DonMcCabe@aol.com. All communications may be directed to Don McCabe.

## 2. The Exchange

**a)** In exchange for the payments described below, AVKO agrees to provide HSH the content of "The Works" in Microsoft Word®—the complete list of which is on the attached Exhibit A). The physical inventory of "The Works" will be made available for purchase by HSH at the prices listed in Exhibit B.

AVKO reserves the right to retain sufficient copies of "The Works" for its own usage.

**b)** HSH agrees to make all of the publications and instructional aids referred to as "The Works" available for purchase, both in print and electronically within nine months of the signing of his agreement   and to update and improve them to increase their reach and presence in the market. HSH agrees to provide AVKO with no fewer than two (2) desk copies of any updated materials previously published by AVKO.

## 3) The Payment

**a.** HSH will deliver a cashier's check or wire transfer to AVKO in the amount of $50,000 (fifty thousand dollars) **upon closing**; and stock certificates in HSH worth $250,000 (two hundred fifty thousand dollars) worth of shares in HSH   Note: HSH is a public company and these shares would be tradable in accordance with SEC regulations on, first, the OTC market and then the NASDAQ when the Company moves its listing. The price per share determined at the

mid-point of the closing bid-ask spread the day before the day of closing for purposes of the payment to AVKO.

**b.** As soon after closing as HSH has realized a gross revenue of $300,000 (three hundred thousand dollars) from publications covered by this agreement (see Exhibit A), HSH will pay an additional $50,000 in cash and provide certificates for another $250,000 (two hundred fifty thousand dollars) worth of shares in HSH. The price per share determined at the mid-point of the closing bid-ask spread the day before the day of payment.

**d.** Should HSH realize revenue greater than $300,000 (three hundred thousand dollars) in the first year from the date of closing, (See 3b. above), AVKO will receive an additional $10,000.00 and certificates for an additional $10,000.00 worth of shares in HSH (price determined as above) for every full $300,000.00 of increase.

**e) CLOSING SHALL BE FRIDAY, JUNE 4, 2010.**

**4) Other Payments and Obligations**

**a.** AVKO agrees to make Don McCabe available as a member of the Product Advisory Board which HSH may soon inaugurate. As part of the Board, Mr. McCabe is to advise HSH and the employees on issues related to the development and assembly of curriculum, curriculum packages, and instructional aids. AVKO also agrees to make Mr. McCabe available to accept at least 3 (three) scheduled speaking engagements on behalf of HSH each year if they are offered. Travel and reasonable incidental expenses to be defrayed by HSH.

**b.** HSH further agrees to reimburse AVKO for Don McCabe's services as a member of the Product Advisory Board at the rate of $50.00 per hour or $3,000.00 per quarter beginning November 1, 2010 or whenever the Board shall be inaugurated, whichever is greater, and $2,000.00 for each speaking engagement he accepts on behalf of HSH.

**c.** HSH agrees to continue to serve AVKO's existing distributors in a friendly and appropriate manner, only discontinuing their distribution agreements for violations of those agreements, non-payment, or at the request of the distributor.

**d.** AVKO, its employees and agents agree to keep confidential all information about HSH they receive that is not publicly available.

**e.** HSH agrees to keep all information it receives from AVKO confidential, except as disclosure may be required by the Securities and Exchange Commission or other regulatory bodies.

**f.** AVKO has the right to audit the books and records of HSH at any time after closing at its own expense with 24 hours notice.

**g.** AVKO retains the right to distribute "The Works" to individual persons via its website, e-books, phone orders, and community sales. AVKO retains the right to provide free electronic copies of "The Works" to its members. HSH agrees to sell "The Works" to AVKO at 60% discount from its suggested retail price, on consignment; AVKO may determine its own sale prices to AVKO customers. AVKO will remit payment to HSH for consignment sales within 30 days of merchandise sales.

**h.** AVKO retains the right to continue to print, for in-house and non-sale purposes, "The Works" as they were at the time of Closing. AVKO retains the right to continue to print and sell any of "The Works" that HSH has not had printed and made available for sale.

**i.** HSH agrees to maintain and uphold the Sequential Spelling DVD agreement between AVKO and Instructional Media Innovations (IMI). HSH agrees to fully execute this contract so that all 7 Sequential Spelling DVDs have been manufactured, produced, and sold. AVKO and HSH agree to have AVKO staff continue to oversee the production of these Sequential Spelling DVDs with IMI.

**j.** HSH agrees to not produce altered forms of Sequential Spelling, excluding minor alterations to the directions, superficial typographic errors, or cover/binding changes, until 3 months after the release of the Sequential Spelling 2 DVD. Notice of changes and any revised versions must be delivered to IMI at its corporate office or via electronic mail at least one month before the sale of these revised versions.

**k.** HSH agrees to continue to distribute and sell Sequential Spelling DVDs as long as the Sequential Spelling brand (or changed-name versions) are distributed and sold by HSH or any future owner of HSH or the publishing rights to "The Works", or until stipulated by written, contractual agreements between HSH and IMI.

**5. Term of the Agreement; Default; Termination**

**a.** The agreement is intended to continue indefinitely.

**b.** The agreement immediately terminates and the right to publish "The Works" reverts to AVKO if HSH does not make the payments listed in this agreement or if HSH violates any provision of this agreement.

**c.** All other disputes will be resolved through negotiation between the HSH and AVKO.

**6. Controlling Law; Disputes**

**a.** Should there ever be a dispute that cannot be resolved amicably between the parties, this agreement shall be governed by the law of the State of Michigan; the parties agree to the jurisdiction of the courts of Saginaw County, Michigan. If HSH relocates to Grand Rapids, then the parties agree to the jurisdiction of the courts of Kent County, Michigan.

**b.** If the parties agree to binding arbitration, each party shall bear its own expenses to resolve the dispute. If any dispute is resolved in court or as a result of legal settlement subsequent to the filing of suit, the prevailing party shall be entitled to receive reimbursement of its reasonable attorney's fees.

**c.** The parties agree not to file suit against one another until at least 45 days have passed from the written notification of the concern that has arisen in order to give the parties time to resolve it.

| For AVKO Educational Research | For Home School Holdings, Inc. |
|---|---|
| | |
| Donald J. McCabe | Thomas Morrow |
| Date:_____ | Date:_____ |

Witnessed by: _____

Date:_____

**Exhibit A –"The Works"**

1. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 1

2. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 2

3. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 3

4. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 4

5. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 5

6. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 6

7. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 7

8. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 8

9. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 9

10. The Patterns of English Spelling with their Word Families put into Sentence Context Vol. 10

11. The Patterns of English Spelling with their Word Families put into Sentence Context Vols. 1-5

12. The Patterns of English Spelling with their Word Families put into Sentence Context Vols. 6-10

13. The Patterns of English Spelling with their Word Families put into Sentence Context Vols. 1-10

14. Word Families in Sentence Context

15. Sequential Spelling 1

16. Sequential Spelling 2

17. Sequential Spelling 3

18. Sequential Spelling 4

19. Sequential Spelling 5

20. Sequential Spelling 6

21. Sequential Spelling 7

22. Speech to Spelling

23. Student Response Book for Sequential Spelling

24. Engaging Language Kit 1

25. Engaging Language Kit 2

26. Engaging Language Kit 3

27. Engaging Language Kit 4

28. Engaging Language Kit 5

29. Engaging Language Kit 6

30. Engaging Language Kit 7

31. Engaging Language Kits 1-7

32. Sequential Spelling for Adults

33. Individualized Spelling

34. If it is to be it is up to me to do it.

35. If it is to be it is up to US to HELP.

36. Mechanics of English Spelling

37. The Tricky Words

38. The IT-ss and the TOOZE, Apostrophes and the I before E Rule Made Easy

39. Reading Teacher's List of Over 5,000 Basic Spelling Words

40. Readings for Fluency

41. Let's Write Right

42. Rimes and More Rhymes

43. Starting at Square One

44. Individualized Keyboarding

45. Individualized Keyboarding Teacher Edition

46. The Teaching of Reading and Spelling: a Continuum from Kindergarten through College

47. To Teach a Dyslexic

48. Get Outta My Face! Get Offa My Case!

49. 220 Names and Faces, 220 Dolch Words Are Too Many for Students with Memories like Mine.

Exhibit B

| Item ID | Item Description | Full Price | Unit Cost | Number | Total |
|---------|------------------|-----------:|----------:|-------:|------:|
| 100w | TPES1-10w/WFSC | 359.90 | 120.00 | 2 | 240.00 |
| 101-5W | TPES 1-5 w/WFSC | 179.95 | 60.00 | 4 | 240.00 |
| 101W | TPES w/ WFSC  #1 | 39.95 | 13.00 | 4 | 52.00 |
| 102W | TPES & WFSC  #2 | 39.95 | 13.00 | 4 | 52.00 |
| 103W | TPES & WFSC  #3 | 39.95 | 13.00 | 4 | 52.00 |
| 104W | TPES & WFSC  #4 | 39.95 | 13.00 | 4 | 52.00 |
| 105W | TPES & WFSC  #5 | 39.95 | 13.00 | 4 | 52.00 |
| 106w | TPES 6 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 106-10W | TPES 6-10w/WFSC | 179.95 | 60.00 | 4 | 240.00 |
| 107W | TPES 7 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 108W | TPES 8 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 109W | TPES 9 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 110W | TPES 10 & WFSC | 39.95 | 13.00 | 4 | 52.00 |
| 215 | Reading Teacher's List of 5000 | 29.95 | 10.00 | 4 | 40.00 |
| 240 | Word Families in Sentence Context | 39.95 | 13.00 | 4 | 52.00 |
| 60 | Readings for Fluency | 14.95 | 6.00 | 4 | 24.00 |
| 301H | Seq Sp 1 70 cases 50 ea | 14.95 | 2.00 | 3500 | 7000.00 |
| 302H | Seq Sp 2   3 cases 75 | 14.95 | 2.00 | 225 | 450.00 |
| 303H | Seq Sp 3 27 cases 75 | 14.95 | 2.00 | 2025 | 4050.00 |
| 304H | Seq Sp 4 13 cases 75 | 14.95 | 2.00 | 975 | 1950.00 |
| 305H | Seq Sp 5   3 cases 80 | 14.95 | 2.00 | 240 | 480.00 |
| 306H | Seq Sp 6   3 cases 80 | 14.95 | 2.00 | 240 | 480.00 |
| 307H | Seq Sp 7   3 cases 80 | 14.95 | 2.00 | 240 | 480.00 |
| 310 | Seq Sp Response Bk 30 cases 55 | 9.95 | 2.00 | 1650 | 3300.00 |
| 321 | Speech to Spelling | 14.95 | 4.00 | 10 | 40.00 |
| 331 | Rimes & More Rhymes | 39.95 | 10.00 | 10 | 100.00 |
| 332H | Let's Write Right HS | 39.95 | 10.00 | 10 | 100.00 |
| 350 | SS for Adults | 14.95 | 4.00 | 10 | 40.00 |
| 361 | Sequential Spelling 1 DVD | 39.95 | 10.00 | 50 | 500.00 |
| 362 | Sequential Spelling 2 DVD | 39.95 | 10.00 | 50 | 500.00 |
| 380 | Engaging Language Kit  1-7 | 79.95 | 20.00 | 5 | 100.00 |
| 381 | Engaging Language Kit  1 | 12.95 | 4.00 | 10 | 40.00 |
| 382 | Enagaing Language Kit 2 | 12.95 | 4.00 | 10 | 40.00 |
| 383 | Engaging  language Kits  3 | 12.95 | 4.00 | 10 | 40.00 |
| 384 | Engaging Language Kit 4 | 12.95 | 4.00 | 10 | 40.00 |
| 385 | Engaging Language Kit 5 | 12.95 | 4.00 | 10 | 40.00 |
| 386 | Engaging Language Kit 6 | 12.95 | 4.00 | 10 | 40.00 |
| 387 | Engaging Language Kit 7 | 12.95 | 4.00 | 10 | 40.00 |
| 401 | Individualized Keyboarding | 12.95 | 4.00 | 50 | 200.00 |
| 450 | Starting At Square One | 59.95 | 15.00 | 5 | 75.00 |
| 500 | The Tricky Words | 14.95 | 4.00 | 5 | 20.00 |
| 650 | The Teaching of Reading | 59.95 | 15.00 | 5 | 75.00 |
| 660 | Get Outa My Face Get Offa My | 19.95 | 4.00 | 10 | 40.00 |
| 663 | To Teach a Dyslexic 8 cases 44 | 14.95 | 3.50 | 352 | 1232.00 |
| 712 | Individualized Spelling | 29.95 | 5.00 | 10 | 50.00 |
| 715 | If It Is To Be HELP | 14.95 | 4.00 | 10 | 40.00 |
| 716 | If It Is To Be DO IT | 29.95 | 5.00 | 10 | 50.00 |

| 720 | I Before E, Apostrophes, it-ss & tooz | 14.95 | 5.00 | 10 | 50.00 |
| Grand Total | | | | | 23,038.00 |

Exhibit 5

Inquisicorp Corporation dba Sonlight
8042 S. Grant Way
Littleton, CO 80122

April 20, 2016

Dear Wayne and Tim:
It is my pleasure at long last to provide you with the distribution agreement we will use going forward, the future price list, and a rundown of our plans for the future.

Let's begin with the Distribution Agreement. As you will see, it now includes a requirement for a Minimum Advertised Price. This is an important change which will serve to improve financial returns for all distributors and enhance the product line's prestige. This is the largest change we are making to how we have interacted up to now. You are not required to sign this agreement, but, if you elect not to, please see the important legal directions below.

If you elect to sign the Distribution Agreement, we want to carry out this transition in an orderly way, so we will send out new images, descriptions and so forth for your websites and catalogs in late September. If you need them even earlier, please feel free to ask.

Beginning this fall, a PR campaign will begin to introduce the new coming editions. We have a 2017 promotional budget of $75,000 so it is our intention to make a very large splash; this is three times more than we have ever spent before. There will be opportunities for cooperative advertising, naming Sonlight as a "preferred" vendor if you wish to take part. I will be coming to visit all the distributors who sign their Distribution Agreements late summer / early fall to show them the new versions and discuss plans for 2017.

If you elect NOT to sign the Distribution Agreement:
1. You must end all use of the Sequential Spelling Levels 1-7 trademarks in your advertising, catalogs, materials and on your website(s).
2. You may continue to sell any product you acquired from us ever until the inventory is liquidated.
3. Any product you acquired from AVKO before February 25, 2016 may be sold without constraint.
4. Any product you acquired from AVKO on or after February 25, 2016 may only be sold in accordance with the following constraint: you must report these purchases to us and provide copies of the invoice(s) for these purchases. You may not under any circumstances make any further purchases from AVKO without becoming liable for copyright and trademark infringement. If you do not report these purchases to us, any sales of these items will be regarded as copyright infringement and we will act accordingly to defend our exclusive right to the copyrights and trademarks in the US and Canada.

If you have any questions regarding this letter, the changeover, the new prices and agreements, please feel free to call or email.

Exhibit 6

**A History of Malicious Emails and Threats by Thomas Morrow:**

**Email Fri, Mar 4, 2011**

TM gives AVKO 45 days notice "as per our agreement." In it he claims that

1. he has been defrauded,
2. AVKO failed to inform them of Inqisicorp's dissatisfaction with W3L's new version of Sequential Spelling
3. AVKO failed to inform them of another party owning the website sequentialspelling.com
4. AVKO is and has "always been in breach of our agreement."
5. AVKO is currently operating an online store on CBD.com (Actually the "store" was where W3L's books were being sold that Christian Book Stores bought from W3L)
6. AVKO has offered Kindle versions of The Works
7. AVKO has not signed over the copyrights.

> To cure these breaches and torts we will require:
>
> > $16,000.00 in refund of overpayment
> >
> > Completion of the Trademark and Copyright assignment documentation
>
> Should you choose not to cure:
>
> > You may rest assured we will bring suit following the conclusion of the selling season.
> >
> > You will need to disclose to Board Member candidates that they can be made personally liable for the outcome of our suit against the Foundation and you personally. Please don't...then they will have cause to sue you, too.

On March 13, 2011 TM emails:

> > You are not authorized to address customers, Mr. McCabe. My relationship with you has been fraught with fraud, malfeasant and sundry misbehavior **THAT NEEDS TO STOP! (sic)**
> >
> > You are already on course for a lawsuit that will likely end AVKO. I suggest you amend your inappropriate behavior and attitude IMMEDIATELY and pretend that you are able to act your age whenever you have an opportunity to interact with customers if you have any desire to see AVKO outlive you.

On July 19, 2011 TM emails McCabe's grandson Brian in an attempt to get Brian to convince his grandfather to settle "amicably."

> > I am also willing to bring suit and destroy AVKO and your G-pa's estate if I have to. The decision is Don's, so I hope you can help all of us out. I know of all the people in the world, your voice is the one he hears most with both respect and affection. The complete e-mail was put into evidence by Wave 3. It is quoted in its entirety at the end of this exhibit.

Two days later, TM emails McCabe's son Robert in which he states:

If we can avoid litigating, I would prefer that, but I also am not interested in arbitration as I am very confident the law will bear me out completely if this goes in front of a judge and/or jury. Should it do so, I will be seeking $350,000 in compensatory damages, specific performance with regard to the defamation and punitives (sic) that I expect probably would not exceed $1,050,000. Still that adds up to a number that would likely wipe out both AVKO and your dad's estate. I don't like making threats, implied or explicit, but you need to understand the downside you are looking at if this is not quickly resolved with respect for the law as it is written and interpreted.

**The reason for selecting the Illinois Courts was both malicious and in violation of the terms of the agreement W3L supposedly was following.**

In the June 4, 2010 agreement signed by TM on p. 4, Part 6 Controlling Law; Disputes: it states:

a. Should there ever be a dispute that cannot be resolved amicably between the parties, this agreement shall be governed by the law of the state of Michigan; the parties agree to the jurisdiction of the courts of
Saginaw County, Michigan. If HSH relocates to Grand Rapids, then the parties agree to the jurisdiction of the courts of Kent County, Michigan.

b. If the parties agree to biding arbitration, each party shall bear its own expenses to resolve the dispute. If any dispute is resolved in court or as a result of legal settlement subsequent to the filing of suit, the prevailing party shall be entitled to receive reimbursement of its reasonable attorney's fees.

c. The parties agree not to file suit against one another until at least 45 days have passed from the written notification of the concern that has arisen in order to give the parties time to resolve it.

Why did W3L file its two cases against AVKO in Illinois rather than in Michigan (as the agreement specifies) and without 45 days notice (as the agreement specifies? AVKO strongly suspects the reason was to drive up AVKO's expenses.

W3L purports to be following the applicable terms of the June 4, 2014 agreement and uses it as a stepping stone to argue its case when in the agreement itself it states:

The agreement immediately terminates and the right to publish "The Works" reverts to AVKO if HSH (or now TM and/or W3L) does not make the payments listed in this agreement or if HSH (TM and/or W3L) violates any provision of this agreement.

The parenthetical phrases are AVKO's.

**A few of the "lies" or contradictions of W3L and TM**

In Case No.: 1:11-cv-13381-TLL-CEB DEFENDANT THOMAS MORROW'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES:

In answer to INTERROGATORY NO. 9 Question b. which asked

State why you failed to operate under the general terms of the Publishing Rights Agreement after you signed it on June 4, 2010 by continuing to disregard key terms of agreement after January 29, 2011.

TM/W3L answered

After January 29, 2011, all key terms were adhered to that could have been adhered to but for Mr. McCabe's actions.

There was no action by McCabe that would have prohibited W3L/TM from providing AVKO with desk copies of any changed works. PDF's would have cost W3L nothing except a few key strokes of the computer.

Under 2 b) **The Exchange** of the Agreement "HSH agrees to make all of the publications ... available for purchase..." and under 2 a) agrees that "The Works will be made available for purchase by HSH at the prices listed in Exhibit B." There are at least 11 books that cannot be purchased from W3L at the prices listed in Exhibit B

There was no action by McCabe that would have prohibited W3L/TM from giving the 45 day notice or from filing its claim in Michigan.

There was no action by McCabe that would have prohibited W3L/TM from paying the $600,000 for the licensing fee or $550,000 assuming AVKO would receive permission from HSH to apply its $50,000 down payment to what W3L/TM's balance. See statement immediately below that clearly states the $50,000 was HSH's

In Case No.: 1:11-cv-13381-TLL-CEB **DEFENDANTS WAVE 3 LEARNING, INC AND THOMAS MORROW'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on p. 13 it states "Defendant Thomas Morrow paid $50,000 to Plaintiff on behalf of Home School Holdings in his official capacity" and on p. 14 "...no contract was formed between Plaintiff AVKO and Defendant Wave 3 Learning."

Wave 3's self-incriminating exhibit:

Case: 1:14-cv-01948 Document #: 48-5 Filed: 02/06/15 Page 2 of 2 PageID #:990


From: Thomas Morrow <thomas@wave3learning.com>
Date: Tue, Jul 19, 2011 at 1:07 PM


Subject: A Favor Request
To: Brian McCabe <yirzmbrian@gmail.com>

**Hey, Brian.\*\*\*\***

\*\* \*\*

I hope things are going well. I expect you are pretty busy with research over the Summer, so I will keep this short.****

** **

Your G-pa and I are likely to soon find ourselves in litigation. I can't honestly claim to like him much, but I do respect him and I would never wish the joys of litigation on anyone. Having been around that particular block several times, both winning and losing, I know it is no fun either way. A man Don's age should be enjoying his garden and travelling and seeing family, not getting himself embroiled in discovery and depositions and all the stress it implies.****
** **

If you agree that he would be better off without this stress and strain, I would appreciate it if you could spend a moment or two chatting with him about it. I am willing to settle this as amicably as possible. I am also willing to bring suit and destroy AVKO and your G-pa's estate if I have to. The decision is Don's, so I hope you can help all of us out. I know of all the people in the world, your voice is the one he hears most with both respect and affection.****
** **

Thanks whatever you decide and best regards,****

**Thomas Morrow****
President****